UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SWATCH S.A., | |
| Plaintiff, | |
| v. | Civil Action No. 1:11-cv-434 LO/JFA |
| BEEHIVE WHOLESALE, L.L.C., | |
| Defendant. | |

## **NOTICE OF SUBMISSION**

Plaintiff, through its undersigned counsel, respectfully submits:

(1) Designations and Counterdesignations of Excerpts of Depositions,

(2) Declaration of Patricia Higgins,

(3) Appendix,

(4) List of Trial Exhibits and

(5) Trial Exhibits.

These documents were exchanged with opposing counsel on October 26, 2011 pursuant to the

Court's Order dated October 18, 2011. Additional materials have been filed under seal.

Dated:  October 28, 2011                                  Respectfully submitted,

                                                         /s Kenneth W. Curtis

Kenneth W. Curtis, VSB 13,931
ALLRED, BACON, HALFHILL
& YOUNG, PC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
(703) 352-1300 (phone)
(703) 352-1301 (fax)
kcurtislaw@msn.com
kcurtis@abhylaw.com
*Attorneys for Swatch S.A.*

Jess M. Collen
Thomas P. Gulick
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Ossining, NY 10562
(914) 941-5668 (phone)
(914) 941-6091 (fax)
*Attorneys for Swatch S.A.*

( 1 )

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SWATCH S.A.,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        Civil Action No. 1:11-cv-434 LO/JFA
                                      )
BEEHIVE WHOLESALE, L.L.C.,            )
                                      )
            Defendant.                )
                                      )

## I.   **PLAINTIFF'S DEPOSITION DESIGNATIONS**

1. September 7, 2006 discovery deposition of Amy Bernard

   a. 4:4-11

   b. 5:19-6:13

   c. 5:22-24,

   d. 11:2-12

   e. 11:13-13:5

   f. 21:15-22:6

   g. 24:6-18

   h. 26:18-27:2

   i. 33:10-23

   j. 35:1-2

   k. 41:13-22

   l. 42:8-13

   m. 50:22–52:2

   n. 69:3-70:6

2.  September 7, 2006 discovery deposition of Brent Bernard

    a.  4:4-10

    b.  5:7-8:7

    c.  21:20-24

    d.  24:18-26:7

    e.  30:1-11

    f.  30:12-23

    g.  29:12-21

    h.  72:4-75:25

3.  December 28, 2009 rebuttal deposition of Brent Bernard

    a.  26:1-4

    b.  28:22-29:9

4.  October 14, 2009 Testimonial Deposition of Amy Bernard

    a.  10:7-16

    b.  11:13-13:16

5.  October 14, 2009 Testimonial Deposition of Michelle Bernard

    a.  7:5-9:13

    b.  35:7-11

    c.  38:19-22

    d.  40:20-41:2

    e.  46:8-16

6.  October 14, 2009 Testimonial Deposition of Brent Bernard

    a.  8:12-9:20

      b.  10:24-11:13

      c.  14:23-15:2

      d.  16:13-14

      e.  18:4-7

      f.  29:10-20

      g.  43:1-4

      h.  49:24-50:7

      i.  67:13-24

      j.  69:7-14

      k.  82:18-83:13

      l.  84:18-20

## II.    <u>DEFENDANT'S COUNTERDESIGNATIONS</u>

1. September 7, 2006 discovery deposition of Amy Bernard

      a.  22:16-23:4

      b.  24:19-26:15 & Ex. 4

      c.  27:3-28:6

      d.  34:22-35:10

      e.  41:23-42:1

      f.  52:3-20

      g.  61:8-22

      h.  70:23-71:12

      i.  73:3-74:23

      j.  j. 91:3-9

2. September 7, 2006 discovery deposition of Brent Bernard

    a. 20:7-21:19

    b. 26:20-27:5

    c. 30:24-31:1

    d. 33:3-14

    e. 34:9-35:1

    f. 38:3-39:19

    g. 40:17-41:11

    h. 45:10-46:2

    i. 76:1-2

    j. 76:10-77:21

    k. 78:4-79:4

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

```
     IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
            TRADEMARK TRIAL AND APPEAL BOARD

SWATCH S.A.,                    )
      Opposer,                  )
                                ) Opposition No. 91169312
vs.                             )
                                ) Mark:  SWAP
AMY T. BERNARD,                 )
      Applicant                 ) Serial No. 78/459527
```

ORAL DEPOSITION

AMY T. BERNARD

SEPTEMBER 7, 2006

ORAL DEPOSITION OF AMY T. BERNARD, produced as a witness at the instance of the Opposer and duly sworn, was taken in the above-styled and numbered cause on the 7th day of September, 2006, before Tammy L. Goolsby, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Napper, Madden & Rogers, Ruston, Louisiana, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

ORIGINAL

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

```
1                         APPEARANCES

2   FOR OPPOSER:

3             MR. THOMAS P. GULICK
              COLLEN IP
4             The Holyoke-Manhattan Building
              80 South Highland Avenue
5             Ossining, NY  10562

6

7   FOR APPLICANT:

8             MR. RAY MADDEN
              NAPPER, MADDEN & ROGERS
9             207 West Carolina
              Ruston, LA  71270
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1                               INDEX

2                                                PAGE

3    Appearances                                  2

4    Index                                        3

5    AMY T. BERNARD

6        Direct Examination by Mr. Gulick         4

7    Reporter's Certificate                      97

8

9

10                            EXHIBITS

11   NO.     DESCRIPTION                          PAGE

12   No. 8   Notice of Deposition                  4

13   No. 9   SWATCH Mark                          54

14   No. 10  E-Bay Materials                      75

15   No. 11  E-Bay Materials                      77

16   No. 12  E-Bay Materials                      78

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1                        AMY T. BERNARD,

2    having been first duly sworn, testified as follows:

3                      DIRECT EXAMINATION

4    BY MR. GULICK:

5                    (Exhibit No. 8 marked.)

6        Q.    Okay.  Would you state your name and address

7    for the record?

8        A.    Amy Bernard.  Home address?

9        Q.    Or business address.  Doesn't matter.

10       A.    1901 North Service Road East, Ruston,

11   Louisiana, 71270.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      Q.     Okay.   And that you are an employee of Beehive

20  corporation?   Would that be correct?

21      A.     Correct.

22      Q.     Okay.   To start with, can you tell me your

23  title at the corporation?

24      A.     Secretary.

25      Q.     Okay.   And what roles and responsibilities do

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    you have as secretary?

2         A.    As far as the corporation goes?

3         Q.    Yes.

4         A.    Secretary, I don't really have any roles other

5    than it's just a title.

6         Q.    Okay.  Do you have any operational

7    responsibility?

8         A.    Yes.

9         Q.    Can you tell me --

10        A.    For the corporation?

11        Q.    Yeah.

12        A.    Mainly direction of the company, overseeing

13   the company, and product development mainly.

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2       Q.    Can you tell me when you developed or started

3   the idea for SWAP?

4       A.    Around June of 2003, I believe.

5       Q.    Okay.  And what was the mark SWAP to be used

6   for?

7       A.    In the beginning?

8       Q.    Uh-huh (affirmative.)

9       A.    Beaded watch bands and watch faces.

10      Q.    And is there anything else now that the mark

11  is used for?

12      A.    Ribbon bands, slide pendants primarily.

13      Q.    Okay.  Can you tell me who developed the name

14  SWAP or how this name SWAP developed?

15      A.    Like everything, we usually have a

16  brainstorming session.

17      Q.    Okay.

18      A.    And that name was thrown out among a lot of

19  other different names.

20      Q.    Can you tell me what some of those other names

21  were?

22      A.    Oh, gosh.  Let me think.  Mix-a-Lot maybe,

23  Switch, Create-a-Watch maybe.  I don't -- yeah, I don't

24  really remember all the ones that didn't make it.

25      Q.    Okay.  Can you tell me why those other names

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    were considered?

2        A.    We were looking for a word that meant

3    interchangeable.

4        Q.    Why were you looking for a word that meant

5    interchangeable?

6        A.    Because that was the basis of our line, that

7    you could swap out bands with faces and create your own

8    watch basically.

9        Q.    Okay.  So how was it decided that SWAP was

10   going to be the name?

11       A.    It was the one everyone liked in our office.

12   It was short.  It meant interchangeable.

13       Q.    Okay.  And when you say interchangeable, is

14   that a function of the product?

15       A.    Correct.

16       Q.    Okay.  Can you explain how it's

17   interchangeable?

18       A.    You can change out bands to different watch

19   faces in according to what color you're wearing that

20   day, so you can have one watch head and wear it multiple

21   ways.

22       Q.    So what you're saying is you swap?

23       A.    Uh-huh (affirmative.)

24       Q.    You're swapping the band with the face?

25       A.    Right.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1          Q.     Okay.

2          A.     Yeah.

3          Q.     And so then you're basically describing the

4     function of the watch?

5          A.     Right.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15     Q.     Okay.  Beehive corporation sells goods other

16   than SWAP products; correct?

17     A.     Correct.

18     Q.     Can you tell me what they are?

19     A.     We sell primarily women's jewelry, children's

20   jewelry, accessories.

21     Q.     When you say accessories, what type of

22   accessories do you make?

23     A.     We do sell some belts and flip flops.  That

24   would not be considered jewelry.  Primarily everything

25   falls under those categories.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    Q.    Okay.  Are those goods that you just described

2    sold under names other than SWAP?

3    A.    Yes.

4    Q.    Can you tell me what names they're sold under?

5    A.    Little Bee, Crazy Daisy, Beehive Kids are a

6    few.

16    Q.    In -- you had just mentioned the use of

17    Beehive Kids as one of the marks.  Beehive is also the

18    name of the company?

19    A.    Correct.

20    Q.    Do you use the name of the company as a mark?

21    A.    What do you mean by that?

22    Q.    Do you use it as a mark to identify your

23    goods?

24    A.    It is printed on a lot of our tags, so I don't

25    know if that is what you're looking for.  We do print

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1  our company names on tagging and catalogs.

2      Q.    And does it normally come in the stylized

3  form?

4      A.    Yes.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6      Q.    Are there other marks that are used -- or

7  names used in connection with the SWAP?

8      A.    SWAP Watch Limited, SWAP Watch Original, SWAP

9  Watch Kids.

10     Q.    Okay.  And all three of those you mentioned

11  the word watch.

12     A.    Uh-huh (affirmative.)

13     Q.    Is watch often used in connection with the

14  word SWAP?

15     A.    Sometimes.

16     Q.    Do you refer to the products that you use that

17  are watches for the product SWAP as SWAP Watches?

18     A.    Sometimes.

19     Q.    And in the bottom right-hand corner, there's

20  also a mark used.  Can you tell me what that mark is?

21     A.    By Beehive?

22     Q.    Yes.  And is the term Beehive used in stylized

23  form?

24     A.    Yes, it is.

25     Q.    Would that be what you were referring to

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1   before when you said that you would use Beehive on some

2   of the products?  Would that be how it would look?

3       A.    Correct.

4       Q.    If you look in the upper left-hand corner, the

5   word SWAP is there.  Is that how the mark is used?

6       A.    Primarily.

7       Q.    Okay.  And if I direct you to Exhibit 2, would

8   you take a look at -- is it used in the same way as it's

9   used in Exhibit 2?

10      A.    Exhibit 2?  Almost the same.

11      Q.    Are there any differences?

12      A.    There's watch hands in the photo.

13      Q.    Go ahead and tell me.  In which one?  In

14  Exhibit 4?

15      A.    On the one right there, yes.

16      Q.    And they're not in Exhibit 2?

17      A.    Right.

18      Q.    And Exhibit 2 is how you applied for the mark;

19  is that correct?

20      A.    Yes.

21      Q.    The SWAP mark?

22      A.    I guess, yes.

23      Q.    And Exhibit 4 would not be exactly the same as

24  you applied for it as it appears in Exhibit 2?

25      A.    No.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1      Q.    Okay.  Can you tell me -- you mentioned before

2  that you sell jewelry for women and jewelry for

3  children.  Are they the market that you target for your

4  products?

5      A.    We don't necessarily target any market.

6      Q.    Are your goods intended for -- are they

7  intended for everyone or are they more focused towards

8  women and children?

9      A.    I would think they're focused more on women.

10     Q.    Okay.  Is there a particular reason that it's

11  focused more towards --

12     A.    Women probably buy more jewelry --

13     Q.    Okay.

14     A.    -- than men.

15     Q.    Do you -- do you then advertise or market more

16

17

18     Q.    In other words, if your -- you're using the

19  mark, let's say, SWAP.  When you go to present it to the

20  public or for sale, do you normally gear those sale

21  advertisements or marketing materials towards women and

22  children?

23     A.    We don't do a lot of advertising or marketing.

24     Q.    Okay.  Can you tell me what advertising and

25  marketing you use?

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    A.    It would be probably limited to trade shows

2  and our catalog.

3    Q.    Okay.  Does Beehive corporation sell only at

4  trade shows and through their catalog?

5    A.    In addition to trade shows and catalogs, we

6  have two rep groups that represent our product and

7  five -- about five to six in-house sales reps that call

8  on existing customers.

9    Q.    Okay.  Now, you said you had two rep

10  companies.  Can you --

11    A.    Uh-huh (affirmative.)

12    Q.    -- explain to me what they do for you?

13    A.    Sell our product.

14    Q.    Okay.

15    A.    Represent our product.

16    Q.    Are they provided with materials to advertise

17  and market the product?

18    A.    Only our catalog.

19    Q.    Okay.  So the rep -- representative companies

20  get a copy of your catalog and then try to sell your

21  goods from that catalog?

22    A.    Basically.

23    Q.    Do you have any other methods by which you

24  sell your products from?

25    A.    Just the ones I listed.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    Q.    Do you have retail stores?

2    A.    Yeah, we do.  We own three retail stores.

3    Q.    Okay.

4    A.    Two which sell, yeah, this product.

5    Q.    Two sell the SWAP product?

6    A.    Yes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

10     Q.     These are the actual items that will be sold?

11     A.     Correct.

12     Q.     How are they displayed at the trade show?

13     A.     Which item?

14     Q.     The SWAP items.

15     A.     Primarily they're displayed on a display --

16     Q.     Okay.

17     A.     -- built for that product.

18     Q.     And if you look at Exhibit 6 and 7, would that

19     be the type of display we would be talking about?

20     A.     That's what we're -- yes.

21     Q.     Okay.  And on both Exhibit 6 and Exhibit 7, is

22     the term SWAP used with the term watch?

23     A.     Yes, it is.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22      Q.    When you -- well, when you sell the product at
23   your stores, are you aware -- are you pretty much aware
24   of what you're selling at your stores at any particular
25   point in time or no?
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1    A.    We sell a lot of other products in addition to

2  these products.

3    Q.    Okay.

4    A.    To our own products.

5    Q.    Okay.

6    A.    So we have a buyer who specifically buys all

7  that.

8    Q.    So your stores don't necessarily only sell

9  Beehive products?

10    A.    Correct.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13        Q.    Okay.  Do you know on the SWAP line of
14   products, is the mark SWAP used anywhere on the physical
15   product?
16        A.    On the face of the watch.
17        Q.    Okay.  Can you tell me where on the face of
18   the watch it would appear?
19        A.    Right under the 12.
20        Q.    In terms of on the 12 on the face of the
21   watch?
22        A.    Yeah.
23        Q.    Is there any other place that it might be
24   located?
25        A.    There possibly could be a water mark on the
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    back of the head.

8    Q.    In terms of advertising, do you know what your

9    company spends on advertising?

10   A.    No.

11   Q.    No?  Do you know who would know how much the

12   company spends on advertising?

13   A.    We spend very little.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     Q.    Okay.  All right.  When were you first aware

23   of the SWATCH mark?

24     A.    What do you mean aware?

25     Q.    When did you first -- when did you first

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1  recognize the SWATCH mark?

2      A.    I'm not exactly sure.  I do remember probably

3  in the seventh or eighth grade --

4      Q.    Okay.

5      A.    -- when a plastic watch was popular called

6  SWATCH.

7      Q.    Okay.

8      A.    Along with Coca-Cola jerseys.

9      Q.    Okay.

10     A.    At that same time.

11     Q.    When you say -- when you recognized it, what

12  product did you recognize the mark SWATCH with?

13     A.    It was a brightly colored plastic watch.

14     Q.    So it was a watch product?

15     A.    Yeah.

16     Q.    Were you aware of the SWATCH mark in relation

17  to any other products?

18     A.    No.

19     Q.    Were you aware that SWATCH was -- is a mark

20  today?

21     A.    I'm sorry.  Say that again.

22     Q.    Are you aware that SWATCH is a mark used

23  today?

24     A.    Yes.

25     Q.    And is a mark used in association with

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    watches?

2        A.    Yes.

3        Q.    Okay.  And have you seen SWATCH watches

4    anywhere besides the seventh grade?

5        A.    The -- probably the only other time has been

6    recently.  I saw them in Times Square.

7        Q.    Okay.

8        A.    I noticed they had an individual store.  I

9    don't ever see them in other retail establishments, so I

10   assumed maybe their only store, company owned stores.

11   I've seen one there and I've seen one in an airport

12   overseas.

13       Q.    Okay.

14       A.    That's my only two encounters.

15       Q.    And what types of products were they selling

16   when you saw them?

17       A.    It looked to me like primarily watches.

18       Q.    Were you aware of any other goods that they

19   might have been selling?

20       A.    No.

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8      Q.    Okay.  So when you said Beehive would appear

9    on the packaging materials, what do you mean by the

10   packaging materials?

11     A.    On the tag or card insert that a jewelry piece

12   would be on --

13     Q.    Okay.

14     A.    -- or an outside box.

15     Q.    Would they appear on any of the tags or

16   materials on the SWAP watches?

17     A.    I believe they are on the packaging.

18     Q.    That Beehive is located on the tag or wherever

19   it might be --

20     A.    I believe so.

21     Q.    -- on a particular watch?

22     A.    Right.

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1

2

3      A.      We've probably had flip flops that long.

4      Q.      Okay.  And the flip flops, were they sold

5  under a name?

6      A.      I believe we call it Ribbon Wear --

7      Q.      Okay.

8      A.      -- because they're made out of ribbons.

9      Q.      Okay.

10      A.      We have some children's costume bracelets --

11      Q.      Okay.

12      A.      -- that we've sold for that long.

13      Q.      Are they sold under a particular name, though?

14      A.      What do we call them?  I think we just call

15  them Children's Charm Bracelets, I think.  I don't think

16  it's a particular name.

17      Q.      Okay.  You've now just talked about Children's

18  Charm Bracelets and Ribbon Wear.

19      A.      Uh-huh (affirmative).

20      Q.      And that's in association with flip flops --

21      A.      Uh-huh (affirmative).

22      Q.      -- because it's -- it's made of ribbons?

23      A.      Uh-huh (affirmative).

24      Q.      And is that something that you think about in

25  terms of when naming a product in terms of how, you

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1   know, something -- something that tells what it is or

2   what it's made out of, so Ribbon Wear for flip flops

3   because it's made out of ribbon, Children's Charms

4   because they're --

5        A.    Yeah.

6        Q.    -- charm bracelets for children?  Okay.  Do

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Q    (By Mr. Gulick) Were you aware of SWATCH any

24   time in between that time that you mentioned that you

25   first recognized it between seventh and eighth grade

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1   and, I guess, in the past year when you've seen them at

2   the store in Times Square?

3       A.   Was aware of them --

4       Q.   Times square.

5       A.   Aware of them in what way?

6       Q.   In other words, you -- you first recognized

7   them back in seventh and eighth grade.  Did you come to

8   a time where you saw them additionally besides the time

9   a year ago or in the past year in Times Square?

10      A.   To my recollection, up until about maybe two

11  years ago, I had not seen that particular brand in any

12  store.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3     Q.     You also mentioned that you considered the

4     word Switch?

5     A.     Uh-huh (affirmative).

6     Q.     Was there a reason that you didn't select

7     Switch?

8     A.     Not particularly.  SWAP just sounded better,

9     shorter, easy for people to remember.

10    Q.     And was that one of the goals in selecting the

11    name, to make it short so it was easier to remember?

12    A.     I think in marketing, a short name is always

13    probably better.

14    Q.     Okay.

15    A.     But that's just my feeling.

16    Q.     Okay.

17    A.     Interchangeable would be huge on a watch.

18    Q.     Would you consider -- the other names that you

19    had considered, did you consider whether or not other

20    names would have been close to those names that you

21    considered?

22          Like, in other words, Sir Mix a Lot or Mix a

23    Lot you had mentioned as one of them.  Did you mention

24    the idea that maybe there were other marks similar to

25    Mix a Lot or Sir Mix a Lot that would prevent you from

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1    being able to use that name?

2        A.    If we would have liked that name and gone

3    further, we would have probably, you know, looked around

4    whenever we were doing markets to see if there was

5    anything close.

6        Q.    Okay.

7        A.    But it wasn't really a name we liked.

8        Q.    With the name SWAP, was it -- were there any

9    other names that were being considered at that point or

10   did you just decide SWAP was the one name and that's it?

11       A.    I mean, we threw out a lot of names, and SWAP

12   was the one that we consistently liked.

13       Q.    Okay.  And did you look anywhere in terms of

14   magazines or newspapers or anything like that to see if

15   SWAP had been used in any other place or did you only

16   use the trade shows?

17       A.    Well, I had never seen it in a magazine.

18       Q.    Okay.

19       A.    Never seen it in any newspaper.

20       Q.    Okay.

21       A.    Never seen it at a trade show.

22       Q.    Okay.

23       A.    Never run across it on the Internet, so --

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3      Q.    Okay.  Do you think that a store in Times

4  Square might be an indicator that other people may

5  recognize such a mark?

6      A.    There's a lot of stuff in Times Square.  I'm

7  not sure that people recognize every single thing on

8  that street and whether it's world wide because it's on

9  one street in New York, so I don't know.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (Signature waived.)

16          (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1          IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
                TRADEMARK TRIAL AND APPEAL BOARD

2

3   SWATCH S.A.,                )
         Opposer,              )
                               ) Opposition No. 91169312
4   vs.                        )
                               ) Mark:  SWAP
5   AMY T. BERNARD,            )
         Applicant             ) Serial No. 78/459527

6

7                   REPORTER'S CERTIFICATE

8           ORAL DEPOSITION OF AMY T. BERNARD

9                   SEPTEMBER 9, 2006

10

11          I, Tammy L. Goolsby, Certified Shorthand

12   Reporter in and for the State of Texas, hereby

13   certify to the following:

14          That the witness, AMY T. BERNARD, was duly sworn

15   and that the transcript of the deposition is a true

16   record of the testimony given by the witness;

17          That examination and signature of the witness to

18   the deposition transcript was waived by the witness

19   with the agreement of the parties at the time of the

20   deposition;

21          That the original deposition was delivered to

22   Mr. Thomas Gulick, Custodial Attorney.

23          $526.50 is the deposition officer's charges to

24   the Opposer for preparing the original deposition and

25   any copies of exhibits;

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF AMY BERNARD - SEPTEMBER 7, 2006

1          I further certify that I am neither counsel for,

2     related to, nor employed by any of the parties in the

3     action in which this proceeding was taken, and

4     further that I am not financially or otherwise

5     interested in the outcome of this action.

6          Certified to by me on this ___11th___ day of

7     ___October___, 2006.

8

9

10

11     Tammy L. Goolsby, CSR, RPR
       Texas CSR 3101

12     Expiration:  12/31/06

13     Carrifee Reporting

14     909 ESE Loop 323, Suite 660
       Tyler, Texas  75701
       (903) 596-7714

15     (903) 596-7749(Fax)

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**



**EXHIBIT**



# kids watches





*by beehive*

B000255

HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| SWATCH S.A., | ) |
|     Opposer, | ) |
| | ) Opposition No. 91169312 |
| vs. | ) |
| | ) Mark:  SWAP |
| AMY T. BERNARD, | ) |
|     Applicant | ) Serial No. 78/459527 |

ORAL DEPOSITION

BRENT BERNARD

SEPTEMBER 7, 2006

ORAL DEPOSITION OF BRENT BERNARD, produced as a witness at the instance of the Opposer and duly sworn, was taken in the above-styled and numbered cause on the 7th day of September, 2006, before Tammy L. Goolsby, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Napper, Madden & Rogers, Ruston, Louisiana, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

ORIGINAL

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

```
 1                        APPEARANCES

 2   FOR OPPOSER:

 3            MR. THOMAS P. GULICK
              COLLEN IP
 4            The Holyoke-Manhattan Building
              80 South Highland Avenue
 5            Ossining, NY  10562

 6

 7   FOR APPLICANT:

 8            MR. RAY MADDEN
              NAPPER, MADDEN & ROGERS
 9            207 West Carolina
              Ruston, LA  71270

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

```
 1                         INDEX

 2                                              PAGE

 3    Appearances                                 2

 4    Index                                       3

 5    BRENT BERNARD

 6         Direct Examination by Mr. Gulick       4

 7    Reporter's Certificate                     90

 8

 9

10                       EXHIBITS

11    NO.    DESCRIPTION                        PAGE

12    No. 1  Notice of Deposition                 5

13    No. 2  Registration for Mark               22

14    No. 3  Legal Zoom Order Confirmation       31

15    No. 4  Advertisement                       43

16    No. 5  Beehive Central Website Material    53

17    No. 6  Copy of Display                     58

18    No. 7  Copy of Display                     58

19

20

21

22

23

24

25
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1                    BRENT BERNARD,

2    having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. GULICK:

5        Q.    Good morning, Mr. Bernard.

6        A.    Good morning.

7        Q.    Can you just do me a favor?  State your name

8    and address for the record?

9        A.    Brent Edward Bernard.  Brent Edward Bernard,

10   476 Beaty Road, Ruston, Louisiana, 71270.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7          All right.  We'll start with you're here

8    pursuant to -- I'll ask you to take a look at that, if

9    you can review it quickly.

10              (Exhibit No. 1 marked.)

11              MR. MADDEN:  The next page shows items to

12   be discussed.  You've probably seen a copy of that.

13       A.    Yes.  Okay.

14       Q     (By Mr. Gulick) That's my next question.  Have

15   you ever seen that document before?

16       A.    Yes.

17       Q.    Okay.  And where have you seen it?

18       A.    In my office.

19       Q.    Okay.  And I just want you to pay particular

20   attention to -- I believe it will start on the third

21   page.  It's Schedule A, and there's a set of topics on

22   the following -- the two pages that follow, if you can

23   just take a quick look at those.

24       A.    Okay.

25       Q.    Okay.  I just want to make sure you're here as

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    a representative of Beehive Wholesale Corporation;

2    correct?

3        A.    Correct.

4        Q.    Okay.  And as you've read those topics, you

5    would be knowledgeable about these particular topics as

6    it relates to Beehive Wholesale Corporation?

7        A.    Yes, to some extent.

8        Q.    Okay.  Can you just tell me where Beehive

9    Wholesale Corporation is incorporated?

10       A.    By that you mean the state?

11       Q.    Yeah.

12       A.    The state of Louisiana.

13       Q.    Okay.  And can you tell me when it was

14   incorporated?

15       A.    To the best of my knowledge, January of 2005.

16       Q.    Okay.  And your title at the company is?

17       A.    I am the president of the corporation.

18       Q.    Okay.  And how long have you held that title?

19       A.    Since its inception.

20       Q.    Okay.  And what is your role as president of

21   Beehive?

22       A.    Explain what you mean by that.

23       Q.    What responsibilities do you have as

24   president?

25       A.    Of the corporation?

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1      Q.    Yes.

2      A.    As it applies to the corporation, I am the

3  president, and I fulfill the functions of the president

4  for the corporation.

5      Q.    Okay.  Let me ask it maybe a different way to

6  help you along.

7            Are you in charge of every -- every single

8  decision?  Does every single decision go through you?

9  Do you take care of the financial aspects, do you take

10  care of the business decisions, do you -- do you take

11  care -- what in particular are you in charge of?  The

12  day-to-day operations?

13     A.    Got you.  Just making sure I understand the

14  distinction, this is for the corporation -- as a

15  function of the corporate duties or as the corporation

16  you're asking for functions that I perform on a daily

17  basis as operational duties?

18     Q.    First as the corporational duties.  We'll get

19  to the operational duties in a minute.

20     A.    As I see it, they're one and the same, so --

21     Q.    Okay.

22     A.    Yeah.  Just at this point, tomorrow, at

23  present?

24     Q.    Uh-huh (affirmative).

25     A.    I am in charge of basically two things; that

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1  is, to direct the company, and that's general, but I am

2  in charge of directing the company, and I am in charge

3  of developing products at this point at present.

4     Q.   Okay.   When you say developing products, you

5  mean new products or marketing the old ones?   Exactly

6  what do you mean when you say that?

7     A.   Both.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7    Q.    Well, let's start with the -- how the name

8 came about.  Do you know in particular how the name came

9 about as an idea before it was selected as the name?

10    A.    Let's make sure I understand the question.  I

11 did know how the name came about.

12    Q.    Yeah.  How the name was -- I'm not saying it

13 was the name you were going to pick, but at the time

14 were you considering other names for your product?

15    A.    Okay.  Was I considering other names for the

16 product?  Yes.

17    Q.    Okay.  And you went through -- did you go

18 through a selection process to determine how you -- what

19 name you were going to use for your product?

20    A.    Yes.

21    Q.    Okay.  Can you explain that process to me?

22    A.    To the best of my knowledge, Amy, I, and two

23 other creative people that were with Beehive company at

24 the time sat down and we do a brainstorm session.

25    Q.    Okay.  Can you tell me when that brainstorm

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    session was?

2         A.    No.

3         Q.    Was it around the time of 2003?

4         A.    Yes.

5         Q.    Okay.

6         A.    It would be in that time frame, yes.

7         Q.    Okay.  And you mentioned brainstorming.  Did

8    other names come about as possibilities?

9         A.    Yes.

10        Q.    Tell me, if you recall, what any of those

11   names were.

12        A.    Yes.  To the best of my knowledge, Sir

13   Mix-a-Lot, Mix-Max, M-I-X M-A-X, the mark that we

14   currently use.

15        Q.    Which is?

16        A.    SWAP.

17        Q.    Okay.

18        A.    The word Switch, and that's all I can recall

19   at this point.

20        Q.    Okay.  Can you tell me why SWAP was selected?

21        A.    Yes.  We have custom components that allow the

22   customer to choose their own style of watch.

23        Q.    Okay.

24        A.    Interchangeable bands and faces.

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     Q.    Okay.  Did -- let me rephrase it.  I'm

19  actually going to go a little bit further back.

20          When you decided that you were going to select

21  SWAP, why did you select SWAP over -- I believe before

22  you said Sir Mix-a-Lot, Mix Max.  Can you tell me why

23  you chose that name?

24     A.    We were looking for a term that defined

25  interchangeable, and SWAP fit that for us.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    Q.    Okay.  And why was that important to you?

2    A.    Because we -- in that product line we sell

3  custom components that are interchangeable.

4    Q.    Okay.  When you say you sell custom components

5  that are interchangeable, what parts, components are you

6  talking about?

7    A.    Watch bands, watch faces.

8    Q.    So just to make sure I'm understanding you

9  right, you have different types of watch faces and

10  different types of watch bands that can be used

11  interchangeably?

12    A.    Correct.

13    Q.    So I'm just going to use a for instance, and

14  you can tell me if I'm on the right track or on the

15  wrong track.

16          It can be a round face with a leather band and

17  then you can have a square face with a plastic band,

18  whatever the case may be?

19    A.    To the best of my knowledge, we don't sell any

20  plastic bands.

21    Q.    Okay.  I was just using that as an example.

22    A.    Sure.

23    Q.    Different styles of bands?

24    A.    Correct.

25    Q.    Okay.  So you selected the name SWAP over the

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1   other ones -- I'm just trying to understand -- because

2   it defined what the product was doing, what you can do

3   with the product; is that correct?

4       A.   Correct.

5       Q.   Okay.  So you picked SWAP because it best

6   described, what, a function of the product?

7       A.   Correct.

8

9

10

11

12

13

14

15

16

17

18

19

20       Q.   Can you tell me, for example, why Mix Max

21   wasn't selected as the name for the mark?

22       A.   No, I can't tell you why that wasn't selected.

23       Q.   Okay.  Can you tell me why Sir Mix-a-Lot you

24   had mentioned, can you tell me why that wasn't

25   purchased?

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1      A.    What was pretty obvious.  That's a horrible

2  name.

3      Q.    That was just preference?  You didn't like the

4  name?

5      A.    Preference, correct.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12     Q.    I just wanted to make sure I understood.  Can

13  you tell me who your product -- well, who your products

14  are sold -- your SWAP products are sold toward?  Is

15  there a market that it's sold towards?

16     A.    I don't think I have a distinction.

17     Q.    Okay.  Do you have particular -- do you have a

18  consumer in mind for your SWAP product?

19     A.    No.

20     Q.    So it's just for everybody?  There's not --

21     A.    Correct.

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1       Q.    Okay.  Do you have lines of SWAP products?

2       A.    By the word lines, what do you mean?

3       Q.    Lines of product, like -- in other words, are

4    there certain materials that are sold under the --

5    different categories of materials sold under your SWAP

6    mark?

7       A.    Correct.

8       Q.    Can you tell me what they are?

9       A.    We sell watch faces.  We sell beaded bands.

10   We sell ribbon bands.  We sell slide pendants with bands

11   under that mark in those categories.

12      Q.    Okay.  Could you have other words or terms

13   that you use in connection with your SWAP mark when

14   selling your product?

15      A.    Yes.

16      Q.    Can you tell me what they are?

17      A.    SWAP Watch Limited, SWAP Chick, unofficially

18   SWAP Watch Original.

19      Q.    Okay.  When you say unofficially, what do you

20   mean by unofficially?

21      A.    To distinguish with our customers, we call the

22   beaded bands SWAP Watch Original, as opposed to the

23   ribbon band, which we call SWAP Watch Limited.

24      Q.    Okay.

25      A.    And I say unofficially because it's not on the

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    display as such.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3      Q.    Did you look anywhere to determine whether or

4    not SWAP was being used as a mark anywhere else?

5      A.    Sure.

6      Q.    Okay.  Can you tell me what you did?

7      A.    Specifically I have been in the marketplace

8    with this type of product for six years with this

9    company, seven years with a previous company, so I would

10   know in the marketplace if there was another product

11   similar in use or mark than this one.

12     Q.    Okay.  When you say in the market for this

13   product, what do you mean by -- define product?

14     A.    Fashion accessories.

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9        Q.    Okay.  Did you do any other type of

10   investigation to see what else was out there for the

11   mark SWAP?

12        A.    Define investigation.

13        Q.    In other words, did you -- you said you have

14   experience in the particular product line that we're

15   talking about here?

16        A.    Right.

17        Q.    Did you do anything else to determine whether

18   or not the mark SWAP was being used by anyone else?

19        A.    Officially, no.  Informally, yes.

20        Q.    What did you do informally?

21        A.    Informally looked at the different markets

22   that we're in, that we sell product at, Atlanta Gift

23   Market, Dallas Gift Market, New York Gift Market,

24   Chicago Gift Market, to see in the directory was there

25   any other word like SWAP being used and was there

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    another product like SWAP in its form being sold.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3      Q.    Can you tell me what -- besides trade shows,

4  what marketing channels you use?

5      A.    We have a website presence.

6      Q.    Okay.  When you say you have a website

7  presence, where would that website be located?

8      A.    Beehive Central dot com.

9      Q.    And do you advertise your product on your

10  website?

11      A.    By advertise, what do you mean?

12      Q.    Do you include material such as what the

13  product might look like?

14      A.    Of course.

15      Q.    Prices?

16      A.    Of course.

17      Q.    But you don't sell on your website?

18      A.    No.

19      Q.    Can you tell me what other methods besides the

20  Internet you use to advertise your product to get people

21  to recognize -- and I'm speaking specifically about the

22  SWAP product or products.  Can you tell me where --

23  where they would be advertised?

24      A.    As I explained before, the trade shows.  We

25  have a sales force.  We have two rep groups.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1      Q.    When you say rep groups, what is a rep group?

2      A.    It is a liaison between a company like mine

3   and a retail store.

4      Q.    And the purpose of this representative company

5   is what in particular?

6      A.    Their main function would be to sell products.

7      Q.    Okay.  You mentioned you have a sales force as

8   well.  How many -- how many salespeople do you have?

9      A.    At present?

10     Q.    Yes.

11     A.    Five.

12     Q.    Okay.  Is that including or excluding yourself

13   and your wife?

14     A.    Excluding.

15     Q.    Okay.

16     A.    We're not -- we're not sales reps.

17     Q.    Okay.  What other methods of advertising do

18   you use?

19     A.    We have a catalog that's printed.

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17     Q.    Okay.  Signage, I guess, at trade shows and

18  your stores?

19     A.    In what way do you mean signage?

20     Q.    In other words, do you have, you know, banners

21  or anything of the like to identify you at a trade show

22  or identify your store to anybody?

23     A.    We wouldn't have a banner as such.

24     Q.    Okay.

25     A.    We would have a booth with signage.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1        Q.    Okay.

2        A.    And that's how trade shows operate.

3        Q.    Okay.  Well, yeah.  So in other words, you can

4   be recognized at the trade show because you have some

5   type of signage up?

6        A.    Of course.

7        Q.    Would that signage have any SWAP materials on

8   it?

9        A.    Yes.

10       Q.    Okay.  The SWAP term?

11       A.    Of course.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4

5

6

7

8

9

10      Q.    No?  Okay.  But you do you use the term

11   "watch" in connection with the term SWAP?

12      A.    At times.

13      Q.    Okay.  Do you refer to the product as a SWAP

14   watch?

15      A.    Which product in specific are you talking

16   about?

17      Q.    In terms of in general when you -- you're

18   using it obviously in your product in connection with

19   watches.  Do you refer to it as a SWAP watch, the

20   product?

21      A.    When it's applicable, yes.

22      Q.    Can you explain what you mean by when it's

23   applicable?

24      A.    Well, SWAP Chick is not a watch.

25      Q.    Okay.  So when there are watches involved, you

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1   may refer to your product as a SWAP watch?

2        A.    Yes.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4      A.    Yes.

5      Q.    Okay.  When did you first become aware of the

6   SWATCH mark?

7      A.    Sometime in my childhood it became popular to

8   have that brand on a watch, children at school.  That's

9   how I became aware of it.

10     Q.    So you knew the term SWATCH in association

11   with watches?

12     A.    I knew the term in association with watches,

13   yes, that would be accurate.

14     Q.    The connection was with watches.  The term

15   SWATCH was connected with watches in your mind?

16     A.    Yes.

17     Q.    Okay.  And that's when you first became aware

18   of it?

19     A.    Yes.

20     Q.    Have you been -- were you aware of them after

21   that?

22     A.    Can you -- you're asking did I lose my

23   awareness and get it back again?

24     Q.    No, no.  Did you become aware of the term

25   SWATCH at any other point in time?

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1     A.    You can only become aware of something once.

2     Q.    Once.   Okay.

3     A.    How can you explain that I would be aware of

4  it twice.

5     Q.    When you first became familiar with the term,

6  you mentioned it was watches.   Was the mark in any way

7  not associated with watches for you?

8     A.    Not that I recall.

9     Q.    Okay.   And now has any other event made you

10  aware of the SWATCH mark in association with watches?

11     A.    What you're asking is have I ever seen the

12  SWATCH mark again and be -- and have been aware of that?

13     Q.    Well, no, I'm asking is there any particular

14  event that made you aware of the SWATCH marks in

15  association with watches again besides your childhood?

16     A.    Define the word event.   What do you mean by

17  event?

18     Q.    Has anything occurred which would make you

19  aware that SWATCH is a mark for watches again?

20     A.    I just want to be sure I understand.   Have I

21  seen that mark again after the first time that I saw

22  it --

23     Q.    Yes.

24     A.    -- and understood that that was a mark for

25  watches?

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1     Q.    Yes.

2     A.    Yes.

3     Q.    When would that be?

4     A.    I don't recall.

5     Q.    Okay.  Have you at any time in the past two

6   years been aware of it in relation to opposing your SWAP

7   mark?

8     A.    No.

9     Q.    Okay.  Are you aware that SWATCH is opposing

10  your trademark application for the mark SWAP?

11    A.    Yes.

12    Q.    And your SWAP product is sold in connection

13  with a watch product; correct?

14    A.    Not exclusively.

15    Q.    No, but it's one of the things that's sold

16  under the SWAP mark?

17    A.    Correct.

18    Q.    Okay.  And you were aware that SWATCH was a

19  mark sold in connection with watch products --

20    A.    Correct.

21    Q.    -- at that point in time?

22    A.    Correct.

23    Q.    Okay.  Can you recall about how many years ago

24  you first knew --

25    A.    No.

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1       Q.      -- about -- no?  Can we put it at greater

2    than, let's say, 20 years?

3       A.      I wouldn't -- wouldn't be able to say that one

4    way or the other.

5       Q.      Okay.  Would you feel confident in saying 15

6    years, more than 15 years that you've been aware that

7    SWATCH was associated with watches, the term SWATCH?

8       A.      I wouldn't be able to say that.

9       Q.      Ten years?

10      A.      Yes.

11      Q.      Okay.  So it's been longer than ten years you

12    were aware that SWATCH was associated with watches?

13      A.      Yes.

14      Q.      Okay.  And you're aware that SWATCH is

15    associated with watches today; correct?  The term SWATCH

16    is used in association with watches today?

17      A.      Yes.

18      Q.      Okay.  So over that ten year time span, you --

19    you would have known SWATCH to be associate -- the mark

20    SWATCH to be associated with watches?

21      A.      Yes.

22      Q.      Are you aware of the famousness of the mark

23    SWATCH?

24      A.      What do you mean famousness?

25      Q.      In other words, do you think the mark is well

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1    recognized?

2        A.    I wouldn't know.

10       Q.    Okay.  Have you seen the SWATCH mark anywhere

11   else since your childhood?

12       A.    Yes.

13       Q.    Okay.  Can you tell me where?

14       A.    Times Square.

15       Q.    Okay.  And where did you -- in what way did

16   you see in Times Square?

17       A.    You have a retail store there.

18       Q.    Okay.  And have you seen any other retail

19   stores?

20       A.    Yes.

21       Q.    Can you tell me where you saw those?

22       A.    Couldn't recall.

23       Q.    Okay.  Any idea a number?  More than two, less

24   than ten?

25       A.    Yeah.  More than two, less than ten would be

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1    accurate.

2        Q.    Okay.  And do you recall where you saw --

3    like, in other words, what part of the country you saw

4    them in?

5        A.    It wasn't in the country.

6        Q.    It wasn't in the country?

7        A.    No.

8        Q.    Okay.  But you saw the one in New York?

9        A.    Yes.

10       Q.    And then you're saying you've seen other ones

11   in other places besides the U.S.?

12       A.    Yes.

13       Q.    And the retail store in Times Square that you

14   saw, they were selling watches?

15       A.    Best I recall.

16       Q.    Okay.  Do you remember how long ago that was?

17       A.    This year.

18       Q.    It was this year?  Any time before that?

19       A.    Any time before that what?

20       Q.    That you saw the retail store in Times Square?

21       A.    No.

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1

2

3

4    Q.    Do you know of any instances where your

5  product has been confused with a SWATCH product?

6    A.    No.

7    Q.    Would you be aware if someone was confused?

8    A.    What do you mean?

9    Q.    In other words, you said that you sold to

10  retailers?

11    A.    Uh-huh (affirmative).

12    Q.    Would those retailers report back to you any

13  instances of confusion with a SWATCH mark -- or the

14  SWATCH mark?

15    A.    Possibly, yes.

16    Q.    Have they?

17    A.    No.

18    Q.    Has in your stores?

19    A.    In the retailers?

20    Q.    Yes.

21    A.    I would not know.

22    Q.    So you wouldn't know if there was instances

23  where people --

24    A.    No.

25    Q.    -- were confused in your stores, but you might

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

1  be aware of them if they were at retailers outside your

2  stores?

3      A.   That's never been brought to my attention

4  there was a confusion between the two marks.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006



1

2

3

4

5

6

7

8

9

10

11          (Signature waived.)

12          (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

```
 1        IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
              TRADEMARK TRIAL AND APPEAL BOARD
 2
   SWATCH S.A.,                    )
 3        Opposer,                 )
                                   ) Opposition No. 91169312
 4   vs.                           )
                                   ) Mark:  SWAP
 5   AMY T. BERNARD,               )
          Applicant               ) Serial No. 78/459527
 6
 7                  REPORTER'S CERTIFICATE
 8             ORAL DEPOSITION OF BRENT BERNARD
 9                   SEPTEMBER 9, 2006
10
11        I, Tammy L. Goolsby, Certified Shorthand
12   Reporter in and for the State of Texas, hereby
13   certify to the following:
14        That the witness, BRENT BERNARD, was duly sworn
15   and that the transcript of the deposition is a true
16   record of the testimony given by the witness;
17        That examination and signature of the witness to
18   the deposition transcript was waived by the witness
19   with the agreement of the parties at the time of the
20   deposition;
21        That the original deposition was delivered to
22   Mr. Thomas Gulick, Custodial Attorney.
23        $432.25 is the deposition officer's charges to
24   the Opposer for preparing the original deposition and
25   any copies of exhibits;
```

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

DEPOSITION OF BRENT BERNARD - SEPTEMBER 7, 2006

1          I further certify that I am neither counsel for,

2     related to, nor employed by any of the parties in the

3     action in which this proceeding was taken, and

4     further that I am not financially or otherwise

5     interested in the outcome of this action.

6          Certified to by me on this ___11th___ day of

7     _October_____, _2006_.

8

9

10

11     Tammy L. Goolsby, CSR, RPR
       Texas CSR 3101
12     Expiration:  12/31/06

13     Carrifee Reporting
       909 ESE Loop 323, Suite 660
14     Tyler, Texas  75701
       (903) 596-7714
15     (903) 596-7749(Fax)

16

17

18

19

20

21

22

23

24

25

**HIGHLIGHTED TEXT INDICATES DEFENDANT'S COUNTERDESIGNATIONS**

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

Page 1

IN THE UNITED STATES
PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD
-----------------------------------------X

SWATCH S.A.,

            Opposer,

        vs.            Opposition No:
                       91169312
AMY T. BERNARD and     Mark:  SWAP
BEEHIVE WHOLESALE LLC,  Serial No: 78/459527

            Applicant.

------------------------------------X

                CONFIDENTIAL

        DEPOSITION OF BRENT BERNARD

        Ossining-on-Hudson, New York

        Monday, December 28, 2009

Reported by:
JOAN WARNOCK
JOB NO. 306403B

Brent Bernard                                December 28, 2009

CONFIDENTIAL

Page 2

1

2

3              December 28, 2009

4              4:10 p.m.

5

6        CONFIDENTIAL - Deposition of BRENT

7    BERNARD, held at the offices of Collen

8    IP, The Holyoke-Manhattan Building,

9    80 South Highland Avenue,

10   Ossining-on-Hudson, New York, before

11   Joan Warnock, a Notary Public of the

12   State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

b04eb7ed-3110-4a4c-a075-fc94b647e97c

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

Page 3

1

2    A P P E A R A N C E S:

3

4        COLLEN IP

5        Attorneys for Opposer

6             The Holyoke-Manhattan Building

7             80 South Highland Avenue

8             Ossining-on-Hudson, New York 10562

9        BY:   THOMAS P. GULICK, ESQ.

10

11       OLIFF & BERRIDGE, PLC

12       Attorneys for Applicant

13            277 South Washington Street

14            Suite 500

15            Alexandria, Virginia  22314

16       BY:   WILLIAM J. UTERMOHLEN, ESQ.

17            (Via telephone)

18

19

20

21

22

23

24

25

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

1        Confidential - B. Bernard

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Q.    Are you aware if Orange County

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

1          Confidential - B. Bernard

2    Creations has stopped selling under the SWAP

3    mark?

4          A.   No, I'm not aware.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

b04eb7ed-3110-4a4c-a075-fc94b647e97c

Brent Bernard                           December 28, 2009
CONFIDENTIAL

1       Confidential - B. Bernard

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      Q.   Are there any other trademark

23  infringement lawsuits that Beehive is

24  currently involved in?

25      A.   Not related to SWAP?

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

1        Confidential - B. Bernard

2        Q.   Right.  Not related to SWAP.

3        A.   Yes.

4        Q.   Can you tell me how many?

5        A.   To the best of my knowledge, it's

6    one.

7        Q.   And it's a trademark infringement

8    action not involving SWAP; is that correct?

9        A.   Yes, that is correct.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

b04eb7ed-3110-4a4c-a075-fc94b647e97c

Brent Bernard

CONFIDENTIAL

December 28, 2009

50

1       Confidential - B. Bernard

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18       _____

19       BRENT BERNARD

20

21       Subscribed and sworn to before me

22       this ___ day of _____, 2010.

23

24       _____

25



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

CONFIDENTIAL

51

1

2                     C E R T I F I C A T E

3       STATE OF NEW YORK            )

4                                    : ss.

5       COUNTY OF WESTCHESTER        )

6

7              I, JOAN WARNOCK, a Notary Public

8       within and for the State of New York, do

9       hereby certify:

10             That BRENT BERNARD, the witness

11      whose deposition is hereinbefore set

12      forth, was duly sworn by me and that

13      such deposition is a true record of the

14      testimony given by the witness.

15             I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I

18      am in no way interested in the outcome

19      of this matter.

20             IN WITNESS WHEREOF, I have hereunto

21      set my hand this 7th day of January,

22      2010.

23

24                      Joan Warnock

25                       JOAN WARNOCK

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Brent Bernard                                    December 28, 2009
                          CONFIDENTIAL

```
                                                    Page 52
 1

 2     ----------------- I N D E X ----------------

 3     WITNESS              EXAMINATION BY           PAGE

 4     B. Bernard           Mr. Ulick                  4

 5                          Mr. Utermohlen            30

 6                          Mr. Ulick                 33

 7                          Mr. Utermohlen            48

 8

 9     ------------ INFORMATION REQUESTS -----------

10     DIRECTIONS:

11     RULINGS:

12     TO BE FURNISHED:

13     REQUESTS:

14     MOTIONS:

15

16

17

18

19

20

21

22

23

24

25
```

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

Page 53

1

2      ------------------- EXHIBITS ----------------

3      OPPOSER EXHIBIT                        FOR ID.

4       EXHIBIT E                              24

5       Results from TARR web server

6       EXHIBIT G                              39

7       Portion of Oral Deposition of Brent

8       Bernard, September 7, 2006

9

10     APPLICANT'S EXHIBIT

11      EXHIBIT F                              30

12      Three-page document containing

13      emails

14

15

16

17

18

19

20

21

22

23

24

25

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

Page 54

1                        DEPOSITION ERRATA SHEET

2

3    RE:          Esquire Deposition Solutions

4    File No.    13529

5    Case Caption:   SWATCH S.A.

6    vs.   BERNARD and BEEHIVE WHOLESALE LLC

7    Deponent:   BRENT BERNARD

8    Deposition Date: December 28, 2009

9    To the Reporter:

10   I have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to me.

12   I request that the following changes be entered upon the

13   record for the reasons indicated.  I have signed my name to

14   the Errata Sheet and the appropriate Certificate and

15   authorize you to attach both to the original transcript.

16

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   Page No._____Line No._____Change to:_____

24   _____

25   Reason for change:_____

Brent Bernard                                    December 28, 2009

CONFIDENTIAL

Page 55

1    Deposition of BRENT BERNARD

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22

23   SIGNATURE:_____DATE:_____

24                     BRENT BERNARD

25

**Amy Bernard**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


SWATCH S.A.,

    Opposer,                  Opposition No.: 91169312

v.

                                 Mark: SWAP

AMY T. BERNARD and
BEEHIVE WHOLESALE LLC,        Serial No.: 78/459527

    Applicant.


ORAL DEPOSITION OF AMY BERNARD

October 14, 2009

207 West Carolina Avenue

Ruston, Louisiana

Reported by Sara Jo Hood, CCR

State of Louisiana

### Amy Bernard

<u>APPEARANCES</u>:


FOR THE APPLICANT:

        WILLIAM J. UTERMOHLEN, ESQ.
        Oliff & Berridge, PLC
        277 South Washington Street, Suite 500
        Alexandria, Virginia 22314


FOR THE OPPOSER:

        THOMAS P. GULICK, ESQ.
        Collen *IP*
        The Holyoke-Manhattan Building
        80 South Highland Avenue
        Ossining-on-Hudson, Westchester County
        NEW YORK 10562



<u>ALSO PRESENT</u>:

        Mr. Brent Bernard



<u>REPORTED BY</u>:

        Sara Jo Hood
        Certified Court Reporter
        Certificate No. 87336
        State of Louisiana
        100 West Texas Avenue, Third Floor
        Ruston, Louisiana  71270
        (318) 255-4691

**Amy Bernard**
I N D E X

ORAL DEPOSITION OF AMY BERNARD

Taken October 14, 2009

PAGE

Exhibit Index                                           3

Stipulations                                            5

Direct Examination by Mr. Utermohlen                    7

Cross-Examination by Mr. Gulick                        11

Signature                                              16

Reporter's Certificate                                 17

**Amy Bernard**
<u>EXHIBIT INDEX</u>

ORAL DEPOSITION OF AMY BERNARD

Taken October 14, 2009

<u>EXHIBIT</u>                                                <u>INITIAL REFERENCE</u>

  17        Copy of notes from brainstorming
            session                                             8

**Amy Bernard**

The deposition, upon oral examination, of AMY BERNARD,

being taken by counsel for applicant pursuant to notice and

agreement of counsel as authorized by 37 C.F.R. Section

2.123 and the Federal Rules of Civil Procedure before Sara

Jo Hood, Certified Court Reporter, State of Louisiana,

beginning at 8:15 a.m., on the 14th day of October, 2009, at

the Law Offices of Raymond Madden, III, 207 West Carolina

Avenue, Ruston, Louisiana 71270; it being agreed and

stipulated by and between counsel that all formalities, with

the exception of swearing the witness and the reading and

signing of the deposition, are waived; that the notarization

of deponent's signature is waived; that objections shall be

stated on the record.

**Amy Bernard**

1

2

3

4

5

6

7  Q.   I want to change to another topic now.  To your

8  knowledge, do any of the purchasers of Swap products

9  resell those products?

10 A.   Yes.  I have seen our products resold.

11 Q.   In what context?

12 A.   Under the Swap brand.

13 Q.   Where have you seen them resold?

14 A.   Ebay, various Internet outlets.

15 Q.   And are they labeled in any way or under what name?

16 A.   Yeah.  They usually put "Swap Watch."

17

18

19

20

21

22

23

24

25

**Amy Bernard**

CROSS-EXAMINATION

BY MR. GULICK:

Q.   You just mentioned that Swap brand products were resold in other, I guess, market channel, markets of trade, correct?

A.   Yes.

Q.   And one of those would be the Internet, correct?

A.   Yes.

Q.   Ebay would be one of the sites that had some of the watches --

A.   Correct.

Q.   It's also true that you sell them in your retail store locations, correct?

**Amy Bernard**

1    A.    Yes.

2    Q.    Is it true that you're aware of the Swatch brand in

3    association with watches?

4    A.    Yes.

5    Q.    Is it true that you have seen Swatch displayed in

6    Times Square and internationally?

7    A.    Yes.  After this came up and we got a letter from

8    Swatch, I was in New York and I saw the store there --

9    Q.    Do the --

10                   MR. UTERMOHLEN:

11                   Let her finish her question --

12    A.    Yeah.  Before that, I had never seen it in an

13    outlet near us, but after, you know, visiting New York,

14    I did see it there.

15    MR. GULICK:

16    Q.    Are you aware of the Swatch store in the Houston

17    airport?

18    A.    No.

19    Q.    Have you been to the Houston airport?

20    A.    I can't say I usually fly to that airport, no.

21    Q.    Was the Swatch name chosen because of the

22    interchangeability feature of the watch?

23    A.    Can you repeat that?  I'm sorry.

24    Q.    Actually, let me rephrase it.  The name "Swap" was

25    selected because of the interchangeability feature of

**Amy Bernard**

1 the watch, correct?

2 A.   We thought it suggested that, yes.

3 Q.   Has the word "watch" been used in association with

4 Swap, such as "Swap Watch"?

5           MR. UTERMOHLEN:

6           Objection, beyond the scope of direct.

7 A.   I believe so.

8 MR. GULICK:

9 Q.   Swap mark is used in association with beaded watch

10 bands and watch faces?  Is that correct?

11 A.   That's correct.

12           MR. UTERMOHLEN:

13           Same objection.

14 MR. GULICK:

15 Q.   Did the term "Swap" for you mean interchangeable?

16 A.   I believe it suggests that.

17

18

19

20

21

22

23

24

25

**Amy Bernard**

I, AMY BERNARD, do hereby certify that I have read the foregoing transcript and that the same and accompanying change sheets, if any, constitute a true and complete record of my testimony.

_____

AMY BERNARD

**Amy Bernard**

STATE OF LOUISIANA   :

PARISH OF LINCOLN    :

    I, Sara Jo Hood, Certified Court Reporter in and for the State of Louisiana, do hereby certify that the said witness came before me at 8:15 o'clock a.m., on the 14th day of October, 2009, and after she was first duly sworn, she was examined and testified as shown; that the testimony was reported by me and thereafter transcribed by me and is a true and correct record of the testimony given by the witness; that the adverse party was not present for the taking of the deposition.

    I further hereby certify that the officer before whom this deposition was taken was not disqualified as specified in Rule 28 of the Federal Rules of Civil Procedure.

    I further certify that I am not of counsel or related to or employed by any of the parties to this cause or by their attorneys or in any wise interested in the event thereof.

    SUBSCRIBED AND SWORN TO on this the 3rd day of November, 2009.



    Sara Jo Hood
    Certified Court Reporter
    Certificate No. 87336
    State of Louisiana

**Brent Bernard**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


SWATCH S.A.,

    Opposer,                   Opposition No.: 91169312

v.

                               Mark: SWAP

AMY T. BERNARD and
BEEHIVE WHOLESALE LLC,          Serial No.: 78/459527

    Applicant.


ORAL DEPOSITION OF BRENT BERNARD

October 14, 2009

207 West Carolina Avenue

Ruston, Louisiana

Reported by Sara Jo Hood, CCR

State of Louisiana

**Brent Bernard**

APPEARANCES:


    FOR THE APPLICANT:

        WILLIAM J. UTERMOHLEN, ESQ.
        Oliff & Berridge, PLC
        277 South Washington Street, Suite 500
        Alexandria, Virginia 22314


    FOR THE OPPOSER:

        THOMAS P. GULICK, ESQ.
        Collen *IP*
        The Holyoke-Manhattan Building
        80 South Highland Avenue
        Ossining-on-Hudson, Westchester County
        NEW YORK 10562




REPORTED BY:

    Sara Jo Hood
    Certified Court Reporter
    Certificate No. 87336
    State of Louisiana
    100 West Texas Avenue, Third Floor
    Ruston, Louisiana  71270
    (318) 255-4691

**Brent Bernard**
I N D E X

ORAL DEPOSITION OF BRENT BERNARD

Taken October 14, 2009

PAGE

Exhibit Index                                          4

Stipulations                                           6

Direct Examination by Mr. Utermohlen                   7

Cross-Examination by Mr. Gulick                        49

Redirect Examination by Mr. Utermohlen                 92

Recross-Examination by Mr. Gulick                      97

Signature                                              106

Reporter's Certificate                                 107

**Brent Bernard**
ORAL DEPOSITION OF BRENT BERNARD

Taken October 14, 2009

| EXHIBIT | | INITIAL REFERENCE |
|---|---|---|
| 3 | Copy of pages from 2006 catalog showing Swap products | 14 |
| 8 | Copy of excerpts from *Gift Beat* publication | 37 |
| 9 | Copy of Learning Express award | 42 |
| 10 | Images from Beehive website before January/February 2009 | 19 |
| 11 | Images from current Beehive website | 21 |
| 15 | Photographs of Swap displays | 28 |
| 17 | Copy of notes from brainstorming session | 11 |
| 21 | Copies of trade show advertisement items | 9 |
| 23 | Image of Orange County Creations website page | 46 |
| 24 | Swap Watch face | 32 |
| 25 | Swap Limited watch face | 18 |
| 26 | Swap Watch band | 33 |
| 27 | Swap Kids watch band | 34 |
| 28 | Swap Limited watch band | 34 |
| 29 | Flair watch band | 34 |

**Brent Bernard**

(Exhibit Index Cont'd.)

| | | |
|---|---|---|
| 30 | Swap Chick pendant | 35 |
| 31 | Swap pendant/pin | 36 |

**Brent Bernard**

The deposition, upon oral examination, of BRENT BERNARD, being taken by counsel for applicant pursuant to notice and agreement of counsel as authorized by 37 C.F.R. Section 2.123 and the Federal Rules of Civil Procedure before Sara Jo Hood, Certified Court Reporter, State of Louisiana, beginning at 11:00 a.m., on the 14th day of October, 2009, at the Law Offices of Raymond Madden, III, 207 West Carolina Avenue, Ruston, Louisiana 71270; it being agreed and stipulated by and between counsel that all formalities, with the exception of swearing the witness and the reading and signing of the deposition, are waived; that the notarization of deponent's signature is waived; that objections shall be stated on the record.

**Brent Bernard**

1

2

3

4

5

6

7

8

9

10

11

12    Q.   Now, as to your products, the Swap products, who

13    are they sold to?

14    A.   We have a network of retail stores that sell our

15    products.

16    Q.   What do you mean by "a network of retail stores"?

17    A.   That network would be a collection of stores that

18    we've gathered, either by trade show exposure, by leads

19    from other retailers, by road reps going into stores

20    and finding those leads and subsequently and ultimately

21    securing that account through order placing and

22    subsequent relationship from there.

23    Q.   So these are retail stores that you're referring

24    to?

25    A.   Correct, and they are independent.  So the majority

**Brent Bernard**

1  of our stores are independent retailers and that would

2  be our general and main customer.

3  Q.   You refer to them as customers?

4  A.   Yes.

5  Q.   What industry are they involved with, these

6  customers?

7         MR. GULICK:

8              Objection, vague.

9  A.   The industry, one industry, we catagorize it as the

10  gift industry, but there are plenty of other industries

11  inside our customer base that would not just be gift.

12  We might have pharmacies, and we might have card shops,

13  meaning Hallmarks.  It is a traditional card shop that

14  you would be aware of.  There might be other places of

15  business, too, that we would consider our customer.

16  MR. UTERMOHLEN:

17  Q.   What does the gift industry include?

18  A.   Gift industry, the overlap would be a Hallmark

19  store.  That would be considered gift.  Hospital gift

20  shops.  Those type of shops.

21

22

23

24

25

Brent Bernard

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Q.   Do you know what they sell for retail?

25  A.   It varies.  But --

**Brent Bernard**

1  Q.   Is there a range that you're familiar with?

2  A.   Sure.  Sure.  We call doubling of those wholesale

3  prices keystone, and there are a lot of stores that

4  keystone that product, meaning 50 percent or 100

5  percent markup, depending which way you look at it, a

6  doubling of that product, for example, and then others

7  go higher, depending on their expenses for their

8  particular store.

9  Q.   All right.

10 A.   But the top-end range, if that's what the question

11 was, is $20 or so for a -- actually probably $12 for

12 the face, to $13, $14 even, and then the top end for a

13 band, watch band, would be probably 7, 8 dollars or so.

14

15

16

17

18

19

20

21

22

23

24

25

**Brent Bernard**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Q.   All right, Mr. Bernard.   Showing you what's been

24   marked as Exhibit 3, what is that, if you know?

25   A.   This is, it seems to me, and I'm looking through it

**Brent Bernard**

1  now.  This is a portion of the Beehive catalog from

2  2006.

**Brent Bernard**

Q.   What's 35 and 34?   What products are shown there?

A.   This is the Swap Watch Kids product.

**Brent Bernard**

1

2

3

4    A.   Page 10 shows a product called "Swap Watch

5    Limited," and those actual products consist of ribbon

6    bands with watch faces.   The watch faces have bars on

7    them to accept the ribbon band.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Brent Bernard**

1

2

3

4

5

6

7

8

9

10  MR. UTERMOHLEN:

11  Q.   On this particular one, the logo "Swap Chick by

12  Beehive" appears at the top?

13  A.   Yes.

14  Q.   Let's go to the second one.  What type of product

15  is this particular display used for?

16  A.   This would have the original Swap products on it,

17  faces on the top, bands on the bottom.

18  Q.   What's the meaning of "Limited"?

19  A.   Limited is the line of products that would be

20  ribbon bands specifically is what designates a product

21

22

23

24

25

**Brent Bernard**

1  Q.   And how are you familiar with Learning Express?

2  A.   Learning Express, we are in their -- I'm familiar

3  with them because we have hundreds of their stores as

4  customers and we are also listed in their book of

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24  your particular product.  Are you aware of a third

25  party that has adopted the mark Swap for Watches as

**Brent Bernard**

1  products?

2  A.   When you say "adopted," I don't know --

3  Q.   They use the mark Swap in association with watches.

4  Are you aware of any companies?

5  A.   Yes.   Orange County Creations.

6  Q.   Any other companies?

7  A.   Puma, because of the zzz 4A,26.26

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Brent Bernard**

13 Q.   Are Swap products sold to end consumers?

14 A.   Repeat the question?

15 Q.   Are Swap products sold to end consumers?

16 A.   By that, you mean by Beehive Wholesale?

17 Q.   No.  I mean the product itself, is it sold to end

18 consumers?

19 A.   Yes.

20 Q.   So Beehive sells to retailers and the retailers

21 sell to the end consumers?

22 A.   Correct.

23 Q.   They end up in the end consumers' hand?

24 A.   Sure.

25

**Brent Bernard**

7  Q.   I'm asking you the question do you sell to
8  department stores?
9  A.   Is Stein Mart a department store then?
10 Q.   Do you consider Stein Mart to be a department
11 store?
12 A.   I do, yes.
13 Q.   Okay.  Do you sell to Stein Mart?
14 A.   Yes.

**Brent Bernard**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18  Q.   Does Beehive Wholesale sell any Swap products

19  directly to end consumers?

20  A.   No.

21  Q.   Does Beehive Wholesale own retail locations of

22  their own?

23  A.   They have their own tax ID number and things like

24  that, so that --

25  Q.   I'm sorry?  Beehive Wholesale has its own tax

**Brent Bernard**

1  identification number?

2  A.   Correct.

3  Q.   What I'm asking you is, do they own retail

4  locations?

5  A.   Yes, I believe they do.

6  Q.   Are Swap products sold at those retail locations?

7  A.   Yes, they are.

8  Q.   Are the products sold at those retail locations

9  sold to end consumers?

10 A.   Yes.

11 Q.   So, then, Beehive Wholesale, LLC, does sell some of

12 the Swap products to end consumers?

13 A.   Yes.

14

15

16

17

18

19

20

21

22

23

24

25

**Brent Bernard**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.   Did you know of the term "Swatch" as a brand for

19    watches when you started selling Swap?

20    A.   Yes.

21

22

23

24

25

**Brent Bernard**

I, BRENT BERNARD, do hereby certify that I have read the foregoing transcript and that the same and accompanying change sheets, if any, constitute a true and complete record of my testimony.

This __7th__ day of __December__, 2009.

_____
BRENT BERNARD

**Brent Bernard**

STATE OF LOUISIANA   :

PARISH OF LINCOLN    :

I, Sara Jo Hood, Certified Court Reporter in and for the State of Louisiana, do hereby certify that the said witness came before me at 11:00 o'clock a.m., on the 14th day of October, 2009, and after he was first duly sworn, he was examined and testified as shown; that the testimony was reported by me and thereafter transcribed by me and is a true and correct record of the testimony given by the witness; that the adverse party was not present for the taking of the deposition.

I further hereby certify that the officer before whom this deposition was taken was not disqualified as specified in Rule 28 of the Federal Rules of Civil Procedure.

I further certify that I am not of counsel or related to or employed by any of the parties to this cause or by their attorneys or in any wise interested in the event thereof.

SUBSCRIBED AND SWORN TO on this the 3rd day of November, 2009.



OFFICIAL SEAL
SARA JO HOOD
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 87336
Certificate expires 12-31-09

Sara Jo Hood
Certified Court Reporter
Certificate No. 87336
State of Louisiana

**Michelle Bernard**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


SWATCH S.A.,

    Opposer,                 Opposition No.: 91169312

v.

                                  Mark: SWAP

AMY T. BERNARD and
BEEHIVE WHOLESALE LLC,      Serial No.: 78/459527

    Applicant.


ORAL DEPOSITION OF MICHELLE BERNARD

October 14, 2009

207 West Carolina Avenue

Ruston, Louisiana

Reported by Sara Jo Hood, CCR

State of Louisiana

**Michelle Bernard**

<u>APPEARANCES</u>:


FOR THE APPLICANT:

    WILLIAM J. UTERMOHLEN, ESQ.
    Oliff & Berridge, PLC
    277 South Washington Street, Suite 500
    Alexandria, Virginia 22314


FOR THE OPPOSER:

    THOMAS P. GULICK, ESQ.
    Collen *IP*
    The Holyoke-Manhattan Building
    80 South Highland Avenue
    Ossining-on-Hudson, Westchester County
    NEW YORK 10562
    CHARLES A. SCHUTTE, JR., ESQ.
    Guglielmo, Marks, Schutte,


<u>ALSO PRESENT</u>:

    Mr. Brent Bernard


<u>REPORTED BY</u>:

    Sara Jo Hood
    Certified Court Reporter
    Certificate No. 87336
    State of Louisiana
    100 West Texas Avenue, Third Floor
    Ruston, Louisiana  71270
    (318) 255-4691

**Michelle Bernard**
I N D E X

ORAL DEPOSITION OF MICHELLE BERNARD

Taken October 14, 2009

PAGE

Exhibit Index                                              4

Stipulations                                              6

Direct Examination by Mr. Utermohlen                     7

Cross-Examination by Mr. Gulick                          44

Redirect Examination by Mr. Utermohlen              69, 72

Recross-Examination by Mr. Gulick                   72, 74

Signature                                               75

Reporter's Certificate                                  76

**Michelle Bernard**
EXHIBIT INDEX

ORAL DEPOSITION OF MICHELLE BERNARD

Taken October 14, 2009

| EXHIBIT | | INITIAL REFERENCE |
|---|---|---|
| 1 | Image of website page listing trade shows winter 2007-2008 | 42 |
| 2 | List of trade shows attended 2004-2005-2006 | 43 |
| 4 | 2005 Swap sales report | 16 |
| 5 | 2006 Swap sales report | 22 |
| 6 | 2007 Swap sales report | 23 |
| 7 | Spreadsheet of costs for 2006, 2007 and first half 2008 | 30 |
| 12 | Swap customer list for 2005 and 2006 | 26 |
| 13 | Sales order form | 15 |
| 14 | Report of Stein Mart sales of Swap products 2007, 2008, 2009 through deposition date | 25 |
| 16 | Complete customer list to June 13, 2006 | 29 |
| 18 | 2008 Swap line sales report | 24 |
| 19 | 2008 report of marketing expenses | 34 |
| 20 | Website development agreement and statements | 37 |

**Michelle Bernard**

(Exhibit Index cont'd.)

21      Copies of trade show advertisement
        items                                    38

22      Flyer sheets of specials inserted
        in outgoing shipments                    41

25      Swap Limited watch face                  70

### Michelle Bernard

The deposition, upon oral examination, of MICHELLE

BERNARD, being taken by counsel for applicant pursuant to

notice and agreement of counsel as authorized by 37 C.F.R.

Section 2.123 and the Federal Rules of Civil Procedure

before Sara Jo Hood, Certified Court Reporter, State of

Louisiana, beginning at 8:45 a.m., on the 14th day of

October, 2009, at the Law Offices of Raymond Madden, III,

207 West Carolina Avenue, Ruston, Louisiana 71270; it being

agreed and stipulated by and between counsel that all

formalities, with the exception of swearing the witness and

the reading and signing of the deposition, are waived; that

the notarization of deponent's signature is waived; that

objections shall be stated on the record.

**Michelle Bernard**

BY MR. UTERMOHLEN:

Q.    Ms. Bernard, could you state your name for the record, please?

A.    Michelle Bernard.

Q.    Where are you employed?

MR. GULICK:

Sorry.

MR. UTERMOHLEN:

Oh, I'm sorry.

MR. GULICK:

I just want to get the same thing in again about the people who are in the room.

MR. UTERMOHLEN:

Same objection?

MR. GULICK:

Same objection.

MR. UTERMOHLEN:

All right.

MR. GULICK:

As the previous deposition.

MR. UTERMOHLEN:

**Michelle Bernard**

1  Q.   I'm sorry.  I missed the answer.  Did you state your

2  name for the record?

3  A.   I did.  Michelle Bernard.

4  Q.   All right.  Where are you employed, Ms. Bernard?

5  A.   At Beehive Wholesale.

6  Q.   What's your position there?

7  A.   I am the chief operating officer.

8  Q.   And how long have you been with Beehive Wholesale?

9  A.   I have been there for nine years.

10 Q.   Has your role changed over that time?

11 A.   It has.

12 Q.   Could you just kind of briefly summarize how that's

13 evolved?

14 A.   Initially, when I started at Beehive, I was their first

15 employee so I did a little bit of everything, from making

16 the product, shipping the product out, invoicing for the

17 product, just overseeing general day-to-day operations, of

18 course, being the first employee.  Over the years, we have

19 added many, many employees.  We have grown tremendously with

20 the number of accounts that we have and so, therefore, my

21 roles within the company have changed to more of a

22 supervisory role today.

23 Q.   What do you supervise at the moment?

24 A.   I supervise the wholesale employees and oversee each

25 department functioning from a day-to-day operation.

**Michelle Bernard**

1  Q.    What departments are included?

2  A.    We have the sales department, we have the

3  shipping/inventory department, and we have the graphics

4  department.

5  Q.    What does the sales department involve?

6  A.    Sales involves day-to-day sales, meaning we assist our

7  customers with placing reorders, initial orders, customer

8  concerns or issues that may arise on a day-to-day basis.

9  Q.    Who is employed in the sales department?

10 A.    We have in-house sales reps that are in those

11 positions.

12 Q.    How many are there?

13 A.    At present, we have three.

14

15

16

17

18

19

20

21

22

23

24

25

**Michelle Bernard**

Q.   Do you still use catalogs as much as you did back in 2006?

A.   We have done away with them as of this year.

Q.   Meaning 2009?

A.   Meaning 2009.

**Michelle Bernard**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19  Q.  Ms. Bernard, I'm handing you Exhibit 21, which is, just

20  count the pages, that'll make it 12 pages.  Is this all the

21  same document or more than one document?

22  A.  It's more than one document.

23

24

25

Michelle Bernard

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   Q.   Let's go on to the next page, which is B000267, and
21   it's similar to B000268 and B000264.   What are those
22   documents?
23   A.   This is also another postcard advertisement that we've
24   done for our shows.
25   Q.   All three of them are postcard advertisements?
```

**Michelle Bernard**

1  A.   Correct.

2  Q.   Let's go on then to B000425 and -- well, let's just

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Michelle Bernard**

Q.   Do you sell other products besides Swap-branded

products?

A.   Yes, we do.

Q.   Can you tell me what those would include?

A.   We sell Bee Bops, which are flip flops.  We sell a line

called Little Bee, which are our sterling silver children's

products.  We sell a line called Retro, which are fashion

jewelry necklaces; a line called Vintage; a line called

Bella; a line called Crazy Daisy; and numerous other lines.

### Michelle Bernard

1   I, MICHELLE BERNARD, do hereby certify that I have read

2   the foregoing transcript and that the same and accompanying

3   change sheets, if any, constitute a true and complete record

4   of my testimony.

5   This 1st day of December , 2009.

6

7   _Michelle Bernard_

8   MICHELLE BERNARD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### Michelle Bernard

STATE OF LOUISIANA    :

PARISH OF LINCOLN     :

I, Sara Jo Hood, Certified Court Reporter in and for the State of Louisiana, do hereby certify that the said witness came before me at 8:45 o'clock a.m., on the 14th day of October, 2009, and after she was first duly sworn, she was examined and testified as shown; that the testimony was reported by me and thereafter transcribed by me and is a true and correct record of the testimony given by the witness; that the adverse party was not present for the taking of the deposition.

I further hereby certify that the officer before whom this deposition was taken was not disqualified as specified in Rule 28 of the Federal Rules of Civil Procedure.

I further certify that I am not of counsel or related to or employed by any of the parties to this cause or by their attorneys or in any wise interested in the event thereof.

SUBSCRIBED AND SWORN TO on this the 3rd day of November, 2009.



Sara Jo Hood
Certified Court Reporter
Certificate No. 87336
State of Louisiana

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

SWATCH S.A.,

     Opposer,

v.

AMY T. BERNARD and
BEEHIVE WHOLESALE LLC

     Applicant.

Opposition No.: 91169312

Mark:  SWAP

Serial No.: 78/459527

## ERRATA SHEET OF MICHELLE BERNARD
## FOR DEPOSITION OF OCTOBER 14, 2009

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 13 | 9 | "to our existing customers" should be "and give to our in-house reps" | not sure 3 maybe a typo |
| 49 | 15 | "naturally" is supposed to be "actually" | maybe she misunderstood |

DATED this __1st__ day of __December__ 2009.

Respectfully submitted,

*Michelle L Bernal*

( 2 )

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SWATCH S.A., <br><br> Plaintiff, <br><br> v. <br><br> BEEHIVE WHOLESALE, L.L.C., <br><br> Defendant. | Civil Action No. 1:11-cv-434 LO/JFA |

## DECLARATION OF PATRICIA HIGGINS

I, Patricia Higgins, declare as follows:

Background

1.     I am the SWATCH Brand Manager of The Swatch Group (U.S.) Inc., located at 1200 Harbor Boulevard, Weehawken, New Jersey.

2.     The Swatch Group (U.S.) Inc. is a subsidiary of Swatch Group LTD. Plaintiff Swatch S.A. is also a subsidiary of Swatch Group LTD.   The Swatch Group (U.S.) Inc. is the exclusive United States distributor of SWATCH products manufactured by Plaintiff Swatch S.A.

3.     The facts set forth in this declaration are personally known to me and I have first-hand knowledge thereof.  I offer this testimony in this proceeding and if called as a witness, I could and would competently testify to all the following facts that are within my personal knowledge.

4.     As SWATCH Brand Manager for The Swatch Group (U.S.) Inc., I am in charge of the distribution and marketing of SWATCH brand products in the United States. I have held the position of SWATCH Brand Manager since September 25, 2005.

5.     The Swatch Group (U.S.) Inc. maintains in the regular course of its business, documents including historical and current sales, advertising, and marketing of SWATCH products.

6.      In the scope of my employment as SWATCH Brand Manager for Swatch Group (U.S.) Inc., I am the custodian of, have control of, and regularly review current and historical business records of Swatch Group (U.S.) Inc. I am further responsible for creating some of these documents for Swatch Group (U.S.) Inc.  It is critical to my function as the head of SWATCH brand distribution in the United States that I have full access to all current and historical records for the past and present activities and performance of SWATCH brand products.  I have carefully reviewed each trial exhibit to which I refer in this Declaration and confirm that all are accurately taken from the records and databases which we maintain and on which we rely to run our day to day business. These figures are often reported to Plaintiff Swatch S.A.

7.      As part of my responsibilities, I rely on and keep records relating to sales of SWATCH brand products in the United States.

<u>Sales</u>

8.      Swatch has been a major player in the watch industry for over 25 years.  Within the past decade alone, sales have been over███████████.  Between 2002 and 2004, Swatch sold more than ██████SWATCH brand watches and more than ████ pieces of SWATCH jewelry, for a total of nearly██████ SWATCH-branded products sold in the U.S. and Caribbean.  (Carribean sales are historically approximately ████ of the total each year.  These figures are demonstrated in Exhibit 55 and the reflected in the chart below, which come from the historical records of the company:

Swatch Sales in Units

| Year | Swatch | Swatch Bijoux | Swatch Total |
|------|--------|---------------|--------------|
| 2002 | ████████████████ | | |
| 2003 | ████████████████ | | |

| 2004 | | | |
|---|---|---|---|

9.     Our records further reflect that from 2005 through May 2011 Swatch sold almost 3 million SWATCH brand watches and more than ▮▮▮ pieces of SWATCH jewelry in the United States, for a total of ▮▮▮ SWATCH-branded products sold in the U.S.   These figures are reflected in the chart below:

Swatch Sales in Units

| Year | Swatch | Swatch Bijoux | Swatch Total |
|---|---|---|---|
| 2005 | | | |
| 2006 | | | |
| 2007 | | | |
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |
| Through May 2011 | | | |

We anticipate, at current rates of sale that our total for 2011 will be ▮▮▮ units, combined watches and jewelry (of which roughly ▮▮▮ units are jewelry).

10.     Between 2002 and 2004, Swatch has earned nearly ▮▮▮ in revenue from its sale of SWATCH-branded watches in the United States and the Caribbean.   For the same period, Swatch has earned more than ▮▮▮ in revenue for its sales of SWATCH jewelry in the United States and the Caribbean.   In total, Swatch has earned over ▮▮▮ from sales of SWATCH products in the United States and the Caribbean between 2002 and 2004. These figures, all in U.S. Dollars, are reflected in the chart below:

Swatch Sales in Revenue in U.S. Dollars

| Year | Swatch | Swatch Bijoux | Swatch Total |
|------|--------|---------------|--------------|
| 2002 |        |               |              |
| 2003 |        |               |              |
| 2004 |        |               |              |

11.     From 2005 through May 2011 Swatch earned nearly [          ] in revenue from the sale of SWATCH brand watches in the United States.  In this same time period, Swatch earned more than [          ] in revenue from the sale of SWATCH jewelry in the United States. Overall, this amounts to [          ] from sales of SWATCH products in the United States from 2005 through May 2011. These figures, all in U.S. Dollars, are reflected in the chart below:

Swatch Sales in Revenue in U.S. Dollars

| Year | Swatch | Swatch Bijoux | Swatch Total |
|------|--------|---------------|--------------|
| 2005 |        |               |              |
| 2006 |        |               |              |
| 2007 |        |               |              |
| 2008 |        |               |              |
| 2009 |        |               |              |
| 2010 |        |               |              |
| Through May 2011 |  |           |              |

Our gross estimated revenue for 2011 will be [          ], of which about [      ] is jewelry and [      ] will be watches.

12.     A true and correct copy of sales figures of SWATCH products in the United States and

Caribbean from 2002 through May 2011 broken down in units, Swiss francs, and U.S. dollars for SWATCH watches and jewelry (referred to in the document as Bijoux) is located at Trial Exhibit 55.

13.     A true and correct copy of sales of SWATCH products in the United States from 2005 through May 2011, broken down in units, and U.S. dollars, for SWATCH watches, and for jewelry (referred to in the document as Bijoux), is located at Trial Exhibit 133.

14.     Between 2002 and the present, Swatch's sales of SWATCH-branded watches and jewelry has increased by as much as ▓▓▓ units for jewelry and ▓▓▓ units for watches, and more than doubled in revenue.

15.     Worldwide, over ▓▓▓ SWATCH watches had already been sold from the mid-1980s through 2006.

Advertising

16.     Over the past ten years, over ▓▓▓ have been spent on advertising and promotion of SWATCH products in the U.S. In recent years, the marketing budget has averaged about ▓▓▓ ▓▓▓ per year.

17.     I have reviewed   Trial Exhibit 17, Swatch has paid the following amounts for advertisements in the United States for the following years:

| Year | Swatch | |
|------|--------|---|
| 2001 | | |
| 2002 | | |
| 2003 | | |
| 2004 | | |
| 2005 | | |
| 2006 | | |

18.     In addition Swatch has paid the following amounts for advertisements in the United States for the following years:

5

| 2009 | | |
|------|--|--|
| 2010 | | |
| Through May 2011 | | |

Our 2011 forecast by year end for 2011, will be ▮▮▮▮▮.

19.    Over the years, SWATCH products have been advertised in magazines such as *Vogue*, *Rolling Stone*, *Us Weekly*, *Teen Vogue*, *Marie Claire*, *Nylon*, *Maxim*, *Wired*, *Details*, *Surface*, *Wallpaper*, and *Elle*, as well as newspapers such as *New York Post*, *New York Times*, *L.A. Times*, *Chicago Tribune*, and *Metro* (New York).

20.    In addition to paid advertisements, SWATCH-branded watches and jewelry are frequently featured in editorial copy and feature or fashion articles contained in nationally-published media, without cost or solicitation by Swatch.

21.    SWATCH Products have been featured in: *American Photographer* (a true and correct copy is located at Trial Exhibit 18); *The Wall Street Journal* (true and correct copies are located at Trial Exhibits 19-20); *ADWEEK* (a true and correct copy is located at Trial Exhibit 21); *The New York Times Magazine* (a true and correct copy is located at Trial Exhibit 22); *Marketing and Media Decisions* (Trial Exhibit 23); *Smithsonian* (a true and correct copy is located at Trial Exhibit 24); *Advertising Age* (a true and correct copy is located at Trial Exhibit 25); *New York Times* (true and correct copies are located at Trial Exhibit 26 – 27); *Popular Science* (a true and correct copy is located at Trial Exhibit 28); *American Jewelry Manufacturer* (a true and correct copy is located at Trial Exhibit 29); *Ms.* (Trial Exhibit 30); *Gary, IN Post-Tribune* (Trial Exhibit 31); *Observer (New York)* (a true and correct copy is located at Trial Exhibit 32); *Los Angeles Times* (a true and correct copy is located at Trial Exhibit 33); *Cambridge Tab* (a true and correct copy is located at Trial Exhibit 34); and *Women's Wear Daily* (a true and correct copy is located

at Trial Exhibit 35).

22.     There are many more examples.  For instance, in 2007, a series of advertising campaigns

and placements occurred around Mother's Day, a true and correct copy of the Swatch Mother's

Day Print Advertising Recap including appearances in *Metro New York* and *The New York Post*

is located at Trial Exhibit 36.

23.     In 2008, Swatch ran a series of advertising campaigns which were featured in *Page 6*

*Magazine, Island Outrigger Magazine Details, Wired,* and on phone kiosks and a diorama at

Grand Central Terminal.  True and correct copies of examples of the advertising campaign are

located at Trial Exhibits 51, 127 and 128.

24.     Swatch has also advertised its products in *Vogue, Rolling Stone, Nylon, Maxim, Wired,*

*Surface, Wallpaper, Elle, New York Post, Chicago Tribune,* and *Metro* (New York).

25.     Swatch also advertises in other media.  For example, Swatch has paid for advertising in

the Nordstrom Catalog. Nordstrom is a department store with locations throughout the United

States, and has been a seller of SWATCH-branded watches and jewelry at over 100 locations

from coast to coast, from 2008 until earlier this year.  We are now selling in Dillard's stores,

Lord and Taylor and Van Mauer department stores.  Lord and Taylor has a strong presence,

especially on the East Coast.  Dillard's and Van Mauer are strong particularly in the South and

Midwest.

26.     SWATCH products have also been marketed and advertised on television, including paid

advertisements on the MTV channel, as well as through news reports on CNN, and FOX News.

27.     In more recent years, SWATCH products have been widely promoted through social

media such as Facebook and Twitter. As of October 2011, over 546,000 visitors to the Swatch

Facebook page had indicated that they "Like" the page.

28.   SWATCH recently ran advertising campaigns on travel maps and guides, buses, taxi cabs, telephone kiosks, billboards and banners in such high traffic areas as New York City and Los Angeles, and on AMTRAK ticket jackets.   A true and correct copy of the advertising campaign appears at Trial Exhibit 51.

29.   Swatch's advertising campaigns are often on a grand-scale, with very high costs.   They reach a large number of consumers in a very short period of time.  For example, in 2008, Swatch paid [          ] for an advertising campaign that ran on 150 buses in New York City for two months. A true and correct copy depicting the SWATCH advertising campaign is located at Exhibit 51.   Another campaign cost [          ], running advertisements on New York City taxi cabs for four months. Another [          ] (approximately) was spent on placing advertisements for SWATCH-branded watches in telephone kiosks. True and correct copies of examples of these SWATCH advertising campaigns are located at Exhibits 37 and 51.

30.   Swatch pays [          ] annually for one ad alone, that being for its advertising space on a Billboard in New York's Times Square. A true and correct copy of SWATCH advertising on a Times Square Billboard is located at Trial Exhibit 128.

31.   Swatch has also advertised its products on billboards in Los Angles, including one at the Beverly Center. A true and correct copy of SWATCH advertising on a Times Square Billboard is located at Trial Exhibit 37.

32.   SWATCH has a well-known affiliation with the Olympic Games, including prominent sponsorship of the Olympic Games in Athens, Sydney and Atlanta (Trial Exhibit 38). These uses featured daily depiction of the SWATCH "official timekeeper" logo on millions of television screens each night during the Games themselves, as well as signs at the sporting venues and product identification at the competitions themselves such as tough pads in swimming pools and

time clocks at track and field events.  SWATCH also sponsors the Professional FIVB volleyball league, Motorcross, and other sporting events, such as snowboarding with Olympic Gold Medal Champion Shaun White.

33.    SWATCH products have also been created and endorsed by athlete Shaquille O'Neal, artist Keith Haring, singer Phil Collins, artists Kiki Picasso, Vivian Westwood, and Billy the Artist, and the products are seen in media photos as worn by celebrities as Tyra Banks, Phil Collins, Bill Gates, Sting, Carmen Electra, George Clooney, and Spike Lee.

34.    Well-known entertainment and sports celebrities are frequently observed, and reported in the entertainment and fashion media as wearing SWATCH-branded watches.

35.    There is a dedicated SWATCH club for collectors of SWATCH watches and other SWATCH products.

36.    In January 2009, the "Loving Twister" SWATCH watch was featured in the *Watch and Jewelry Review*. A true and correct copy is located at Trial Exhibit 56.

37.    In February 2009, an advertisement for SWATCH appeared in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 101.  The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

38.    In June 2009, an advertisement for SWATCH appeared in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 102.  The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

39.     In September 2009, an advertisement for SWATCH appeared in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 103. The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

40.     The October 2009 edition of the French *Elle* magazine featured a SWATCH watch. A true and correct copy is located at Trial Exhibit 104.  The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

41.     In December 2009, a SWATCH watch was featured in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 105. The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

42.     In January 2010, an advertisement for SWATCH appeared in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 106.  The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada, Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

43.     In April 2010, an advertisement for SWATCH appeared in the French Edition of *Elle* magazine. A true and correct copy is located at Trial Exhibit 107.  The French Edition of *Elle* is published in the United States of America, France, Belgium, Switzerland, Algeria, Canada,

Spain, Finland, the United Kingdom, Greece, Ireland, Italy, Luxembourg, Morocco, Netherlands, Portugal, and Tunisia.

44.     In September 2010, a SWATCH watch was featured in *Time n' Style* magazine. A true and correct copy is located at Trial Exhibit 108. *Time n' Style* magazine is published and distributed in the United States of America and Mexico.

45.     In November 2010, another advertisement for SWATCH appeared in *Elle* magazine. A true and correct copy is located at Trial Exhibit 109.  This Edition of *Elle* magazine was published and distributed in the United States of America and Mexico.

46.     In December 2010, an advertisement for SWATCH appeared in *Dazed & Confused*, a very contemporary magazine featuring fashion, arts, and editorial comment. A true and correct copy is located at Trial Exhibit 110. *Dazed & Confused* magazine is published and distributed in the United States of America and the United Kingdom.

47.     In April 2011, an advertisement for SWATCH appeared in *Dazed & Confused* magazine. A true and correct copy is located at Trial Exhibit 111.  *Dazed & Confused* magazine is published and distributed in the United States of America and the United Kingdom.

48.     In the spring of 2011, an advertisement for SWATCH appeared in *Another Man* magazine. A true and correct copy is located at Trial Exhibit 112. *Another Man* magazine is published and distributed in the United States of America and the United Kingdom.

49.     In the summer of 2011, an advertisement for SWATCH appeared in *V Man* magazine which boasts an audience interested in "international style and culture." A true and correct copy is located at Trial Exhibit 113. *V Man* magazine is published and distributed in the United States of America and Canada.

50.     In the winter of 2010-2011, an advertisement for SWATCH appeared in *V*, an

international fashion magazine. A true and correct copy is located at Trial Exhibit 114. *V* magazine is published and distributed in the United States of America and Canada.

51.     In the winter of 2010-2011, an advertisement for SWATCH appeared in *V Man* magazine. A true and correct copy is located at Trial Exhibit 115. *V Man* magazine is published and distributed in the United States of America and Canada.

52.     In July 2008, SWATCH was featured in the *Women's Wear Daily* Top 100 Annual Consumer Brand-Awareness Survey. SWATCH was ranked as the sixty-third most recognizable brand in the United States, as well as the fifth most recognizable watch/jewelry brand. A true and correct copy is located at Trial Exhibit 57.

Description Of Swatch's Goods

53.     Swatch sells watches and jewelry under the SWATCH brand.

54.     Swatch has been selling watches under the SWATCH brand in the United States for over 25 years.

55.     Swatch also sells watch bands under the SWATCH brand. Watch brands sold separately have always been a component of Swatch's sales over the history of almost three decades.

56.     In addition to its sale of new watches, each year, Swatch sells more than [redacted] watch bands alone (separate from complete watches) under the SWATCH brand.

57.     Swatch introduces numerous new models of its watches every year. As many as 100 new models of watches are produced each year under the SWATCH brand as sold in the United States.

58.     The SWATCH Mark is often followed by the word "watch" when used by our company, by our customers and by the media, so that the product is known both as "SWATCH" and "SWATCH WATCH."

59.     SWATCH emphasizes in its branding the colorful, fanciful designs for its watches and its SWATCH brand jewelry.

60.     Jewelry sold under the SWATCH mark compliments the SWATCH watch line.

61.     Some of the watches sold under the SWATCH Mark include both beads, and beaded bands.

Channels Of Trade In Which SWATCH Brand Products Are Sold

62.     SWATCH-branded watches and jewelry are sold in: (1) stores owned by Swatch; (2) third party retail locations, including independently owned jewelry and gift stores as well as national-chain department stores; and (3) on the Internet.

63.     SWATCH watches and jewelry are also sold on the Internet, at the website address: store.swatch.com

64.     SWATCH watches and jewelry have been sold, for example, in 105 different Nordstrom department stores, and over the years since its introduction in the United States, been sold at all major stores in every part of the United States including stores such as department stores, Macy's, Bloomingdales, and others.  Currently, as of today, our products are in Lord and Taylor, Dillard's and Van Mauer stores on the coasts, in the South and in the Midwest.

65.     Swatch owns 45 stores of its own that sell SWATCH-branded watches and jewelry. These store locations include New York City (Times Square, Grand Central Station, SoHo, 72nd Street, Broadway and Bleecker, and Fifth Avenue in New York), Roosevelt Field Mall on Long Island, New York, JFK International Airport (Queens, New York), three locations in the state of

New Jersey (Newark Airport, Garden State Plaza, Willowbrook Mall), Washington D.C., Orlando Airport, the Orlando (Florida) Mall, Miami, Florida, Coral Gables, Florida, George Bush International Airport in Houston, Texas, the Houston Galleria, Dallas North Park, McAllen, Texas, the Chicago area (Michigan Avenue, Schaumburg, Illinois), San Francisco Downtown, Palo Alto, California, Los Angeles, Glendale, California, Costa Mesa and Mission Viejo, California, Las Vegas, Nevada, and Pittsburgh, Boston and Cleveland airports.

66.    Several of the Swatch-owned stores as can be seen from the above are located at busy international airports.

67.    In total, SWATCH-branded watches and jewelry are currently sold in approximately 275 points of sale in the United States, plus on the Internet.  Over the years, SWATCH brand watches have been sold in thousands of other locations across the country including SWATCH owned stores, department stores, and over one hundred independent watch and jewelry stores and other merchants.

68.    SWATCH products are ubiquitous across the country and appeal to multiple demographic segments of customers.

69.    SWATCH watches are relatively inexpensive.  They retail starting at about the fifty dollar range; accessories such as separate watch bands, cost proportionally less.

70.    SWATCH-branded retail locations are in many of this country's highest traffic tourist destinations, which Swatch selects because they are known to draw very large numbers of visitors from every corner of the country.

71.    For example, the flagship SWATCH store in Times Square in New York City, draws over ▮▮▮▮▮▮SWATCH store visitors per year.  This equates, on average, to over ▮▮▮▮ consumers visiting just this one store alone every single day.

Success of the Brand

72.     The SWATCH watch became an instant success when Mr. Nicholas Hayek rescued the Swiss watch manufacturing industry in the 1980s. A true and correct copy of the Swatch product catalog is located at Exhibit 10, which details the SWATCH product range.

73.     The brand's success has spurred many possible imitators over the years. Swatch S.A. has filed a very large number of Oppositions, actions against third party trademark applications in the United States Patent and Trademark Office, Trademark Trial and Appeal Board, as part of its enforcement efforts in support of its SWATCH Mark in the United States. I searched the records of the United States Trademark Trial and Appeal Board at the address www.uspto.gov. I selected the link for the Trademark Trial and Appeal Board, which redirected me to the Trademark Trial and Appeal Board page of the USPTO located at the address http://www.uspto.gov/trademarks/process/appeal/index.jsp. I then clicked on the link for TTABVUE, which opened a new window in my internet browser with the address http://ttabvue.uspto.gov/ttabvue/. While on the TTABVUE page, I entered the term "swatch" into the field labeled "party" and then clicked on the button marked "search." This search resulted in over 100 results. This includes marks with "SWA-" uses of prefixes. A true and correct copy of the listing of the Oppositions filed in the Trademark Trial and Appeal Board records for Swatch as a party is attached as Trial Exhibit 39.

74.     Swatch is unique among registered trademarks. I verified this on a public government database. I searched and have found that all of the active U.S. trademark registrations for the term SWATCH are owned by Plaintiff Swatch S.A. I accessed the World Wide Web and navigated to United States Patent and Trademark Office website at the address www.uspto.gov. I selected the link for "Search Marks", which redirected me to the Trademark Electronic Search

System   (TESS)   page   of   the   USPTO   located   at   the   address http://tess2.uspto.gov/bin/gate.exe?f=tess&state=4009:vbq2as.1.1.   I then clicked on "Basic Word Mark Search," which lead me to the search input screen.   I selected the radio button "live" and entered the term "swatch" into the search term field and clicked on the "submit query" button.

75.   The success of the SWATCH brand has been built upon its reputation in the last decades as a trendy, hip, creative and fashionable manufacturer of watches and jewelry.

76.   The SWATCH mark is a very valuable commodity in the watch industry.

77.   Products sold under the SWATCH mark must meet very high standards for quality, workmanship, and stylizing.

78.   The important SWATCH mark is therefore aggressively protected. There are no other SWATCH marks registered in the United States, as discussed above, and to the best of my knowledge, experience and observation, there are no SWA- prefixed marks registered for watches in the United States.

79.   The SWATCH mark is important to The Swatch Group (U.S.) Inc. as the exclusive U.S. distributor of SWATCH brand products.

80.   The use of similar sounding SWA- prefixed marks by others would divert the goodwill and reputation built in the SWATCH name.

81.   This is especially true if the similar sounding brand name is for watches and/or jewelry products.

82.   I have worked in this industry for the past six years, during which time I have traversed the country and methodically canvassed the watch market for fashion watches.  I am not aware of any other trademarks which begin with the SWA- prefix, with the exception of the defendant's

trademarks for watches.

83.     Control over how the SWATCH mark is used, and the quality of the products associated with the SWATCH trademark is vital to the integrity of the brand, goodwill and reputation, which have taken close to three decades to build.

84.     The use of an SWA- prefix mark for watches, such as that of the defendant, will impact the control and recognition of the SWATCH mark by allowing others to use similar sounding marks for watches in the United States.

85.     SWATCH watches sell from $50-$250. SWATCH watches may be sold for these prices in part due to the power of the SWATCH brand and its brand image.

86.     SWATCH watches often incorporate fanciful designs and artwork which others inevitably try to evoke.

87.     Swatch's work with famous artists to design SWATCH watches, such as Billy the Artist, Kiki Picasso, Keith Haring, Jeremy Scott, Manish Arora, and Pedro Almodovar insure a reputation for cutting edge artwork and imagery.

88.     SWATCH products have used innumerable designs and devices over the years, including color, creative themes, and art to keep up with trends in the fashion and art industries.

89.     Swatch also creates special edition watches, available for limited times, which have quickly become collectors' items.

90.     The SWATCH brand has always maintained a presence in the contemporary art movement and community.

91.     SWATCH products are seen by many as a reflection of pop culture.

92.     Significant efforts are made to keep SWATCH products at the edge of fashion trends. These efforts make SWATCH products successful.

93.     Our market information also shows us that SWATCH products are very commonly bought as gifts.

94.     Because SWATCH products are featured and advertised in high profile ways, such as in fashion magazines and billboards such as the one in Times Square, it is my experience that if another party is permitted to continue selling watches under an SWA- prefixed mark, that product will ride on the coattails of the success of SWATCH products.

95.     The reputation of the SWATCH brand and products is controlled not only through the advertising and marketing of the products but also the quality standards of the products.

96.     Anyone making watches under a similar name to SWATCH on watches or jewelry will undoubtedly detrimentally affect the SWATCH brand and its sales and brand equity.  This harm is further deepened when the same quality standards of the SWATCH products are not met.

97.     Consumers who see any similar mark, such as SWAP, on goods which are not the same quality goods as a SWATCH product, will gain a negative perception of the SWATCH brand.

98.     Negative perceptions of the SWATCH brand affect sales cause a deterioration of the brand image, and hurt the product and its sales.  They would at a minimum, require increased expenditures for advertising and promotion to erase confusing perceptions.  Ultimately, I do not believe that a confused consumer will necessarily be re-gained as once trust in a brand is lost it can be almost impossible to repair.   It is a very competitive marketplace which may afford consumers many choices, and it can never be presumed that a lost consumer will be recaptured.

99.     Any loss of control regarding how SWATCH products are perceived harms not only the brand, but those who distribute, sell or advertise SWATCH products.

100.    As explained above, SWATCH products are heavily advertised in order to continue the recognition of the brand, and maintain its image to customers and potential customers.  Anything

which interferes with the brand and supporting activities, causes harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed _October 25_____, 2011 at Weehawken, NJ.

Patricia Higgins

( 3 )

# APPENDIX

TTAB Decision ...........................................................................A

Note: All filings in Opposition No. 91163912 are available on the
Trademark Trial and Appeal Board at
http://ttabvue.uspto.gov/ttabvue/v?pno=91169312&pty=OPP

# EXHIBIT A

> **THIS OPINION IS NOT A
> PRECEDENT OF
> THE T.T.A.B.**

Oral Hearing:  September 22, 2010 Mailed:  February 23, 2011

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

Swatch AG
v.
Amy T. Bernard and Beehive Wholesale, LLC

_____

Opposition No. 91169312
to application Serial No. 78459527

_____

Jess M. Collen and Thomas P. Gulick of Collen IP for Swatch AG.

William J. Utermohlen of Oliff & Berridge, PLC for Amy T. Bernard.

_____

Before Seeherman,[1] Cataldo and Wellington, Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Applicants, Amy T. Bernard and Beehive Wholesale, LLC, seek to register on the Principal Register the mark displayed below:

_____

[1] Administrative Trademark Judge Ellen Seeherman is substituted in place of Administrative Trademark Judge James Walsh, who retired from the Trademark Trial and Appeal Board on January 28, 2011.

Opposition No. 91169312



for "watch faces, ribbon watch bands, slide pendants, and beaded watch bands" in International Class 14.[2]

In its amended notice of opposition opposer, Swatch AG, pleaded ownership of the following marks, previously used and registered on the Principal Register:

# swatch

for "watches and parts therefor" in International Class 14;[3]

SWATCH

(in typed format) for "watches, clocks and parts therefor" in International Class 14;[4] and

---

[2] Application Serial No. 78459527 was filed by Amy T. Bernard on July 30, 2004, based upon her assertion of June 1, 2003 as a date of first use of the mark anywhere and in commerce.  The assignment of the application to Beehive Wholesale, LLC was recorded with the Assignment Branch of the United States Patent and Trademark Office (USPTO) subsequent to commencement of this proceeding, and Beehive Wholesale, LLC was joined as party defendant by a Board order issued on December 23, 2008.
[3] Registration No. 1356512 issued on August 27, 1985.  Section 8 affidavit accepted; Section 15 affidavit acknowledged.  Renewed.
[4] Registration No. 1671076 issued on January 7, 1992.  Section 8 affidavit accepted; Section 15 affidavit acknowledged.  Renewed.

Opposition No. 91169312

# swatch

for "books and periodicals, namely a series of books illustrating collectable articles, magazines for watch collectors" in International Class 16.[5]

As grounds for opposition, opposer alleged that applicants' mark, when used in connection with the recited goods, so resembles opposer's famous SWATCH marks, previously used and registered for goods including watches, as to be likely to cause confusion; that applicants' mark is likely to dilute the distinctive character of opposer's SWATCH marks; and that applicants' mark is merely descriptive as applied to the recited goods.

In their answer to the amended notice of opposition, applicants denied the salient allegations thereof.

## Evidentiary Matters

We begin by observing that on February 24, 2010, opposer submitted on CD-ROM the testimonial depositions of Patricia Higgins and Daniel Rodriguez, the rebuttal testimonial depositions of Amy T. Bernard and Brent Bernard, and exhibits corresponding thereto. At one time evidence could be made of record in this manner pursuant to Trademark

---

[5] Registration No. 2050210 issued on April 8, 1997. Section 8 affidavit accepted; Section 15 affidavit acknowledged. Renewed.

Opposition No. 91169312

Rule 2.126(b).  However, by amendment effective August 31, 2007 and applicable to all cases pending or commenced on or after that date, Trademark Rule 2.126(b) no longer accords parties the option of making submissions to the Board in CD-ROM form.[6]  Thus, because opposer's above-noted testimonial depositions and exhibits were not filed on paper or by electronic means as required under the operative Trademark Rule, they have not be considered in this decision.[7]

In addition, each party has filed objections to certain testimony and exhibits introduced by its adversary.  However, we see no compelling reason to discuss the objections in a detailed fashion.  Suffice it to say, we have considered all of the testimony and exhibits submitted by the parties with the exception of the testimony and exhibits improperly submitted on CD-ROM and excluded as discussed above.  In so doing, we have kept in mind the various objections raised by the parties, and we have accorded whatever probative value the subject testimony and exhibits merit.

---

[6] Notice thereof is posted on the Trademark Trial and Appeal Board (TTAB) page of the USPTO internet website at http://www.uspto.gov/web/offices/com/sol/notices/72fr42242.pdf http://www.uspto.gov/web/offices/com/sol/notices/72fr42242_ FinalRuleChart.pdf.

[7] We also note that applicants raised objections to certain testimony and exhibits that were submitted on CD-ROM.  Because of our decision to exclude these depositions and exhibits for the reasons discussed above, we need not consider these objections.

Opposition No. 91169312

## The Record

By operation of Trademark Rule 2.122, 37 C.F.R. §2.122, the record in this case includes the pleadings and the file of the involved application.

In addition, during its assigned testimony period, opposer submitted notices of reliance upon copies of its pleaded registrations prepared by the USPTO showing current status and title thereto; printed publications and printouts from Internet websites that are available to the general public; dictionary definitions; the discovery depositions of Amy Bernard and Brent Bernard; and opposer's interrogatories to applicants and applicants' responses thereto.

During their assigned testimony period, applicants submitted the testimony depositions, with exhibits, of Amy Bernard, applicant and Beehive Wholesale, LLC's ("Beehive") founder; Brent Bernard, Beehive's President; and Michelle Bernard, Beehive's Chief Operating Officer.  Applicants also submitted notices of reliance upon dictionary definitions; opposer's responses to applicants' requests for admission; and excerpts from the discovery deposition of Caroline Faivet, an officer of The Swatch Group (U.S.).

Opposer and applicants filed main briefs on the case, and opposer filed a reply brief.

Both parties have designated portions of their testimony, evidence and briefs as containing "confidential"

5

Opposition No. 91169312

information.  In this decision we will endeavor to discuss

materials deemed confidential only in general terms.

### Opposer's Standing

Because opposer has properly made its pleaded

registrations of record, and further has shown that it is

not a mere intermeddler, we find that opposer has

established its standing to oppose registration of

applicants' mark.  *See Cunningham v. Laser Golf Corp.*, 222

F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and *Lipton*

*Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213

USPQ 185 (CCPA 1982).

### Mere Descriptiveness

Turning to opposer's claim of mere descriptiveness, a

term is deemed to be merely descriptive of goods or

services, within the meaning of Trademark Act Section

2(e)(1), if it forthwith conveys an immediate idea of an

ingredient, quality, characteristic, feature, function,

purpose or use of the goods or services.  *See, e.g., In re*

*Gyulay, 820 F.2d 1216*, 3 USPQ2d 1009 (Fed. Cir. 1987); and

*In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215,

217-18 (CCPA 1978).  A term need not immediately convey an

idea of each and every specific feature of applicants' goods

or services in order to be considered merely descriptive; it

is enough that the term describes one significant attribute,

function or property of the goods or services.  *See In re*

Opposition No. 91169312

*H.U.D.D.L.E.*, 216 USPQ 358 (TTAB 1982); and *In re MBAssociates*, 180 USPQ 338 (TTAB 1973). It further is settled that "[t]he question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them." *In re Tower Tech Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002).

In this case, opposer argues that applicants' SWAP mark merely describes the identified goods, namely, "watch faces, ribbon watch bands, slide pendants, and beaded watch bands." In support of its position, opposer relies upon the following statements made by two of applicants' witnesses in their discovery depositions, taken prior to opposer's amendment of its notice of opposition to assert mere descriptiveness as a ground therefor:

> Q. Okay. So how was it decided that SWAP was going to be the name?
>
> A. It was the one everyone liked in our office. It was short. It meant interchangeable.
>
> Q. Okay. And when you say interchangeable, is that a function of the product?
>
> A. Correct.
>
> Q. Okay. Can you explain how it's interchangeable?
>
> A. You can change out bands to different watch faces in according [sic] to what color you're wearing that day, so you can have one watch head and wear it multiple ways.

7

Opposition No. 91169312

Q. So what you're saying is you swap?

A. Uh-huh (affirmative).

Q. You're swapping the band with the face?

A. Right.

Q. Okay.

A. Yeah.

Q. And so then you're basically describing a function of the watch?

A. Right.[8]

---

Q. Okay.  Did - let me rephrase it.  I'm actually going to go a little bit further back.  When you decided that you were going to select SWAP over - I believe before you said Sir Mix-a-Lot, Mix Max. Can you tell me why you chose that name?

A. We were looking for a term that defined interchangeable, and SWAP fit that for us.

Q. Okay.  And why was that important to you?

A. Because we - in that product line we sell custom components that are interchangeable.

Q. Okay.  When you say that you sell custom components that are interchangeable, what parts, components are you talking about?

A. Watch bands, watch faces.

Q. So just to make sure I'm understanding you right, you have different types of watch faces and different types of watch bands that can be used interchangeably?

A. Correct.

...

---

[8] Opposer's First Notice of Reliance, Exhibit 30, Discovery Deposition of Amy Bernard, p. 12-13.

Opposition No. 91169312

> Q. Okay.  So you selected the SWAP name over the
> other ones – I'm just trying to understand –
> because it defined what the product was doing,
> what you can do with the product; is that correct?
>
> A. Correct.
>
> Q. Okay.  So you picked SWAP because it best
> described, what, a function of the product?
>
> A. Correct.[9]

Opposer argues that, in light of the above statements,

"Applicant has even admitted that it adopted the mark

because it well described Applicant's goods."[10]

However, applicants' same witnesses made the following

statements during their testimony depositions:

> Q. This exhibit contains a list of names that you
> were considering for what is now the Swap Watch
> product?
>
> A. This list contains a brainstorming session and
> words that came out of that to help us come up
> with a name for the Swap brand of products, yes.
>
> Q. Well, obviously before it was the Swap brand of
> products, correct?
>
> A. Correct.
>
> Q. Included in this list is Switch Watch?  Is that
> correct?
>
> A. Yes.
>
> Q. Mix Match is another name?
>
> A. Mix Match, yes.
>
> Q. Create your own watch?

---

[9] Id. at Exhibit 31, Discovery Deposition of Brent Bernard, p. 25-6.
[10] Opposer's Brief, p. 36.

Opposition No. 91169312

A. Yes.

Q. Part of the reason why these names were considered was because it was to feature a function of the particular product.  Is that correct?

A. Yes.

    MR. UTERMOHLEN:
    Objection, vague.

A. If you're asking whether it suggests interchangeability, yes.

Q. Does the Swap product contain custom components that allow a customer to choose their own style of watch?

A. Yes.

Q. Did you select Swap as a possible name for your watch because you were looking for a term that defined interchangeability?

    MR. UTERMOHLEN:
    Objection, vague.

A. We picked the Swap mark because of the fact that it highlights the feature that you could do that.[11]

---

Q. Ms. Bernard, let me show you what's been marked as Exhibit 17.  Do you recognize that document?

A. Yes.

Q. What is it?

A. It's a piece of paper where we did a brainstorming session and tried to come up with names for our new product line.

Q. And which of these names were potential, or let me restate that.  Which of these words were potential names for the product line?

---

[11] Brent Bernard Testimony (cross-examination), p. 84-6.

Opposition No. 91169312

A. Pretty much all of them.  They were all considered.  We wrote down just a list of what we were thinking about.  Most of them on there are potential names, with the exception of "watch" or "beads," you, know, from just brainstorming.

Q. So "Sir Mix a Lot" was one?

A. Yes.

Q. And "Switch" was another?

A. Yes.

Q. "Mix Match"?

A. Yes.

Q. "Mix Max" as well?

A. Yes.

Q. Did all those names suggest interchangeability?

    MR. GULICK:
    Objection, foundation.

A. Yes, they did.

Q. And is that what you thought at the time?

A. Yes.

Q. Of those names, why was Swap chosen?

A. Out of the names we came up with, Swap was the shortest, number one.  It was the easiest to remember, and it was catchy.[12]

While opposer argues that the statements made by applicants' officers during their discovery depositions should be construed as admissions that SWAP merely describes the identified goods, these statements are inconsistent with

---

[12] Amy Bernard Testimony, p. 8-10.

Opposition No. 91169312

the statements of those same witnesses during their
testimonial depositions, in which they assert that SWAP
suggests a feature – namely interchangeability – of the
recited goods.   It is clear from the entirety of the
testimony that applicants' witnesses are not sophisticated
in trademark law or the significance of particular words as
they relate to trademark principles, and that they followed
the language used by the attorneys who questioned them.
Therefore, we construe the statements made in applicants'
discovery depositions as simply demonstrating a lack of
understanding of the significance of descriptiveness versus
suggestiveness as applied to applicants' mark at a time when
mere descriptiveness was not a ground for opposition in this
proceeding, and the statements fall short of admissions that
SWAP merely describes applicants' recited goods.   We note in
this regard that opposer has not made of record any request
for admission in which applicants admit that their applied-
for mark is merely descriptive.

In addition, opposer relies upon the dictionary
definition of SWAP:  "to trade one thing for another; to
exchange (one thing) for another; an exchange of one thing
for another."[13]  Opposer further relies upon the following
evidence of two instances of third-party use of SWAP in

---

[13] Applicants' Notice of Reliance, Exhibit 34, from The American
Heritage College Dictionary (3d ed., 1997).

12

Opposition No. 91169312

connection with watches.  The first is simply in an Internet address of Orange County Creations:

> Changeable watch faces can be used on our Changeable watch bands (also known as Build-A-Watch).  The Changeable watch faces and bands allow you to order just a few faces and bands and have a large variety of choices. …
> http://occreations.net/build_a_watch_swap_faces;[14]

The second is use of SWAP for PUMA watches:

> PUMA SWAP BLACK & WHITE INTERCHANGEABLE STRAP WATCH NIB
>
> Puma Women's Swap Steel Dress Crystal Watch
>
> Women's Puma Black White Swap Band Watch
>
> New PUMA Watch SWAP Stainless Steel Bracelet – Limited
>
> PUMA LADY SWAP WATCH TWO BANDS 50m
>
> PUMA SWAP LADIES WATCH
>
> New Puma Watch SWAP Rose Gold – Special Edition STONES
>
> Women's' Puma Brown & White Swap Watch …
> http://shop.ebay.com;[15]

and

> Puma Women's Swap Interchangeable Band Watch
>
> Puma Women's Sportslifestyle Collection Swap Interchangeable Band
>
> Puma Swap Ladies Watch …
> http://www.google.com.[16]

---

[14] Opposer's Notice of Reliance, Exhibits H and I.
[15] Id. at Exhibit J.
[16] Id. at Exhibit K.

Opposition No. 91169312

However, the above evidence falls short of establishing that SWAP merely describes a function, feature or use of applicants' goods. The contradictory statements of applicants' officers demonstrate little more than a lack of understanding of the significance of the term comprising their mark. There is nothing in the dictionary definition of SWAP to indicate that the term merely describes watch bands, watch faces or slide pendants. And it is impossible to tell from the Internet address of Orange County Creations how the term SWAP is used therein. Similarly, it is unclear from opposer's evidence whether Puma is using the term SWAP in a descriptive sense, as a trademark, or as part of a trademark, although we note that the term is shown either in all capital letters or with its initial letter capitalized, which is consistent with trademark use.

When viewed in its totality, the evidence of record is insufficient to support a finding that SWAP merely describes a function, feature or characteristic of applicants' goods. Given the uncertainty of the third-party evidence and the lack of clear testimony or other evidence of mere descriptiveness, we find that opposer has failed to meet its burden of proof on this ground. Based upon this record, SWAP does suggest interchangeability, which is a feature of the goods. However, suggestive marks are registrable on the Principal Register without a showing of acquired

Opposition No. 91169312

distinctiveness.  Opposer's evidence simply is insufficient to create a prima facie case of mere descriptiveness such that the burden would shift to applicants to demonstrate that their mark has acquired distinctiveness.

### Opposer's Priority

Because opposer's pleaded registrations are of record, Section 2(d) priority is not an issue in this case as to the marks therein and goods covered thereby.  *See King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

### Likelihood of Confusion

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue.  *See In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  *See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); and *In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

Fame of Opposer's Marks

We begin our likelihood of confusion analysis with the fifth *du Pont* factor, which requires us to consider evidence of the fame of opposer's marks, since if fame exists, we must give great weight to this factor.  *See Bose Corp. v.*

15

Opposition No. 91169312

*QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Recot Inc. v. Becton*, 214 F.3d 1322, 54 F.2d 1894 (Fed. Cir. 2000); and *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

In those portions of its briefs[17] directed toward the fame of its SWATCH marks, opposer makes a number of assertions regarding its length of use of the marks; sales and advertising expenditures; examples of its advertising and promotional efforts in various media; and examples of affiliation of goods bearing its SWATCH marks with celebrities and athletic events. However, in light of our determination above excluding opposer's submissions by CD-ROM, there is no testimony or evidence of record to support these assertions.

As a result, the only evidence of the fame of opposer's SWATCH marks is copies of approximately 30 print advertisements and articles from such general circulation newspapers and periodicals as The Wall Street Journal, The New York Times, Smithsonian, Popular Science, Los Angeles Times, Ms., and Women's Wear Daily. This evidence demonstrates that opposer has advertised goods bearing its SWATCH marks in major periodicals and newspapers and further that its promotional efforts have resulted in a degree of

---

[17] Opposer's brief, p. 22-25; opposer's reply brief, p. 9-12.

Opposition No. 91169312

recognition in such periodicals and newspapers. However, such evidence falls far short of demonstrating that opposer's SWATCH marks are famous for purposes of our likelihood of confusion analysis.

In addition, opposer relies upon statements made by applicants' principals in their discovery depositions in which they acknowledge that they have heard of or otherwise are aware of the SWATCH brand as applied to watches.[18] However, these statements fall far short of admissions by applicants or its principals that opposer's SWATCH marks are famous. Thus, we find that applicants did not admit that opposer's SWATCH marks are famous.

In view of the extreme deference that is accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of a party attempting to establish the fame of a mark to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007). In this case, as discussed above, there is insufficient evidence of record in support of opposer's assertions regarding the fame of the marks in its pleaded registrations. In the absence of compelling evidence properly made of record, or clear

---

[18] Opposer's First Notice of Reliance, Exhibit 30 (Discovery Deposition of Amy Bernard, p. 50-52), and Exhibit 31 (Discovery Deposition of Brent Bernard, p. 72-75).

Opposition No. 91169312

admissions by applicants that opposer's marks are famous, we are left with little more than the mere assertions of fame in opposer's briefs.

Accordingly, we find on this record that the evidence falls short of establishing that any of opposer's pleaded SWATCH marks is famous for purposes of our likelihood of confusion determination. Nonetheless, there is no evidence of record that opposer's marks are weak, to the extent opposer has presented evidence of examples of its advertising and there is no evidence of third-party uses.

### Opposer's Registration No. 1671076

We have determined that opposer has failed to demonstrate that the marks in its pleaded registrations are famous. Furthermore, we note that opposer has neither pleaded nor proven that it owns a family of marks. In considering its three pleaded registrations, we note that by virtue of being presented in typed format (which gives opposer rights in the mark without limitation to any particular stylization), the mark in opposer's Registration No. 1671076 is more similar to the mark in the involved application than the mark in either of its other pleaded registrations. We further note that Registration No. 1671076 recites goods that are most similar to the goods in the involved application.

18

Opposition No. 91169312

Accordingly, we will concentrate our discussion of the issue of likelihood of confusion on opposer's Registration No. 1671076 for the mark SWATCH in typed characters for "watches, clocks and parts thereof" (hereinafter, the '076 Registration). This is because if we find a likelihood of confusion between this registration and applicants' mark, there is no need to consider the question with regard to the other registrations, and if we find no likelihood of confusion between this registration and applicants' mark, there will be no likelihood of confusion with the marks in opposer's other pleaded registrations.

The Goods and Trade Channels

The goods in the involved application are identified as "watch faces, ribbon watch bands, slide pendants, and beaded watch bands." "Watch faces," "ribbon watch bands" and "beaded watch bands" are component parts comprising watches. The testimony of applicants' officers, excerpted above, confirms that the watch faces and bands are interchangeable and intended to be combined into different styles of watches to match different styles of clothing.[19] Thus, we find it appropriate to construe applicants' goods not merely as parts for watches, but as watches themselves. Applicants' goods thus are identical to the "watches and parts therefor"

_____

[19] *See, for example*, opposer's First Notice of Reliance, Exhibit 30, Discovery Deposition of Amy Bernard, p. 12-13.

Opposition No. 91169312

identified in opposer's '076 Registration.  As a result, the
goods in the involved application and '076 Registration are
identical in part.

Because the goods are identical in part and there are
no restrictions as to their channels of trade or classes of
purchasers, we must assume that the goods are, or will be,
sold in all the normal channels of trade to all the usual
purchasers for such goods, and that the channels of trade
and the purchasers for applicants' and opposer's goods would
be the same.  *See Interstate Brands Corp. v. McKee Foods
Corp.*, 53 USPQ2d 1910 (TTAB 2000).  Indeed, applicants
acknowledge that

> "[b]ecause Applicant's application includes watch
> faces and watch bands and because Opposer's
> registrations of record are primarily for watches,
> there is overlap in the recited goods (which does
> not extend to jewelry) and the Board presumes that
> the 'goods are marketed in all normal trade
> channels for such goods.'" (internal cites
> omitted).[20]

It is clear that if these identical and closely related
goods are offered under similar marks there would be a
likelihood of confusion.

Thus, we turn to the marks, keeping in mind that when
marks would appear on identical goods, as they do here, the
degree of similarity between the marks necessary to support
a finding of likely confusion declines.  *See Century 21 Real*

---

[20] Applicants' brief, p. 13.

Opposition No. 91169312

*Estate v. Century Life*, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

### The Marks

We turn then to the first *du Pont* factor, i.e., whether applicants' mark and opposer's mark in its '076 Registration are similar or dissimilar when viewed in their entireties in terms of appearance, sound, connotation and overall commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot, supra.*

In this case, we observe that applicants' mark



and the SWATCH mark in opposer's '076 Registration share the first three letters in common, namely SWA-. This results in some similarity in sound, especially if the marks are not articulated clearly so that the differences in the final consonants are not noted. However, the marks are dissimilar in appearance in that applicants' mark also contains the fourth letter -P while opposer's mark contains the additional three letters -TCH. Overall, there are clear differences in how the marks look.

Opposition No. 91169312

Most importantly, the marks are distinctly different in meaning.  The term SWAP comprising applicants' mark, as set forth previously, is defined as follows:  "to trade one thing for another; to exchange (one thing) for another; an exchange of one thing for another."[21]  Consumers are likely to note and understand the meaning of this common term because, as discussed above, SWAP suggests that applicants' watch faces and watch bands are interchangeable and may be used to combine different colors and styles of watches.  Inasmuch as SWAP has significance relating to applicants' goods, consumers are likely to remember the meaning of SWAP as applied to those goods.  The term "swatch," on the other hand, is defined as follows:  "a sample strip or piece of material."[22]  In addition, opposer's SWATCH mark may be perceived as the term WATCH, to which the letter "S" has been added.  However, regardless of whether opposer's mark is perceived as referencing a watch or a sample piece of material, those meanings are different from the meaning of applicants' mark, namely, a trade or exchange of one thing for another.  Thus, the plain meaning of applicants' mark is clearly different from any meaning that may be ascribed to opposer's mark.  As a result, the marks are highly dissimilar in connotation.

---

[21] Applicants' Notice of Reliance, Exhibit 34, from The American Heritage College Dictionary (3d ed., 1997).
[22] Id.

22

Opposition No. 91169312

Overall, the significant dissimilarity in the meanings of the marks outweighs the fact that the marks begin with the same three letters.  The marks convey dissimilar commercial impressions.

We are not persuaded by opposer's arguments that the "similarity of the marks is further compounded when considering how the marks are used in commerce."[23]  Opposer asserts that applicants often use the word "watch" with their mark, and points to another version of the SWAP mark in which the "S" is replaced by the face of a clock.  We see nothing inappropriate in a party using a generic term with its mark.  On the contrary, it is a basic tenet of trademark practice that one way to prevent one's mark from becoming generic is to use a generic term with it.  As for opposer's second point, the question we must decide is likelihood of confusion between the mark in the challenged application and pleaded registration(s), not other marks that applicant may use.[24]

In view of the foregoing, the *du Pont* factor of the similarity of the marks favors applicant.

---

[23] Opposer's brief, p. 10.
[24] Because applicants' other mark is not the subject of this proceeding, our comment should not be taken as a suggestion that we would or would not find confusion with respect to it.

Opposition No. 91169312

Conditions of Sale

The next *du Pont* factor discussed by the parties is that of the conditions of sale. As identified, neither applicants' nor opposer's goods are limited to expensive, "high end" products. As such, we must presume that opposer's watches and parts therefor as well as applicants' watch faces and bands are of all types and price ranges common thereto. These would include inexpensive products that normally would be purchased without a great deal of thought in addition to more highly specialized and expensive items. We find this fourth *du Pont* factor to favor opposer.

Actual Confusion

Another *du Pont* factor discussed by the parties is the lack of instances of actual confusion despite over six years of use by the parties, at time of trial, of their respective marks. Applicants assert that the absence of actual confusion suggests no likelihood of confusion. We note, however, that it is often difficult to adduce reliable evidence of actual confusion. Furthermore, it is not necessary to show actual confusion in order to establish likelihood of confusion. *See Weiss Associates Inc. v. HRL Associates Inc.* 902 F.2d 1546, 223 USPQ 1025 (Fed. Cir. 1990).

Opposition No. 91169312

Accordingly, this *du Pont* factor must be considered to be neutral or to only slightly favor applicants.

Applicants' Intent in Adopting the SWAP Mark

Next, opposer argues that applicants were "aware of the SWATCH mark in association with watches at a time prior to Applicant's adoption of the SWAP mark for watches."[25] Opposer further argues that despite this prior knowledge, "Applicant did not conduct a trademark search to determine the availability of its SWAP mark."[26]  Opposer asserts that "Applicant did not conduct a search because it knew it was able to capitalize on Opposer's goodwill in its SWATCH mark."[27]

To the extent that opposer is arguing that applicants adopted their mark in bad faith, there is insufficient evidence to show or from which we can infer this.  As noted by opposer, applicants acknowledge that they were aware of opposer's SWATCH marks prior to their adoption of the SWAP mark.  However, mere knowledge of the existence of opposer's marks does not, in and of itself, constitute bad faith.  *See Action Temporary Services Inc. v. Labor Force Inc.*, 870 F.2d

---

[25] Opposer's brief, p. 29, citing to opposer's First Notice of Reliance, Exhibit 30, Discovery Deposition of Amy Bernard, p. 50-2, and Exhibit 31, Discovery Deposition of Brent Bernard, p. 72-5; Testimonial Deposition of Brent Bernard, p. 84.
[26] Id. at 30, citing to Opposer's First Notice of Reliance, Exhibit 5, Applicants' Response to Opposer's First Set of Interrogatories.
[27] Id.

Opposition No. 91169312

1563, 10 USPQ 1307 (Fed. Cir 1989); and *Ava Enterprises, Inc. V. Audio Boss USA, Inc.*, 77 USPQ2d 1783 (TTAB 2006). Opposer points to no evidence or testimony to support its rather conclusory statement that because applicants were aware of opposer's marks and did not perform a trademark search prior to selection of their mark, applicants sought to trade on the goodwill of opposer. In short, the record in this case simply does not support such a finding.

We have concentrated our discussion on the *du Pont* factors discussed by the parties and for which the parties properly introduced testimony and evidence. To the extent other *du Pont* factors are applicable, we find them to be neutral. In accordance with the above analysis, we acknowledge that many of the *du Pont* factors discussed above favor opposer. However, it is settled that from case to case, different *du Pont* factors may play prominent roles, and that even a single *du Pont* factor may be sufficient to find for one party or another. *See Kellogg Co. v. Pack'em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive"). In this case, the factor of the similarity or dissimilarity of the marks plays that dominant role. Because of the significant differences between the parties' marks, even members of the general public exercising only ordinary care will recognize

26

Opposition No. 91169312

that the marks are different, and are not likely to believe that applicants' stylized SWAP mark, used on watch faces and bands that can be used to create watches, emanate from the same source as opposer's watches and parts therefor sold under the mark SWATCH.  Accordingly, we find that opposer has failed to prove that a likelihood of confusion exists between its pleaded SWATCH marks and the mark in the involved application as applied to the identified goods.

### Dilution

Turning next to opposer's claim of dilution, an essential element for proving dilution is proving fame, and fame for dilution purposes requires a more stringent showing than fame for likelihood of confusion purposes.  *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005); and *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001).

Because, as discussed above, opposer has not shown on this record that its marks have achieved fame for purposes of likelihood of confusion, it follows that opposer has not shown the requisite level of fame for purposes of dilution.

### Conclusion

We have carefully considered all of the evidence pertaining to opposer's claims of priority of use and likelihood of confusion, dilution and mere descriptiveness,

Opposition No. 91169312

as well as all of the parties' arguments with respect thereto, including any evidence and arguments not specifically discussed in this opinion.

We conclude that opposer has established its standing and priority of use. However, we also conclude opposer has failed to make a prima facie case that SWAP merely describes the goods identified in the subject application. We further conclude that the marks in opposer's pleaded registrations are simply too dissimilar from applicants' mark to support a finding of likelihood of confusion. In addition, because opposer failed to establish that its marks are famous for purposes of likelihood of confusion, opposer cannot prevail upon its claim of dilution which requires a more stringent showing of fame.

**DECISION**: The opposition is dismissed as to the claim of mere descriptiveness, the claim of priority and likelihood of confusion, and the claim of dilution.

( 4 )

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SWATCH S.A.,

Plaintiff,

v.

BEEHIVE WHOLESALE, L.L.C.,

Defendant.

Civil Action No. 1:11-cv-434 LO/JFA

# Plaintiff's Trial Evidence
# Exhibits 1 - 134
# Chambers Copy Contains Information Filed Under Seal

| EXHIBIT NO | DOCUMENT DESCRIPTION |
|---|---|
| 1 | United States Federal Trademark Registration No. 1,356,512& Trademark Assignment Abstract of Title |
| 2 | United States Federal Trademark Registration No. 1,671,076 |
| 3 | United States Federal Trademark Registration No. 2,050,210 |
| 4 | United States Federal Trademark Application Serial No. 78/459,527 TARR printout, file history& Trademark Assignment Abstract of Title |
| 5 | Opposition No. 91169312 Applicant's Responses to Opposer's First Set of Interrogatories |
| 6 | 2006 Beehive catalog (provided as Exhibit A to Applicant's Response to Opposer's First Set of Interrogatories No. 2) |
| 7 | Display for SWAP WATCH LIMITED Products (Beehive Prod. # 272) |
| 8 | Trade Show Advertisement for SWAP WATCH LIMITED Products (Beehive Prod. #262) |
| 9* | Service Agreement and Invoices from Donnie Bell Design/Business Technology Group for Beehive Wholesale website development (Beehive Prod. # 497-500) |
| 10* | Swatch employee training manual and tool box (Swatch Prod. # 149-220) |
| 11 | September 9, 2009 Printout from Swatch website (www.store.swatch.com) re straps and batteries (Exhibit 5 to Testimonial Deposition of Patricia Higgins) |

| 12 | Swatch Bijoux Jewelry 2009 Spring Summer Collection (Swatch Prod. # 1576-1609) |
|---|---|
| 13 | 2008 examples of SWATCH print advertisements (Swatch Prod. # 1560-1563) |
| 14 | September 9, 2009 Printout from Swatch website (www.store.swatch.com) SWATCH FilamentoMulitcolore, Multiball, Chessboard, Divimos, Pink Flowers, Flash Berries and First Romance watches (Exhibit 4 to Testimonial Deposition of Patricia Higgins) |
| 15 | May 20, 1996 Press Release of Fall/Winter International Artist Collection, May 20, 1996 Press Release "There's No Time Like the Present", SWATCH Watch Categories, Print Advertisement re Swatch official timekeeper of 1996 Olympic Games, Swatch Chronology (Swatch Prod. # 607-622, 655-688) |
| 16* | SWATCH U.S. and Worldwide Sales 2002 – 2008 (Swatch Prod. # 1787) |
| 17* | SWATCH U.S. Marketing Budget 2001-2006 (Swatch Prod. # 475) |
| 18 | "'Sophisticated fun' is the new Swatch word" *American Photographer*, January 1986 (Swatch Prod. # 550-553) |
| 19 | "Santa Suits Up: Red Coat (Check), Shades (Check), Swatch Watches…" *Wall Street Journal*, December 24, 1985 (First Notice of Reliance, Exhibit 8); |
| 20 | "Many Retailers Post Small Gains In Holiday Sales" *Wall Street Journal*, December 27, 1985 (First Notice of Reliance, Exhibit 17) |
| 21 | "'Life's a Beach' for Swatch" *ADWEEK*, (Eastern Edition) (page 32) March 10, 1986 (Swatch Prod. # 547-549) |
| 22 | "It's Time to Swatch Yourself" *New York Times Magazine*, September 8, 1985 (First Notice of Reliance, Exhibit 10) |
| 23 | "The Watch to Wear When You're Wearing More Than One" *Marketing and Media Decisions*, Spring 1985 Special (First Notice of Reliance, Exhibit 11) |
| 24 | "On Land, At Sea and In the Air, Those Polymer Invaders are Here" *Smithsonian*, November 1985 (First Notice of Reliance, Exhibit 12) |
| 25 | "Swatch Cuts Wide Swath" *Advertising Age*, August 25, 1985 (First Notice of Reliance, Exhibit 13) |
| 26 | "Advertising Swatch's Total Look Campaign" *New York Times*, (First Notice of Reliance, Exhibit 14) |
| 27 | "Fighting the Recession by Spotting Some Fads and Inventing Others" *New York Times*, November 17, 1991 (Swatch Prod. # 559-560) |
| 28 | "Swiss ingenuity creates a throwaway quartz Swatch" *Popular Science*, March 1984 (Swatch Prod. # 544-546) |
| 29 | "Watch It! Here Comes Swatch" *American Jewelry Manufacturer*, April 1984 (First Notice of Reliance, Exhibit 16) |
| 30 | "Time Savers" *Ms.*, April 1998 (First Notice of Reliance, Exhibit 18) |
| 31 | "Swatches inspired by about everything" *Gary, IN Post-Tribune,* 1991 (Swatch Prod. # 555) |
| 32 | "Swatch Frenzy in N.Y. as Auction Prices Climb" *Observer,* (New York) August 19, 1991(Swatch Prod. # 557-558) |
| 33 | "All Wound Up" *Los Angeles Times,* September 6, 1991 (Swatch Prod. # 563-564) |
| 34 | "Swatch has great timing" *Cambridge Tab,* July, 1993 (Swatch Prod. # 565) |
| 35 | "Time After Time" *Women's Wear Daily,* August 20, 1991 (Swatch Prod. # |

| | |
|---|---|
| | 000566) |
| 36 | Swatch list of 2007 advertising campaigns and placement and Swatch Mother's Day Print Advertising Recap ("My Beloved Mom") *Metro New York*&*The New York Post*, May 1 -31, 2007& Sample of Metro New York print advertisement (Swatch Prod. # 1547-1555) |
| 37 | Swatch outdoor advertisement campaigns (buses, billboards etc.) in New York City and Los Angeles. (Swatch Prod. # 1556-1559) |
| 38 | Swatch Press Release ATHENS 2004 Swatch Olympic Collection, The Story Continues (Swatch Prod. 432-433) |
| 39 | Printout from USPTO showing all oppositions filed by Swatch against third parties |
| 40 | Webster's II New College Dictionary, 1112 (1986) (Swatch First Notice of Reliance at Exhibit 22) |
| 41 | Google.com search results for "swap watch" (the first twenty (20) listings from a search for "swap watch" at the website www.google.com) (Rebuttal Deposition of Amy Bernard at Exhibit A) |
| 42 | Ebay listing of Puma swap watches available to purchase and/or bid on. Website www.shop.ebay.com. (Opposer's Second Notice of Reliance at Exhibit J and Rebuttal Deposition of Amy Bernard at Exhibit D) |
| 43 | Google.com shopping search results listing Puma "Swap Interchangeable Band Watch," Puma "Interchangeable Strap Watch," and Puma "Swap" watch.  (The first ten (10) listings from a search for "Puma Swap Watches" at the website www.google.com.) (Opposer's Second Notice of Reliance at Exhibit K and Rebuttal Deposition of Amy Bernard at Exhibit C) |
| 44 | Orange County Creations' website, located at www.occreations.net explaining that "[i]nterchangeable watch faces can be used on our interchangeable watch bands (also known as Swap Watches)." (Opposer's Second Notice of Reliance at Exhibit H & L and Rebuttal Deposition of Amy Bernard at Exhibit B) |
| 45* | Swatch business plan 2002-2003 (Swatch Prod. # 476-481) |
| 46 | Swatch Caribbean & U.S. locations (Swatch Prod. 534-541) |
| 47* | Swatch Watches and Swatch Bijoux jewelry sold in units and Swiss francs from 2002 – June 2008 (Swatch Prod. # 1786) |
| 48 | Portions of Swatch Group Annual Report for 2002 and 2005 (Swatch Prod. # 689-694) |
| 49 | Portions of Swatch Group Annual Report for 2005: financial information (Swatch Prod. # 418-422) |
| 50 | Portions of Swatch Group Annual Report for 2002: financial information (Swatch Prod. # 415-417) |
| 51 | Swatch list of 2008 advertisement campaigns and placement and samples (Swatch Prod. # 1564-1575) |
| 52* | Opposer's Amended and Second Supplemental Responses to Applicant's First Set of Interrogatories |
| 53 | "Their Time Has Come" Swatch Dallas Texas News, June 20, 1991 (Swatch Prod. 554) |
| 54* | Swatch Watches and Swatch Bijoux jewelry sold in units and Swiss francs from 2003 – May 2011 (Swatch Prod. # 1810) |

| | |
|---|---|
| 55* | Swatch Watches and Swatch Bijoux jewelry sold in the United States in units, Swiss francs and U.S. dollars from 2002 – May 2011 (Swatch Prod. # 1811) |
| 56 | January 2009 Advertisement in *Watch & Jewelry Review* magazine (cover and pages 19- 20) featuring SWATCH watch (Swatch Prod. # 1814 – 1816) |
| 57 | July 2008   *Women's Wear Daily:  Special Report The WWD 100*  11th Annual Consumer Brand Awareness Survey (Swatch Prod. # 1944 – 1991) |
| 58 | Beehive's Swap watch sales by item (2005) (Beehive Prod. # 976 – 984) |
| 59* | Beehive's Swap watch sales by item (2006) (Beehive Prod. #  950 – 962) |
| 60* | Beehive's Swap watch sales by item (2007) (Beehive Prod. # 936 – 949) |
| 61* | Beehive's Swap watch sales by item (2008) (Beehive Prod. # 920 – 935) |
| 62* | Beehive's Swap watch sales by item (2009) (Beehive Prod. # 676 -  684,  905 – 919) |
| 63* | Beehive's Swap watch sales by item (2010) (Beehive Prod. # 685 – 693,  889 – 904) |
| 64* | Beehive's Swap watch sales (Jan. through June 27, 2011)  (Beehive Prod. # 875 – 888) |
| 65* | Beehive's Swap watch sales to Steinmart (Jan. through June 21, 2011) (Beehive Prod. # 740) |
| 66* | Beehive's Swap watch sales to Steinmart (2010) (Beehive Prod. # 703, 741) |
| 67* | Beehive's Swap watch sales to Steinmart (2009) (Beehive Prod. # 704, 742) |
| 68* | Beehive's Swap watch sales to Steinmart (2008) (Beehive Prod. # 743) |
| 69* | Beehive's Swap watch sales to Steinmart (2007)  (Beehive Prod. # 744) |
| 70 | Display for Interchangeable watch bands and faces (for Swap watch )    718 |
| 71 | Display and tags showing Swap watch faces and straps noting that the goods are interchangeable (Beehive Prod. # 726) |
| 72 | April 29, 2011 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1009) |
| 73 | April 29, 2011 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1007) |
| 74 | April 29, 2011 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1008) |
| 75 | April 29, 2011 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1072) |
| 76 | July 3, 2008 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1057) |
| 77 | January 22, 2010 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1062 – 1063) |
| 78 | March 9, 2010 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1067 – 1068) |
| 79 | March 11, 2010 letter from Defendant's counsel regarding third party use of SWAP mark (Beehive Prod. # 1070) |
| 80 | July 14, 2011  Defendant's  responses to Plaintiff's First Set of Requests for Admission in the federal lawsuit |
| 81 | July 14, 2011 Defendant's responses to Plaintiff's First Set of Interrogatories |
| 82 | Printout of TESS search for live "SWATCH" registrations showing Swatch as |

| | |
|---|---|
| | only owner of live SWATCH Marks |
| 83 | November 24, 2009 – Case No. 4:2009 cv 204 (E.D.N.C.) – Complaint – The Mainstreet Collection, Inc. v. Beehive Wholesale, LLC (Swatch Second Notice of Reliance at Exhibit D) |
| 84* | Beehive's Swap watch sales by Customer (2010) (Beehive Prod. # 748 – 754) |
| 85* | Beehive's Swap watch sales by Customer (2009) (Beehive Prod. # 755 – 762) |
| 86* | Beehive's Swap watch sales by Customer (2008) (Beehive Prod. # 763 – 772) |
| 87* | Beehive's Swap watch sales by Customer  (2007) (Beehive Prod. # 773 – 793) |
| 88* | Beehive's Swap watch sales by Customer  (2006) (Beehive Prod. # 794 – 830) |
| 89* | Beehive's Swap watch sales by Customer (2005) (Beehive Prod. # 831 – 874) |
| 90* | Invoices for Swap watches sold from Best of Beehive (Beehive Prod. # 737) |
| 91* | August 26, 2008 Sales receipt for Swap Limited kit sold at www.bestofbeehive.com (Beehive Prod. # 1049) |
| 92 | Domain name registration information for bestofbeehive.com (Beehive Prod. # 738 – 739) |
| 93 | Swap watch by Beehive sample picture of watch and tag (Beehive Prod. # 1000) |
| 94 | April 29, 2011 email chain of correspondence between Defendant's counsel and third party regard use of SWAP mark (Beehive Prod. # 1016-1018) |
| 95 | Website printout from www.etsy.com/shop/swapwatch printed on June 20, 2011 (Swatch Prod. # 1788 – 1790) |
| 96 | Website printout from chronograph-canvas-watch.blogspot.com/2011/04/swappable-red-canvas-strap.html printed on June 20, 2011 (Swatch Prod. # 1791 – 1793) |
| 97 | Website printout from dvice.com/archives/2011/01/slyde-hd3-watch.php printed on June 20, 2011 (Swatch Prod. # 1794 – 1798) |
| 98 | Website printout from alibaba.com printed on June 17, 2011 (Swatch Prod. # 1801 – 1802) |
| 99 | Website printout from www.princetonwatches.com/shop/puma-swap-womens-watches.asp printed on June 17, 2011 (Swatch Prod. # 1803 – 1804) |
| 100 | Website printout from www.activerideshop.com/!eVBpTCzCEUj1ATHCen4DRA!/Mens/The-Hundreds-1/The-Hundreds-Swap-Watch printed on June 20, 2011 (Swatch Prod. # 1805 – 1807) |
| 101 | February 2009 *Elle* (French) magazine featuring Swatch watch advertisement (cover page and ad) (Swatch Prod. # 1817 – 1818) |
| 102 | June 2009 *Elle* (French) magazine featuring Swatch Bijoux jewelry advertisement (cover page and ad) (Swatch Prod. # 1819 – 1820) |
| 103 | September 2009 *Elle* (French) magazine featuring Swatch watch advertisement (cover page and ad)  (Swatch Prod. # 1821 – 1822) |
| 104 | October 2009 *Elle* (French) magazine featuring Swatch watch (cover page and featured watch)  (Swatch Prod. # 1823 – 1824) |
| 105 | December 2009 *Elle* (French) magazine featuring Swatch ring (cover page and featured ring) (Swatch Prod. # 1825 – 1826) |
| 106 | January 2010 *Elle* (French) magazine featuring Swatch Bijoux jewelry advertisement (cover page and ad) (Swatch Prod. # 1827 – 1828) |

| 107 | April 2010 *Elle* (French) magazine featuring Swatch Bijoux jewelry advertisement (cover page and ad) (Swatch Prod. # 1829 – 1830) |
| 108 | September/October 2010 *Time 'n Style* (International Edition) magazine featuring Swatch watch (cover and featured watch) (Swatch Prod. # 1831 – 1832) |
| 109 | November 2010 *Elle* (Spanish) magazine featuring Swatch Bijoux jewelry advertisement  (cover page and ad) (Swatch Prod. # 1833 – 1834) |
| 110 | December 2010 *Dazed and Confused* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1835 – 1836) |
| 111 | April 2011 *Dazed and Confused* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1837- 1839) |
| 112 | Spring/Summer 2011  *Another Man* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1840 – 1842) |
| 113 | Summer 2011  *V Man* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1843 – 1845) |
| 114 | Winter 2010/2011  *V* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1846 – 1847) |
| 115 | Winter 2010/2011  *V Man* magazine featuring Swatch watch advertisement (cover and ad) (Swatch Prod. # 1848 – 1849) |
| 116 | 18" by 24" poster of side-by-side photos of Swatch's SWATCH FilamentoMulitcolore and Defendant's SWAP beaded bracelet and striped bands. |
| 117 | 18" by 24" poster of side-by-side photos of Swatch's SWATCH Divimos and SWATCH Pink Flowers and Defendant's SWAP Flower watch faces and flower watch bands |
| 118 | 18" by 24" poster of identification of goods of Swatch's U.S. Trademark Registration Nos. 1,671,076 and 2,050,210 and Beehive's U.S. Trademark Application Serial No. 78459527 |
| 119 | 18" by 24" poster of September 2008 *Wired* magazine featuring Swatch watch advertisement (cover page and ad) |
| 120* | 18" by 24" poster of "Fame of the SWATCH Trademark" reciting SWATCH worldwide sales, U.S. Sales of SWATCH products from 2002-2008 and U.S. advertising for SWATCH products. |
| 121 | 18" by 24" poster of side-by-side photos of Swatch's SWATCH Multiball and Defendant's SWAP beaded watch bracelets. |
| 122 | 18" by 24" poster of side-by-side photos of Swatch's SWATCH Flash Berries and Defendant's SWAP beaded watch bracelets and watch face. |
| 123 | 18" by 24" poster of February 2007 Swatch advertisement for SWATCH Windlove necklace |
| 124 | 18" by 24" poster of Defendant's advertisement for SWAP Watch Limited, "Swap It!" |
| 125 | 18" by 24" poster of Defendant's advertisement for SWAP Watch Limited, "Swap It!" |
| 126 | 18" by 24" poster of May 2008 Swatch advertisement on telephone kiosks for SWATCH watch |
| 127 | 18" by 24" poster of June-July 2008 Swatch advertisement (Grand Central |

| | |
|---|---|
| | Terminal Diorama) for SWATCH watch |
| 128 | 18" by 24" poster of Swatch New York City Outdoor Campaign – Times Square Billboard for SWATCH watch |
| 129 | 18" by 24" poster of Defendant's SWAP display stand |
| 130 | 18" by 24" poster of Defendant's advertisement for SWAP Watch Limited, "Swap It!" |
| 131 | Declaration of Brent Bernard in Support of Applicant's Opposition to Opposer's Motion for Summary Judgment |
| 132* | Testimonial Deposition of Patricia Higgins (September 10, 2009) |
| 133* | Swatch Stipulated Sales Figures 2005 – May 2011 |
| 134* | Beehive Stipulated Sales Figures 2005 – June 2011 |

\* Indicates Exhibit that was filed under seal and/or was redacted.