## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| SWATCH, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11-cv-434 |
| | ) | |
| BEEHIVE WHOLESALE, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Beehive Wholesale, L.L.C.'s

("Beehive") Motion in Limine Regarding Trademark Trial and Appeal Board ("TTAB" or

"Board") Trial Record (Dkt. No. 20); Beehive's Motion to Strike (Dkt. No. 44); Plaintiff Swatch,

S.A.'s ("Swatch") First Motion to Exclude Evidence (Dkt. No. 48); and adjudication of this

TTAB appeal on the merits.

Central to the merits of this dispute is whether Defendant's SWAP mark creates a

likelihood of confusion, dilutes Plaintiff's SWATCH marks, or is even registerable as a

trademark. This matter began when Plaintiff opposed Defendant's application to register a mark

(Opposition No. 91169312) before the TTAB. The TTAB rejected Plaintiff's opposition. Here,

Plaintiff seeks to reverse the TTAB's decision and proceed under the Lanham Act, the

Trademark Dilution Act, and Virginia unfair competition and trademark law. Specifically,

Plaintiff's Amended Complaint includes: Count I - appeal of the TTAB's dismissal of Swatch's

opposition to Beehive's mark; Count II - trademark infringement under the Lanham Act, 15

U.S.C. § 1114; Count III - federal unfair competition under the Lanham Act, 15 U.S.C. 1125(a);

Count IV - trademark dilution under the Trademark Dilution Act, 15 U.S.C. § 1125(c); Count V -

common law unfair competition; and Count VI - trademark infringement under Va. Code § 59-1-92.12.

## BACKGROUND

### A. The Parties and their marks

Plaintiff Swatch is a manufacturer of watches, clocks, and parts therefor, along with jewelry, books, and magazines for watch collectors. Plaintiff is a Swiss corporation with its principal place of business in Bienne, Switzerland. The Swatch Group (U.S.) Inc. ("Swatch (U.S.)") is a non-party, wholly owned Swatch subsidiary that acts as the exclusive importer and distributor of Swatch watches in the United States. Patricia Higgins ("Higgins") is the Swatch brand manager for Swatch (U.S.).

Plaintiff owns U.S. trademark registrations for SWATCH (Reg. Nos. 1356512, 1671076, and 2050210). Reg. No. 1671076 refers to **SWATCH** (in typed format) for "watches, clocks and parts thereunder." Reg. No. 1356512, for "watch faces, ribbon bands, slide pendants, and beaded watch bands" and 2050210, for "books and periodicals" refer to:

# swatch

Defendant Beehive is in the business of wholesale and retail sales of various goods, including watches, watch faces, ribbon watch bands, slide pendants, and beaded watch bands sold under the SWAP mark. Beehive is a Louisiana limited liability company, with its principal place of business in Ruston, Louisiana. Amy Bernard is the founder of the business now operated by Beehive; she oversees Beehive's product development and design. Brent Bernard serves as Beehive's President, while Michelle Bernard is Beehive's Chief Operating Officer and Jack Rome, Jr. is its Chief Financial Officer.

The SWAP mark at issue in the underlying TTAB litigation was for a stylized "SWAP," as follows:



In this action, Swatch also points to variants of this mark as additional evidence of infringement. The variants typically add a clock-face within the "S" of the stylized SWAP along with additional language:



The Court refers to any variant with a clock-face within the "S" as the "Clock-Face Variant."

### B. Procedural History

Amy Bernard filed a trademark application for the SWAP mark on July 30, 2004. The application indicated the date of first use was June 1, 2003, for watch faces, ribbon watch bands, gel bands, slide pendants, and beaded watch bands. The trademark application was later assigned to Defendant Beehive. The Trademark office approved Bernard's Application for SWAP and published for a potential opposition on December 6, 2005.

Swatch opposed Mrs. Bernard's application on February 3, 2006. Swatch alleged likelihood of confusion and dilution of its SWATCH mark. On April 14, 2008, Swatch filed an Amended Notice of Opposition to add an assertion that SWAP was descriptive of Beehive's recited goods and therefore unregisterable. Both parties engaged in discovery before the Board, consisting of depositions, interrogatories, document production requests, and requests for admission. Discovery, testimonial, and rebuttal depositions were taken of Beehive's principals

3

and designees of Swatch and third-party Swatch Group (U.S.). The TTAB decided in favor of

Beehive on all three issues on February 23, 2011.

## PRELIMINARY MOTIONS

The Parties filed four preliminary and evidentiary motions. Each motion is addressed in

turn. First, Defendant asks the Court to determine the admissibility of the TTAB trial record

(Dkt. No. 20). Beehive asks the Court to find that the TTAB trial record, including the trial

depositions of its witnesses, are admissible subject to specific objections made in the course of

the TTAB proceeding. *See* 15 U.S.C. § 1071(b)(3) ("In suits brought hereunder, the record in the

Patent and Trademark Office shall be admitted on motion of any party . . . . The testimony and

exhibits of the record in the Patent and Trademark Office, when admitted, shall have the same

effect as if originally taken and produced in the suit."). In response, Swatch withdrew its

objections with the exception of three specific objections to Defendant's exhibits 36-38. The

exhibits in question are Trial Depositions of Beehive's principals. Swatch objects to each

deposition for "failure to disclose designations, hearsay and Defendant's naming deponent as a

witness," and maintains the objections contained within each transcript. Pl. Opp'n, Dkt. No. 23 at

1-2. Given the language of § 1071(b)(3), the Court GRANTS Beehive's Motion (Dkt. No. 20)

and finds the TTAB Trial Record admissible subject only to Swatch's specific objections

contained within the transcripts.

Second, Beehive objects to and moves to strike portions of the evidence offered by

Swatch (Dkt. No. 44). Beehive's Motion is GRANTED in PART and DENIED in PART.

Beehive objects to the hearsay and lack of foundation for: (1) Swatch's non-accounting records;

(2) business records evidence; (3) newspaper article; (4) survey/expert evidence; (5) website

printouts; and (6) additional miscellaneous evidence. Subject to a number of exceptions, the

4

Federal Rules prohibit the admission of hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c), 802. Plaintiff maintains its news articles, advertisements, and PEX 57 are admissible for whatever they show on their face, rather than the truth of the matter asserted. The Court agrees with regard to Plaintiff's news articles and advertisements, which the Court admits for the purpose of showing that others knew of Plaintiff's brand. *See, e.g., Price v. Rochford*, 947 F.2d 829, 833 (7th Cir. 1991) (examining newspaper articles and finding no hearsay problem because the articles were not offered to prove the plaintiff *was* in bankruptcy, but that the plaintiff was reported to be in bankruptcy). However, the Court finds PEX 57, a *Women's Wear Daily* Brand Recognition Survey, inadmissible. Swatch seeks admission and authentication of the survey through Higgins, non-party Swatch (U.S.)'s brand manager. Higgins Decl. ¶¶ 1, 52. But Higgins had nothing to do with the survey. She did not conduct it; she did not write the *Women's Wear Daily* article about the survey; she is not an expert; and she has no personal knowledge of the survey's methodology other than what appears in the *Women's Wear Daily* article announcing its results. *See* Fed. R. Evid. 702-3, 801(c), 802.[1] Higgins' proffer that the survey is a "true and accurate" version of the article featured in *Women's Wear Daily* is insufficient to eliminate the evidentiary concerns raised by Beehive and as a result, the survey is in admissible.[2] Higgins Decl. ¶ 52.

---

[1] The Court is cognizant that courts regularly admit survey results in trademark cases. However, the typical objection courts overrule is to the survey data, which courts either admit because it is not for the truth of the matter and not hearsay or because it goes to the survey participant's then-existing state of mind, a hearsay exception. *See* 4 McCarthy on Trademarks and Unfair Competition § 32:168 (4th Ed. 2012) [hereinafter McCarthy]. This Court's ruling is different; it makes no hearsay finding regarding the underlying data. Rather, it takes issue with the means of its admission, which relies upon hearsay and lacks foundation. Swatch attempts to admit the survey without anyone, expert or otherwise, with personal knowledge of the survey methodology or results beyond recounting the hearsay written by a non-testifying author of an article about the survey.

[2] The Court notes at the outset, however, that were PEX 57 deemed admissible, the outcome of this case would not differ in any respect.

Beehive's additional objections take further issue with the introduction and authentication

of various exhibits by Higgins. Higgins began work with Swatch (U.S.) on September 25, 2005,

and Beehive maintains "she is incapable of testifying to events at Swatch before September 2005

or the creation of, or events mentioned in, any Swatch documents generated or referring to

events before that date." Def. Mot., Dkt. 45, at 3. Higgins has access to, regularly reviews, and is

custodian of a range of Swatch (U.S.)'s business documents including current and historical

financial statements. Higgins Decl. ¶ 6. The Court thus finds Higgins competent to authenticate

and provide foundation for the disputed documents, and will take Beehive's objections into

account as to the weight of the evidence. *See Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008).

Third, Plaintiff moves to exclude a variety of Beehive's trial exhibits and certain

designations from Jack Rome's declaration (Dkt. No. 48). Swatch maintains certain exhibits are

irrelevant, contain hearsay, lack foundation, or constitute unfair surprise. After a review of the

exhibits and the objections thereto, the Court DENIES Swatch's objections. Rather than strike

the exhibits and declaration in question, the Court will take Swatch's objections into account

when considering their weight.

Fourth, within its opposition brief, Swatch moves to strike Defendant Beehive's Trial

Brief as either not filed or in excess of the 50-page limit. Pl. Opp'n at 3-4, Dkt. No. 55. Beehive

responds that rather than file a separate trial brief, it incorporated its briefing into its proposed

Findings of Fact and Conclusions of Law. The portion of Defendant's "Conclusions of Law,"

which is essentially its trial brief is approximately twenty-five pages, well below the fifty-page

limit set by the Court. Accordingly, the Court DENIES Swatch's motion to strike.

## LEGAL STANDARD

Under 15 U.S.C. § 1071(a)(4), a party aggrieved by a TTAB decision has the right to

seek relief by direct appeal to the Federal Circuit on a closed record. 15 U.S.C. § 1071(b)—

utilized here—provides litigants an alternative route; it allows parties to bring a civil action in

district court in lieu of an appeal. The choice has several consequences. While appellate review

is limited to the record before the TTAB, a civil action in district court affords "litigants the

option of producing new evidence in a trial court." McCarthy § 21:20.[3] The choice also impacts

which Circuit's precedent binds the trial court generally, and specifically in reference to its

"likelihood of confusion" analysis.[4] *Compare Coach Svcs., Inc. v. Triumph Learning, LLC*, 668

F.3d 1356, 1365-66 (Fed. Cir. 2012) ("Likelihood of confusion is a legal determination based on

underlying facts.") *and E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (Cust. & Pat. App.

1973) (setting forth the Federal Circuit's thirteen non-exclusive factors for "likelihood of

confusion"), *with Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 92 (4th

Cir. 1997) ("[L]ikelihood of confusion is an inherently factual issue.") *and Rosetta Stone Ltd. v.*

*Google, Inc.*, 676 F.3d 144, 153-54 (4th Cir. 2012) (the Fourth Circuit employs a nine-factor test,

but the factors are neither exclusive nor mandatory).

---

[3] *See also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 12 (D.C. Cir. 2008) (finding parties may introduce new evidence in a § 1071(b) action); *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 674 (7th Cir. 2001) (same); *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 80 (1st Cir. 1996) (same).

[4] The parties disagree about which circuit's law decides "likelihood of confusion." Plaintiff relies on Fourth Circuit law; Defendant relies on Federal Circuit law. An appeal of this action goes to the Fourth Circuit, so Fourth Circuit law applies. *See Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 517 F. Supp. 2d 1, 6 (D.D.C. 2007) (circuit law applies to review of a TTAB decision under 15 U.S.C. § 1071(b)(1)); *see also* Callmann on Unfair Competition, Trademarks and Monopolies § 26:100 (4th Ed. 2012) ("The law of the forum applies when judicial review of a decision of the Patent and Trademark Office is sought in a federal district court, as an alternative to an appeal to the Court of Appeals for the Federal Circuit. A final decision of the district court in such a case will be reviewable by the U.S. Court of Appeals for the relevant regional circuit, and the law of that circuit will apply.").

Section 1071(b) also requires that a trial court employ a "unique" standard of review, while sitting in what amounts to a dual capacity. McCarthy § 21:21.[5] "On the one hand, the court is an appellate reviewer of facts found by the TTAB." *Skippy, Inc. v. Lipton Inv., Inc.*, 345 F. Supp. 2d 585, 586 (E.D. Va. 2002). Facts found by the TTAB are reviewed for substantial evidence. *Id.* at 586-87 (citing *Dickinson v. Zurko*, 527 U.S. 150, 165 (1999)); *see also* McCarthy § 21:21 ("[U]nlike a true de novo proceeding, findings of fact made by the [TTAB] are given great weight . . . . [B]oard fact-finding is not upset unless it is not supported by substantial evidence."). "On the other hand, the court is a fact-finder based on new evidence introduced to the court." *Skippy*, 345 F. Supp. 2d at 586. The Court reviews the new evidence and issues de novo. *Id.* (citing McCarthy, § 21:21).

The majority of Swatch's claims, including portions of Count I, its appeal of the TTAB's infringement decision, and the entirety of Count II (Lanham Act infringement), Count III (Lanham Act unfair competition), Count V (common law infringement and unfair competition), and Count VI (infringement under Va. Code § 59.1-92.12[6]) require Swatch to prove a likelihood

---

[5] *See also CAE, Inc.*, 267 F.3d at 674 ("[T]he district court sits in a dual capacity. It is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court."); *PHC, Inc.*, 75 F.3d at 80 ("Under the Lanham Act, where a contested Board proceeding has already addressed the validity of the mark, the Board's findings can be challenged in a civil action in district court through new evidence, and, at least to a large extent, the issues can be litigated afresh.").

[6] Beehive's argument that Swatch's infringement claim under Virginia statute is barred because there is no evidence of a registered mark in Virginia is unavailing. The statute does not include such a requirement, but allows infringement claims for trademarks—like Swatch's—which are registered before the Patent and Trademark Office ("PTO"). *See* Va. Code § 59.1-92.2 (defining "mark" for the purposes of the Virginia Trademark and Service Mark Act as "any trademark or service mark registered in the Commonwealth *or the United States Patent and Trademark Office* . . . .") (emphasis added).

of confusion.[7] The Court thus analyzes the likelihood of confusion and the aforementioned claims together. Thereafter, the Court undertakes a separate analysis of trademark dilution under 15 U.S.C. § 1125(c) and registerability of the SWAP mark.

## ANALYSIS

In order to prevail on claims of trademark infringement and unfair competition under the Lanham Act, a plaintiff is first obliged to show the court that it had a valid, protectable trademark. *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006). Second, a plaintiff must also show "that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Id.* It is undisputed that Swatch holds a valid, protectable trademark; the Court's infringement analysis turns entirely upon its findings regarding likelihood of confusion.

### I.      Swatch fails to show a likelihood of confusion

Likelihood of confusion exists if "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the good or services in question." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004). The Fourth Circuit looks to nine factors in its analysis of likelihood of confusion. *See Rosetta Stone*, 676 F.3d at 153. The factors are neither exhaustive nor mandatory. *Id.* The factors are: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of

---

[7] *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F. 3d 922, 930 n.10 (4th Cir. 1995) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source or origin of the goods or services involved."); *Lamparello v. Fallwell*, 420 F.3d 309, 312 n.1 (4th Cir. 2005) (Virginia common law infringement and unfair competition require a showing of likelihood of confusion); Va. Code § 59.1-92.12 (requiring proof the infringing use is "likely to cause consumer confusion, mistake, or deception as to the source or origin of any goods or services . . . .").

advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *Id.*; *see Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (setting forth factors one through seven); *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463–64 (4th Cir. 1996) (identifying factors eight and nine). "[N]ot all of these factors are always relevant or equally emphasized in each case." *Pizzeria Uno*, 747 F.2d at 1527 (citation and alteration omitted).

The TTAB's analysis of likelihood of confusion differs from this Court's review in several respects. First, the TTAB applied the thirteen-factor *DuPont* test to likelihood of confusion rather than the Fourth Circuit's nine-factor test. The TTAB also excluded much of Plaintiff's proffered evidence of the SWATCH marks' fame and strength because it was not submitted in a proper format. TTAB Op. at 3-4. Plaintiff does not challenge the TTAB's exclusion, but it does re-proffer the evidence here. Finally, the TTAB considered solely the stylized SWAP mark, but did not evaluate the Clock-Face Variant. *See* TTAB Op. at 23 & n.24 ("[T]he question the Court must decide is the likelihood of confusion between the mark in the challenged application and pleaded registration(s), not other marks that applicant may use."). With these differences in mind, the Court analyzes the relevant likelihood of confusion factors.

## A. Strength or distinctiveness of the plaintiff's mark as actually used in the marketplace

The strength or distinctiveness of the mark is "the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). The "strength" of the trademark is evaluated in terms of its conceptual strength and commercial strength. *Id.* Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical "peculiarity" of the mark, considered in relation to the product, service, or collective

organization to which the mark attaches. *See Perini Corp. v. Perini Constr. Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). By contrast, the commercial-strength inquiry looks to the marketplace and asks "if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Id.* at 125 (quoting *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 160-61 (4th Cir. 1962)). The commercial-strength inquiry is similar to the "secondary meaning" test of validity. *See George & Co. LLC v. Imagination Entm't Ltd*, 575 F.3d 383, 395 (4th Cir. 2009) (commercial strength applying secondary meaning factors in its analysis of commercial strength). "Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." *Id.*

With regard to strength and distinctiveness, the evidence before the TTAB was limited. "[T]he only evidence of fame of opposer's SWATCH marks is copies of approximately 30 print advertisements and articles from . . . general circulation newspapers and periodicals . . . ." TTAB Op. at 16. The TTAB found that while such evidence demonstrates that Swatch had, in fact, advertised goods bearing its marks in major periodicals, "such evidence falls far short of demonstrating that opposer's SWATCH marks are famous for purposes of our likelihood of confusion analysis." *Id.* at 17. The dearth of evidence and "extreme deference" afforded to famous marks under TTAB and Federal Circuit precedent led the Board to conclude Swatch had fallen short of establishing fame. *Id.* at 17-18. With the benefit of the excluded evidence, this Court reaches the opposite conclusion and finds the strength and distinctiveness of the SWATCH mark weighs in favor of infringement.

11

### i.    The conceptual strength of the Swatch mark

Plaintiff argues that SWATCH is conceptually strong because it is distinctive and unusual in the watch and jewelry industry, and because all of the active U.S. trademark registrations for the term SWATCH belong to the Plaintiff. The Fourth Circuit employs the system established by Judge Friendly of the Second Circuit for classifying marks and determining conceptual distinction. *See, e.g., Perini,* 915 F.2d at 124. Word marks are classified into: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976); *Pizzeria Uno,* 747 F.3d at 1527. Under this hierarchy of distinction, generic marks receive no protection, descriptive marks require proof of secondary meaning to be eligible for protection, while suggestive and fanciful marks are inherently distinctive. *See Sara Lee,* 81 F.3d at 464. Depending upon whether one views Swatch as a stand-alone term or a contraction of "S" and "watch," the mark is either fanciful or suggestive under Judge Friendly's analysis. Fanciful marks are "words invented solely for their use as trademarks," while suggestive marks are "words [that are] partially descriptive and partially fanciful . . . ." *Perini,* 915 F.2d at 124; *Swatch Watch, S.A. v. Aste Trading Corp.,* No. 85 Civ. 7726, 1986 WL 734, at *5 (S.D.N.Y. Jan. 3, 1986) (finding SWATCH "is fanciful and therefore a strong mark."). In either case, SWATCH is an inherently distinctive mark.

In addition to inherent distinction, all of the U.S. Trademarks for the term SWATCH belong to Plaintiff and are incontestable. Although "incontestability alone does not establish that the trademark is strong and therefore likely to cause the consumer confusion necessary for a finding of trademark infringement," Beehive presents no evidence that other parties use and therefore weaken Swatch's mark. *Lone Star,* 43 F.3d at 934; *CareFirst,* 434 F.3d at 270 (finding the designation of a mark as "suggestive" does not end the conceptual strength inquiry where

12

there is substantial third party use of the CareFirst mark in the relevant health care industry). In light of the inherent distinction, incontestability, and lack of any third party use of the SWATCH mark, the Court finds Plaintiff's mark conceptually strong.

### ii.   The commercial strength of the Swatch mark

Platiniff's SWATCH mark is also commercially strong. Courts consider six factors when accessing commercial strength: (a) the plaintiff's advertising expenditures; (b) consumer studies linking the mark to a source; (c) the plaintiff's record of sales success; (d) unsolicited media coverage of the plaintiff's business; (e) attempts to plagiarize the mark; and (f) length and exclusivity of the plaintiff's use of the mark. *See George & Co.*, 575 F.3d at 395 (applying secondary meaning factors to its commercial strength inquiry); *Perini*, 915 F.2d at 125 (providing the six factor test for secondary meaning). Several factors highlight SWATCH's commercial strength.

First, in the past ten years, Swatch spent over $30 million advertising and promoting SWATCH products in the United States. Higgins Decl. ¶ 16. Swatch advertises its brand in an array of newspapers and magazines, as well as on billboards in high-profile areas such as New York's Times Square. *See Teaching Co. Ltd. P'ship v. Unapix Entm't Inc.*, 87 F. Supp. 2d 567, 580 (E.D. Va. 2000) (finding $11.7 million dollars, spent on ads and catalogs over an eight-year period significant advertising expenditures for a secondary meaning analysis); *id.* at 580 n.6 (collecting cases, including one where as little as $75,000 in advertising expenditures over four years was sufficient for a finding of secondary meaning). Swatch has also sponsored sporting events and individual athletes. Most prominently, Swatch sponsored the Olympic Games in Athens, Sydney, and Atlanta, and sponsors a professional volleyball league and other sporting events, such as snowboarding with Olympic Gold Medalist Shaun White.

Second, Swatch's sales and revenue are significant. Worldwide, Swatch sold more than 333 million watches between the mid-1980s and 2006. From 2002 until May 2011, Swatch earned approximately $275 million in revenue from its United States sales of more than 3.75 million SWATCH brand watches.[8] Higgins Decl. ¶¶ 8-15; *see, e.g., Coryn Group II, LLC v. O.C. Seacrets, Inc.*, -- F. Supp. 2d ----, 2012 WL 1282382, at *7-8 (D. Md. Apr. 11, 2012) (finding evidence that defendant earned $155 million in revenue in the last ten years, among other evidence, sufficient for the jury to conclude defendant had "at least some commercial strength."); *Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC*, 419 F. Supp. 2d 861, 871-72 (E.D. Va. 2006) (finding annual revenues in excess of $20 million throughout the 1990s and $18 million per year in 2002, 2003, and 2004 sufficient to support a finding of secondary meaning).

Third, Swatch has received unsolicited media coverage in publications ranging from the American Photographer, to the New York Times, Los Angeles Times, and the Wall Street Journal. Higgins Decl. ¶ 21. Celebrities including Tyra Banks, Bill Gates, and George Clooney have been photographed wearing SWATCH products. Higgins Decl. ¶ 33. Moreover, Swatch maintains a club dedicated to Swatch aficionados. Higgins Decl. ¶ 35. Finally, Swatch also points to a number of attempts to plagiarize its long and exclusively held mark. *See* Higgins Decl. ¶ 72-73. The SWATCH mark has been used in United States commerce on watches since 1985. *See* PEX 1. In that time, Plaintiff has filed numerous opposition actions with the United States Patent and Trademark Office ("PTO"). *See Venetian Casino Resort, LLC v. Venetiangold.com*, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (finding support for secondary

---

[8] Determining the relevant U.S. sales data from Swatch's exhibits was a bit of a task. It required disaggregation of the data from 2002-2004, years in which Swatch recorded its U.S. and Caribbean sales together. Swatch indicated that the Caribbean historically accounts for 20% of the combined figure, so the Court presumed U.S. sales represent 80% of the combined figure and calculated the U.S. revenue and unit sales for 2002-2004 accordingly. *See* Higgins ¶¶ 8,10.

meaning where plaintiff cited "at least two examples where [it] prevailed in fending off persons who were plagiarizing or infringing upon its marks.").

In addition to Swatch's evidence of conceptual strength, the Court finds Swatch's significant advertising expenditures, revenue, and unsolicited media coverage, along with attempts to plagiarize or infringe upon its long-held mark indicative of the SWATCH mark's commercial strength.

### B.  Similarity of the two marks to consumers

In assessing the similarity of the marks under the second factor, courts look to whether the marks are similar in "sight, sound, and meaning which would result in confusion." *George & Co.*, 575 F.3d at 396. Courts examine the "allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992). The TTAB analyzed the similarity of the Swatch mark and stylized Swap mark; however, the TTAB did not assess the similarity of Swap's Clock-Face Variant. *See* TTAB Op. at 21-23 n.24.[9] The Court thus divides its analysis between the two marks. The TTAB's findings with regard to the stylized mark are reviewed for substantial evidence, while the Court examines the Clock-Face Variant de novo. In both instances, the Court finds the marks dissimilar.

### i.      The stylized SWAP mark

Though SWAP and SWATCH begin with the same three letters, which results in some similarity in sound, the TTAB found the marks dissimilar in appearance and meaning. The Court agrees, and finds the TTAB's finding supported by substantial evidence. With regard to sound, the TTAB held the identical first three letters, SWA- "results in some similarity in sound,

---

[9] Although the TTAB references the SWAP's Clock-Face Variant, it notes that "mark is not the subject of this proceeding, and our comment should not be taken as a suggestion that we would or would not find confusion with respect to it." TTAB Op. at 23 n.24.

especially if the marks are not articulated clearly so that the differences in the final consonants are not noted." TTAB Op. at 21. *But see Worsham Sprinkler Co.*, 419 F. Supp. 2d at 877 (comparing "Wes Worsham" and "Worsham" and noting that even though "[a]ny difference in sound depends on saying the word 'Wes' with the minimally sufficient elocution needed to establish an audible difference. That difference in sound *is* sufficient to show that the marks sound different." (emphasis added)).[10] "However, the marks are dissimilar in appearance in that [SWAP] also contains the fourth letter –P while [SWATCH] contains the additional three letters – TCH." *Id.* Most important to the TTAB was that "the marks are distinctively different in meaning." TTAB Op. at 22. While SWAP is defined as "to trade one thing for another; to exchange (one thing for another; an exchange of one thing for another," SWATCH either represents a combination of the letter "s" and word "watch" or is defined as "a sample strip or piece of material." *Id.* (quoting The American Heritage College Dictionary (3d ed., 1997)). The TTAB concluded, and the Court agrees, that some similarity in sound when the marks are not fully pronounced is insufficient to establish similarity given the differences in sight and meaning. The manner in which the marks are used in commerce provides further support for this Court's finding of dissimilarity.

ii.      **The Clock-Face Variant of the SWAP mark**

In addition to evaluating the marks based upon their text, to determine whether two marks are similar, courts "must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser-Busch, Inc.*, 962 F.2d at 319; *see also George & Co.*, 575 F.3d at 396-97; *CareFirst*, 434 F.3d at 271. Swatch maintains that as used in commerce, the

---

[10] *Compare* McCarthy § 23:24 (collecting cases, including those where: a), **LEBOW** and **LEBOLE** b) **REAC** and **REACH**, c) **SURF** and **SURGE**, and d) **DUVET** and **DUET** were found phonetically *dissimilar*), *with Commc'n Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1249 (4th Cir. 1970) (**COMSAT** and **COMSET** phonetically similar).

Clock-Face Variant of the SWAP mark is particularly likely to cause confusion. The Clock-Face Variant includes a clock-face with the "S" of Swap, and an underlined "watch" tucked underneath the stylized SWAP mark.

  

Swatch maintains that the Clock-Face Variant encourages consumers to read "S" and "watch" together, and mistake Beehive's product for a Swatch product. The Court finds otherwise. "Watch" is on a different line, in a different font. A number of the Clock-Face Variant marks produced by Swap also include "by Beehive," reinforcing the notion that SWAP has no association with SWATCH. When compared with Swatch's use of its marks in commerce, the dissimilarity is more apparent.



The SWATCH mark typically uses black text on a white background. *See, e.g.*, PEX 13 at 1-3; PEX 14 1-21. It does not include any separation between "S" and "watch" and often prominently features the Swiss flag next to SWATCH. Its font is sans serif and fixed-width; no letter descends below the baseline.

Although the Court has already affirmed the TTAB's finding that the bare language of SWAP and SWATCH are insufficiently similar in sight, sound, and meaning weigh in favor of a likelihood of confusion, the Parties' use of their marks in commerce reaffirms this notion. Differences in the marks' appearance in the marketplace are sufficient to reduce or eliminate likelihood of confusion due to the similarity of the marks. *See CareFirst*, 434 F.3d at 271-72 (finding any likelihood of confusion between "CareFirst" and "Firstcare" "significantly

reduce[d]" because CareFirst was almost always paired with Blue Cross Blue Shield, while First Care was presented alone or with the suffix P.C.); *Petro*, 130 F.3d at 94 (finding two uses of "Petro" not confusing due to the marks' different colors, different accompanying words, and different graphics). The marks at issue have different appearances in the marketplace for several reasons, two of which the Court highlights here.

First, as in *CareFirst*, each mark is often paired with language or art that alleviates potential confusion. SWAP is often featured with "by Beehive," while the SWATCH mark is almost always paired with the distinctive Swiss flag. Second, the marks appear in different fonts. SWATCH uses a distinctive modern sans serif font in a bold typeface. Each letter remains the same width throughout and sits at the same baseline; no letter is capitalized. By contrast, SWAP is written in script. Letters vary in width; for instance, the "P" is widest at the bottom but narrows in its stem. The "P" also extends far beneath the baseline and the "S" is capitalized.

As the TTAB concluded when examining the stylized SWAP mark, the Court finds the Clock-Face Variant mark dissimilar from the SWATCH mark. Despite some similarity in sound if the marks are not articulated, after considering the sight, meaning, and manner in which the marks are used, the Court finds this factor weighs in support of Beehive.

### C. Similarity of the goods

With respect to the third factor, the similarity of the goods or services identified by the marks, "the goods in question need not be identical or in direct competition with each other." *George & Co.*, 575 F.3d at 397. Indeed, "[b]ecause confusion may arise even where products are merely related, the court is to consider whether the public is likely to attribute the products and services to a single source." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 244 (4th Cir. Mar. 30, 2007) (quotations omitted); *see George & Co.*, 575 F.3d at

18

397 (describing third factor). Undoubtedly, there is similarity between the general types of goods sold under the SWAP and SWATCH marks.

Plaintiff and Defendant apply their SWATCH and SWAP marks to goods in international class 14. Plaintiff uses its SWATCH mark on clocks, watches and parts thereof, and jewelry, while Defendant applies its SWAP mark to watch faces, ribbon watch bands, slide pendants, and beaded watch bands. *See* TTAB Op. at 19 (Beehive's "goods thus are identical to the 'watches and parts therefor' identified in" the registration of the SWATCH mark). Beehive responds that the goods differ in price and features,[11] factors which Beehive maintains mitigate the general similarity of the goods. Though the Court agrees that, to an extent, the products' different prices and features lessen the likelihood that the public would attribute the products to a single source, an important function of the Court's "related goods" inquiry "is to protect trademark owners' ability to expand into associated markets in the future." *Renaissance Greeting Cards*, 227 F. App'x at 244. Even were the Court to come to the unlikely conclusion that goods identified by the respective marks are not related, it is unquestionable that the market for goods identified by the SWAP mark are "associated" with the market for goods identified by the SWATCH mark. The Court thus concludes the similarity of the goods weighs in favor of Swatch.

### D. Similarity of the facilities

The fourth factor examines the similarity of facilities used by the parties. "[W]hen there are basic differences between plaintiff's and defendant's modes of distributing their products," this factor does not favor the plaintiff. *CareFirst*, 434 F.3d at 273 (quotations omitted). Plaintiff argues that because both it and the Defendant sell watches on the internet, in department stores,

---

[11] The difference between the products is twofold. First, SWAP watches uniformly feature interchangeable watch faces and bands. SWATCH brand watches do not. In fact, SWATCH watches require a special tool that is not distributed to consumers to change the watch band. Second, SWATCH watches are more expensive than SWAP watches. SWATCH watches retail from $50 to $250, while SWAP watches retail from $16 to $20.

and gift stores, this factor weighs in its favor.[12] Though some overlap exists in each identified

area, Swatch overstates the similarities between the Parties' distribution facilities. Swatch sells

the bulk of its products through Swatch-brand stores. Its stores are located in upscale malls,

airports, and urban areas. By contrast, Beehive operates primarily as a wholesaler and operates

only two rural retail stores. As a wholesaler, Beehive refers to the network of independent retail

stores as its primary consumer. B. Bernard Testimonial Dep. at 9.

In addition to sales in Swatch-brand stores, Plaintiff also sells its products in department

stores, via the internet on its online store, and in gift stores. Though each of these additional

channels overlaps with channels used by Beehive, the overlap proves insignificant. To begin,

Beehive's department store sales are minimal, began only recently, and do not overlap with

Swatch's department store offerings. Beehive has sold to one department store, Stein Mart,

beginning in 2007. Swatch presents no evidence that SWAP and SWATCH products have ever

been sold at the same department store.[13] *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog,*

*LLC,* 507 F.3d 252, 263 (4th Cir. 2007) (finding that even where plaintiff and defendant's

products were sold at the same Macy's department store in New York, the lack of general

overlap in facilities "is so minimal as to be practically non-existent.").

Both parties also sell via the internet. However, both sell only through their respective

websites. *See id.* (finding de minimus overlap when plaintiff sold through its authorized website,

while defendant sold through internet pet stores). Moreover, Beehive's web sales also reflect its

emphasis on wholesale consumers. In contrast to Swatch's focus on direct sales to consumers via

---

[12] The TTAB's consideration of this factor was limited. The TTAB found that it "must assume that the goods are, or will be, sold in all the normal channels of trade to all the usual purchasers for applicants' and opposer's goods would be the same." TTAB Op. at 20. While the TTAB was constrained by this assumption, the Court reviews this factor de novo with the benefit of evidence of the actual facilities used by the Parties.

[13] There is also evidence that Beehive sold to Dillards. However, Beehive claims its sales to Dillards were for non-SWAP products and there is no evidence in the record to the contrary.

its branded stores (whether brick and mortar or online), Beehive did not even develop a website for sales to individual consumers until 2008. And from 2008 to mid-2011, its sales from that site only amount to a small fraction of its total SWAP sales over the same period. *Compare* Def. Finding of Fact ¶ 146, *with* M. Bernard Decl. ¶ 22.

Finally, though Swatch maintains it sells products through gift stores, its gift store sales are insignificant and not its focus. Unlike Beehive, Swatch does not attend gift-oriented trade shows and solely notes that over the years, Swatch brand watches have been sold in over 100 independent watch and jewelry stores and other merchants. Higgins Decl. ¶ 67; *see also* Higgins Dep., Ex. 1. By contrast, by the end of 2006, 3,900 separate retail outlets had sold SWAP products. DEX 12. There is no evidence before the Court regarding which, if any, retail outlets sold both SWATCH and SWAP products. But even if *every* independent SWATCH retailer also sold SWAP products, that would amount to an overlap of less than three percent of retailers. Such de minimus overlap in the facilities utilized by the parties provides insignificant support to Swatch on this factor.

### E. Similarity of advertising

The fifth factor, similarity of advertising, likewise is of no assistance to Swatch. Similarity of advertising has several factors, including the media used, geographic area of advertising, appearance of advertisements, and content. *CareFirst*, 434 F.3d at 273. Defendant's advertising is limited and directed almost entirely to its wholesale customers: retail stores. Beehive sends catalogs to its retail customers and occasionally uses postcards and displays to advertise at trade shows. Swatch does not attend trade shows. Faivet Dep. at 55. Instead, Swatch focuses its advertising on end consumers. Its advertising budget is limited—a significant portion of Swatch's budget goes to one billboard in Times Square, but it has also advertised in

magazines, television, along with social media such as Facebook and Twitter. Swatch has produced a catalog for its jewelry line, but no SWATCH watches appear in the publication. PEX 12; Higgins Dep. at 84-85.

The sole overlap in the Parties' advertising is their use of the internet, in particular their internet stores. But that is no overlap at all. Though Swatch maintains a page on Facebook and a Twitter account, there is no evidence it purchases advertisements on any website. Neither does Beehive. The parties simply maintain stores on their corporate websites where individuals can purchase their products. When taken alone, however, internet stores are no more of an advertisement than a brick and mortar store front. *See Louis Vuitton*, 507 F.3d at 263 (where plaintiff sold its product through an authorized website and defendant sold its products through traditional and internet pet stores, the Fourth Circuit did not so much as mention internet sales in its analysis of advertising channels); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002) (finding "the availability of information about the parties' goods and services on the Internet" insufficient proof "that they use common marketing channels . . . . [A] non-specific reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory."). Even were the Court to consider each company's online store a form of advertising, there is no evidence either party uses their online store as a "substantial" marketing or advertising channel. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 501 (E.D. Va. 2006), *aff'd* 507 F.3d 252 (4th Cir. 2007) (applying the Sixth Circuit's *Thermoscan* test, which guides courts to consider: (1) whether both parties use the web as a *substantial* marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with web-based products, and (3) whether the parties' marketing channels overlap in any other way). The de minimus nature of Beehive's

internet sales to individual consumers has previously been discussed and Swatch's records from 2000-2006 likewise indicate unsubstantial e-commerce sales. *See* Higgins Dep. Ex. 1. Given the Parties direct their advertising to different targets, use different mediums, and only overlap in that they both maintain online stores, the Court finds this factor favors Beehive.

### F. Defendant's intent

The sixth factor is Beehive's intent in adopting its SWAP mark. Where "there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizerria Uno*, 747 F.2d at 1535. Plaintiff argues that Defendant failed to avoid conflict with the SWATCH mark. Swatch points to the deposition testimony of one of Defendant's employees, Amy Bernard, indicating that she was aware of the SWATCH mark and its association with watches at the time she initiated the Swap brand, but failed to conduct a trademark search or contract counsel. Accordingly, Plaintiff maintains the use of an alliterative phrase involving SWAP and "watch" "tries to capitalize on the success and fame of the Plaintiff's SWATCH mark." Pl. Br. at 26. The same is true, Plaintiff argues, regarding the stylized design in which SWAP is displayed to the public. The TTAB previously rejected Plaintiff's "conclusory" assertions. TTAB Op. at 26.

> [T]here is insufficient evidence to show or from which we can infer [intent]. As noted by opposer, applicants acknowledge that they were aware of opposer's SWATCH marks prior to their adoption of the SWAP mark. However, mere knowledge of the existence of opposer's marks does not, in and of itself, constitute bad faith. Opposer points to no evidence or testimony to support its rather conclusory statement that because applicants were aware of opposer's marks and did not perform a trademark search prior to selection of their mark, applicants sought to trade on the goodwill of opposer. In short, the record in this case simply does not support such a finding.

TTAB Op. at 25-26 (citations omitted). The Court finds the TTAB's conclusion supported by substantial evidence.

Although Defendant did not conduct a trademark search to determine the availability of SWAP, "the failure to conduct a trademark search or contact counsel shows carelessness at most, but is in any event irrelevant because knowledge of another's goods is not the same as intent to mislead and to cause confusion." *George & Co.*, 575 F.3d at 398 (quotations omitted). Moreover, due to the dissimilarity of the marks, as Beehive points out, there is no reason to think SWATCH would have been identified as a potential issue had Beehive or its predecessors conducted a search. The PTO's trademark examining attorney did not identify SWATCH as a problem. DEX 32.

Nor does Plaintiff present additional evidence of intent to mislead other than the conclusory allegations the TTAB rejected. In fact, neither the method by which Defendant selected the SWAP mark nor how it is now used in commerce provides any evidence that Beehive sought to capitalize on Swatch's mark. To the contrary, contemporaneous notes suggest that Beehive's employees picked SWAP out of a number of possibilities, which all suggest the interchangeable quality of its product line. *See George & Co.*, 575 F.3d at 397 (finding defendant lacked intent to cause confusion when it "understandably" selected a mark that described how its product, a generic dice game, was played). Moreover, as noted previously, the use of the SWAP mark in commerce is in a far different font and often appears with "by Beehive," both factors that indicate Beehive did not intend to trade on SWATCH's goodwill. Without any evidence of Beehive's intent to mislead, its adoption of a dissimilar mark is of no support to Swatch.

### G. Actual confusion

Though evidence of actual confusion—the seventh factor—is not necessary to show a likelihood of confusion, actual confusion is "often paramount" in a court's analysis. *CareFirst*, 434 F.3d at 268 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001); *see also George & Co.*, 575 F.3d at 398 (actual confusion is the "most important factor"). "The absence of evidence of actual confusion over a substantial period of time . . . creates a strong inference that there is no likelihood of confusion." *CareFirst*, 243 F.3d at 269. The first use of the SWAP mark was in June 2003. The PTO approved Defendant's application for SWAP and published it for potential opposition in December 2005. Swatch then opposed the mark in February 2006. Proceedings before the TTAB and this Court have lasted many years; exhibits and briefing were filed as late as the fall of 2011. Despite this matter's longevity, Swatch does not cite to a single instance of actual confusion—not one. Without evidence of actual confusion over a substantial period of time, the Fourth Circuit has found this "important" factor to weigh "heavily" against a finding of likelihood of confusion. *Id.* at 269; *George & Co.*, 575 F.3d at 399 (finding that because plaintiff presented "at best" de minimus evidence of actual confusion, the factor "weighs heavily against a likelihood of confusion."). Unlike the evidence of actual confusion dismissed as de minimus in *George*, Swatch produces no evidence of actual confusion. The Court thus finds this paramount factor weighs heavily in favor of its finding that there is no likelihood of confusion.

### H. Remaining Factors

The final two factors—the quality of defendant's product and the level of sophistication of the consumer—are not applicable in this case. "Consideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs

of a competitor's trademark-protected goods." *Sara Lee*, 81 F.3d at 467. Though Beehive's

goods are less expensive, there is no allegation that they are a cheap copy or knockoff of

Swatch's goods. Likewise, "buyer sophistication will only be a factor when the relevant market

is not the public at-large." *Id.* Swatch maintains, and Beehive does not contest, that the relevant

market is "anyone with a wrist." Such a national public market renders this factor unhelpful.

Having considered the relevant factors, it is in escapable that some favor Swatch.

However, "the most significant factor, actual confusion, weighs decidedly against" Swatch.

*George & Co.*, 575 F.3d at 400. When combined with the lack of similarity between the marks,

lack of predatory intent, lack of similar advertising and only minimal similarity in facilities, the

Court finds that there is no likelihood of confusion. This finding has several consequences. First,

the TTAB's decision is AFFIRMED as it pertains to infringement; second, the Court enters

judgment in favor of Beehive on Swatch's Counts II-III and V-VI.[14]

## II.      Swatch's dilution by blurring claim lacks merit

Swatch also seeks cancelation of Defendant's registered mark and injunctive relief

because the SWAP mark is likely to cause blurring of its famous mark. 15 U.S.C. § 1125(c)(1).[15]

"'Dilution by blurring' is the association arising from the similarity between a mark or trade

name and a famous mark that impairs the distinctiveness of the famous mark." *Id.* §

1125(c)(2)(B). Courts may find dilution by blurring and grant injunctive relief "regardless of the

presence of absence of actual or likely confusion, of competition, or of actual economic injury."

*Id.* 1125(C)(1). "Dilution is not concerned with confusion in the marketplace. Rather, dilution

---

[14] Count II: infringement of a registered trademark under 15 U.S.C § 1114; Count III federal unfair competition under 15 U.S.C. § 1125(a); Count V: common law trademark infringement and unfair competition; and Count VI trademark infringement under Va. Code § 59.1-92.12.

[15] Though Swatch brought its dilution claim before the TTAB, without sufficient evidence before it on the issue of fame, the TTAB summarily rejected it. With the benefit of further evidence, the Court reviews this claim de novo and affirms the TTAB's finding.

theory provides that 'if customers or prospective customers see the plaintiff's famous mark used by other persons in a non-confusing way to identify other sources for many different goods and services, then the ability of the famous mark to clearly identify and distinguish only one source might be 'diluted' or weakened.'" *Rosetta Stone*, 676 F.3d at 167 (quoting McCarthy § 24:67). "Some classic examples of blurring include hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (quotations omitted).

To state a prima facie dilution claim, the plaintiff must show: (1) it owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that is allegedly diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark. *Louis Vuitton*, 507 F.3d at 264-65. Even assuming Swatch can fulfill the initial three factors,[16] it fails under the fourth, "whether defendant's use is likely to impair the distinctiveness of the plaintiff's famous mark." *Rosetta Stone*, 676 F.3d at 170.

Federal law provides six non-exhaustive factors for courts to consider under the fourth element, including: (1) the degree of similarity between the mark or the trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade

---

[16] This is not to say the first three factors are clearly met, or met at all, but only that other failings make their analysis unnecessary. While the second factor is undisputedly shown, the first and third are not forgone conclusions. Fame is not an easy standard to achieve and given that Swatch produced only one survey of its brand recognition, which the Court struck on evidentiary grounds, it would be a tall order to prove its mark is "truly prominent and renowned," McCarthy 24:104, that it can be considered a "household name." *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004). Nor is it assured that the similarity between Defendant's mark and the famous mark give rise to an association between the marks. *See infra* III. A, C.

name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B). Though Swatch has put forth evidence that its mark is (2) distinctive, (3) exclusive, and (4) recognized (factors 2-4), these factors are outweighed by the minimal similarity between the marks, insufficient evidence that Beehive intended to associate with the SWATCH mark, and no evidence of any actual association between SWAP and SWATCH (factors 1, 5-6). *See Louis Vuitton*, 507 F.3d at 267 (analyzing the factors in case of a parody, and finding that despite factors 2-4 favoring dilution, Plaintiff failed to make out a case of trademark dilution by blurring). Swatch's attempt to fulfill these factors by relying solely on the same evidence and arguments put forth in support of likelihood of confusion fails.

### A. There is insufficient similarity between the marks

Although the marks share the same first three letters and can, if they are not articulated, sound alike, their minimal similarity ends there. The marks are distinct words, with different meanings. Moreover, as presented to consumers, the SWAP mark is even less similar to the SWATCH mark. The marks appear different fonts—SWATCH in a modern sans serif font and SWAP in a script, and SWATCH typically appears with the Swiss flag, while SWAP appears with nothing resembling a Swiss flag and often includes "by Beehive." Without any evidence of similarity sufficient to give rise to an association, this factor weighs markedly against dilution.

### B. Beehive did not intend to associate with the SWATCH mark

Nor is there any evidence that Beehive intended to associate with the SWATCH mark. Plaintiff's sole evidence in this regard, repeating its arguments advanced in reference to likelihood of confusion, is that its principals had heard of Swatch before adopting their SWAP mark. Aside from this conclusory allegation, rejected by the Court and TTAB in the likelihood of

confusion context, Swatch provides no further support. The Court thus finds this factor weighs against dilution.

### C. There is no actual association between the SWAP and SWATCH marks

Association "in the realm of antidilution law means that the ordinary person on encountering the junior user's mark will think of the senior user's mark." *Id.* § 24:116. Put differently, "the accused mark calls to mind or conjures up the senior user's famous mark." *Id.* Courts that have found association typically look to survey results or testimony. *See, e.g., Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2"05-cv-1468, 2007 WL 2782030, at *4 (E.D. Cal. Sept. 18, 2007) (survey asking respondents what came to mind when defendant's mark is first said and 87% of respondents replied that they thought of plaintiff or its products, sufficiently likely to cause association); *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 724, 747-48 (W.D. Ky. 2008), *aff'd* 605 F.3d 382, 389 (6th Cir. 2010) (testimony from individual that seeing the accused store made him think of the famous plaintiff's chain of stores sufficient to show association). Swatch presents neither. Indeed, Swatch presents no evidence whatsoever of association, actual or theoretical. "If the accused mark does not conjure up or call to mind the famous mark, then there is neither dilution nor the likelihood of it." McCarthy § 24:116.

In sum, Plaintiff falls far short of meeting its burden of showing that SWAP's mark impacts its ability to be "uniquely" identified as the single source of the products using its famous mark. *Louis Vuitton*, 507 F.3d at 265. The Court thus decides Count IV in favor of Beehive.

### III.   SWAP is not a merely descriptive mark

Swatch also maintains the TTAB should be reversed for finding the SWAP mark is not merely descriptive. A "merely descriptive" mark describes the qualities or characteristics of a

good or service, and this type of mark may be registered only if the registrant shows that it has acquired secondary meaning, i.e., it "has become distinctive of the applicant's goods in commerce." 15 U.S.C. §§ 1052(e), (f); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-94 (1985). Descriptiveness can include attributes such as the goods' purpose, function or use, size, provider, class of users, desirable characteristic, nature, or end effect. McCarthy § 11:16.

Plaintiff argues SWAP is a significant function of Defendant's goods, and the TTAB disregarded Defendants' admission that "Swap" is a function, as well as several advertisements submitted as part of the TTAB record. Finally, Plaintiff maintains the dictionary definitions and other usage support the conclusion that "Swap" is being used as an ordinary word. Defendant rightly counters that the TTAB considered in detail each of Plaintiff's arguments. Indeed, ten of the twenty-six pages in the TTAB opinion address mere descriptiveness. Far from ignoring the Defendants' testimony, the TTAB opinion spends four pages quoting the testimony of Defendant's principals. The TTAB credited the Defendants' testimonial depositions, in which they assert SWAP suggests a feature. The Board went on to reject Swatch's use of the dictionary definition, noting "[t]here is nothing in the dictionary definition of SWAP to indicate that the term merely describes watch bands, watch faces or slide pendants." TTAB Op. at 14. The TTAB thus concluded that although SWAP *suggests* interchangeability, it does not merely describe interchangeability, and suggestive marks are registrable without a showing of secondary meaning. The Court agrees and finds the TTAB's conclusion supported by substantial evidence.

The conclusion that SWAP is suggestive is unaltered by new evidence presented by Swatch. Plaintiff's evidence, which the Court reviews de novo, includes: (1) a Beehive advertisement that refers to the SWAP watch line as "Interchangeable Watch Bands & Faces;"

(2) a display designed by Stein Mart, which also refers to SWAP products as "Interchangeable

Watches;" (3) letters by Beehive's counsel objecting to the third party use of the term SWAP; (4)

internet printouts of alleged third party use of SWAP; and (5) postcards used by Beehive at trade

shows using the term "Swap It!" Swatch's additional evidence reinforces the TTAB's conclusion

that SWAP is suggestive, not descriptive.

"Suggestive marks connote, without describing, some quality, ingredient, or

characteristic of the good . . . ." *Venetian Casino Resort, LLC*, 380 F. Supp. 2d at 742 (citing

*Sara Lee*, 81 F.3d at 464) ("Coppertone®, Orange Crush®), [sic] and Playboy® are good

examples of suggestive marks because they conjure images of the associated products."); *see*

*also OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) (citing "L'EGGS

pantyhose" in *Sara Lee* and "GLASS DOCTOR window repair" in *Synergistic* as additional

examples of suggestive marks). Though these marks "are meant to project a favorable or

idealistic image with which a prospective user might identify, a person without actual knowledge

would have difficulty in ascertaining the nature of the products that the marks represent." *Sara*

*Lee*, 81 F.3d at 464. Put differently, "the exercise of some imagination is required to associate a

suggestive mark with the product." *George & Co.*, 575 F.3d at 394.

By contrast, "'descriptive' marks merely describe a function, use, characteristic, size or

intended purpose of the product, such as: 5 Minute glue, King Size men's clothing and the

Yellow Pages directory." *Venetian Casino Resort, LLC*, 380 F. Supp. 2d at 742. Descriptive

marks define the particular characteristic "in a way that does not require the exercise of the

imagination." *George & Co.*, 575 F.3d at 394.

No doubt distinguishing between suggestive and descriptive marks "can be difficult." *Id.*

"[I]f the mark imparts information directly, it is descriptive," but "[i]f it stands for an idea which

31

requires some operation of the imagination to connect it with the goods, it is suggestive." *Pizzeria Uno*, 747 F.2d at 1528 (quotations omitted). Like the L'EGGS mark in *Sara Lee* or GLASS DOCTOR in *Synergistic*, SWAP requires imagination to connect it with the good it suggests—watch faces and bands.[17]

In this regard, Swatch finds no support from the additional evidence it submitted. Indeed, the postcards used by Beehive in tradeshows to explain their product provide evidence of suggestiveness. Beehive does not feature a watch band and a watch face together with its SWAP mark. Explaining the function of its product requires a further leap. The postcards feature arrows pointing to the bands and faces. But even a diagram is insufficient for Beehive's wholesaler customers, primarily gift shop owners and employees, to grasp the nature of the SWAP product. Beehive not only adds arrows but adorns "SWAP" with the word "it!" Thus even retail shop professionals have to exercise some imagination to connect "SWAP" with the function of Beehive's watches.[18]

---

[17] This finding is consistent with and perhaps better illustrated by a line of TTAB and other cases from around the country finding analogous marks suggestive. *See, e.g.*, *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (WET ONES pre-moistened wet wipes, noting the term is too generalized that it "could plausibly describe a wide variety of products"); *Indep. Nail & Packing Co. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 925 (7th Cir. 1953) (STRONGHOLD nails); *Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49, 52 (D. Mass. 1990) (360° shoes, finding "the significant feature of plaintiff's shoes—pivotability—is only suggested by the mark '360°.'"); *Maidenform, Inc. v. Munsingwear, Inc.*, 195 U.S.P.Q. 297, 300-01 (S.D.N.Y. 1977) (UNDERNEATH IT ALL underwear); *Glamorene Prods. Corp. v. Boyle-Midway, Inc.*, 188 U.S.P.Q. 145, 161 (S.D.N.Y. 1975) (SPRAY 'N VAC aerosol rug cleaner); *Allied Mills, Inc. v. Kal Kan Foods, Inc.*, 203 U.S.P.Q. 390, 396 (T.T.A.B. 1979) (TAIL WAGGER dog food).

[18] In *Synergistic*, the Court found that GLASS DOCTOR was suggestive, not descriptive, of window repair. 470 F.3d at 172. In so holding, the Fourth Circuit emphasized that it is what "consumers perceive" that matters, not the resolution of the issue by the judiciary after a "prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers." *Id.* (quotations and citations omitted). Though this direction is found within the Court's resolution of the issue of likelihood of confusion, the guidance is no less applicable here, where the Court is asked to apply the same legal framework in the context of registration. The Court thus finds Beehive's postcard significant because it indicates that its consumers—professional retailers—require assistance to deduce that SWAP applies to the interchangeability of its watch faces and bands.



Accordingly, the Court finds the TTAB's decision supported by substantial evidence and de novo review of the Swap's registerability to account for new evidence does nothing to alter the conclusion that Swap is suggestive and properly registerable.

## CONCLUSION

Admittedly, the procedural posture of this case makes review a unique challenge. The TTAB decision is reviewed for substantial evidence but under Fourth Circuit precedent, while new evidence is incorporated and reviewed de novo. After this mosaic review, the Court affirms the TTAB's dismissal of Swatch Opposition to Beehive's mark (Count I) because there is no likelihood of confusion or likelihood of dilution, and the Swap mark is registerable as a suggestive mark. Further, the Court enters judgment in favor of Beehive on the remaining counts under the Lanham Act, Trademark Dilution Act, common law, and Virginia Code (Counts II-VI).

An appropriate Order shall issue.

August 16, 2012
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge